1                        UNITED STATES DISTRICT COURT
                               DISTRICT OF ARIZONA
2

3   UNITED STATES OF AMERICA,      ) Case No. CR 07-01207-TUC-RCC(CRP)
                                    )
4                  Plaintiff,       )
                                    )
5        v.                         ) Tucson, Arizona
                                    ) Wednesday, August 27, 2008
6   HOWARD WESLEY COTTERMAN,        ) 10:06 a.m.
                                    )
7                  Defendant.       )
    _____)
8

9        TRANSCRIPT OF MOTION TO SUPPRESS AND EVIDENTIARY HEARING
                  BEFORE THE HONORABLE CHARLES R. PYLE
10                   UNITED STATES MAGISTRATE JUDGE

11
    APPEARANCES:
12
    For the Plaintiff:        JUDSON T. MIHOK, ESQ.
13                            U.S. Attorney's Office
                              405 West Congress Street
14                            Suite 4800
                              Tucson, Arizona  85701-4050
15                            (520) 620-7300

16  For the Defendant:        ALFRED S. DONAU, III, ESQ.
                              Donau & Bolt
17                            3505 North Campbell Avenue
                              Tucson, Arizona  85719-2033
18                            (520) 795-8710

19  Court Recorder:           Rose Chavez

20  Transcription Service:    Verbatim Reporting & Transcription
                              P.O. Box 68262
21                            Tucson, Arizona 85737
                              (520) 219-1449
22

23

24
    Proceedings recorded by electronic sound recording;
25          transcript produced by transcription service.

2

1                                   INDEX

2                    DIRECT    CROSS   REDIRECT    RECROSS

3  WITNESSES FOR THE
      GOVERNMENT:
4
   Agent Mina Riley            7       22         47         52
5

6  WITNESSES FOR THE
      DEFENDANT:
7
   Agent John Owen            57       71         79
8  Agent Antonio Alvarado     85       96        101
   Agent Craig Brisbine      106      124        136
9

10 EXHIBITS:                                 Marked    Received

11 FOR THE GOVERNMENT:

12 1    Garman Affidavit                                   6
   2    Owen Affidavit                                    56
13

14 FOR THE DEFENDANT:

15 A    Report                                           47
   B    Report                                           47
16 K    Email                            43
   L    Policy                          117              142
17

18

19

20

21

22

23

24

25

3

1          P R O C E E D I N G S

2          THE COURT:  All right.  So, Mr. Mihok, concerning the

3    ex parte application, I understand the attachment needs to be

4    under seal, but I assume that I can get input from Mr. Donau on

5    the issue of whether -- whether documents should be disclosed and

6    when and that type of thing, right?

7          MR. MIHOK:  I would say since it concerns 6(e) material

8    -- well --

9          THE COURT:  Well here, let me --

10         MR. MIHOK:  -- what you want to --

11         THE COURT:  -- let me put it this way then.  Your --

12   the application concerns -- Mr. Donau, concerns Grand Jury

13   testimony from one of the witnesses and -- and the issue is

14   should that testimony be disclosed prior to that witness

15   testifying today.

16         The, Mr. Mihok, it's my understanding the Government

17   does not believe that either Jenks or Rule 26.2 or Rule 12 or

18   anything really requires the disclosure at this time.

19         MR. MIHOK:  That's correct.  We're --

20         THE COURT:  All right.

21         MR. MIHOK:  -- we're not calling him as a witness,

22   so --

23         THE COURT:  All right.  And so the -- the reason that

24   it doesn't apply is because the Government is not calling him as

25   a witness.

4

1          MR. MIHOK:  That's correct, Your Honor.

2          THE COURT:  Very good.  All right, Mr. -- Mr. Donau,

3    what's -- what would your position be on that?

4          MR. DONAU:  Your Honor, I don't think it -- it matters

5    who calls the individual as a witness.  Certainly, we have them

6    under subpoena and we will be requesting to treat them as adverse

7    witnesses and -- and cross-examine them rather than direct them.

8    They are clearly government agents and -- and were the Government

9    to have called them, they would have been required to disclose

10   previous sworn testimony prior to their -- prior to their

11   testimony in this instance --

12         THE COURT:  Right.

13         MR. DONAU:  -- and I can't see of any -- I can't think

14   of any reason why that sworn testimony should not be provided to

15   the extent that it relates to the issues before the Court.

16         THE COURT:  All right.  All right.  Well, the rule

17   specifically refers to -- talks about on motion of the party who

18   did not call the witness, so the explicit language of 26(a) would

19   not seem to require the disclosure.  I -- I agree with the logic

20   of what Mr. Donau is saying.  I'll -- if I have time later, you

21   know, maybe we -- we'll see how fast we proceed today.  I'll --

22   I'll see if there's any -- anything that supports what Mr. Donau

23   is saying, but the present time I'm not going to disclose the

24   documents.

25         The -- we have a number of witnesses.  I assume one

1   side or the other's going to invoke the rule?

2          MR. DONAU:  Yes, Your Honor.  I think it's -- that's

3   already been made -- everyone's here to be sworn --

4          THE COURT:  Very good.

5          MR. DONAU:  -- and then excluded.

6          THE COURT:  All right.  So the rule being invoked, I'd

7   ask that the witnesses, Agent Riley, Agent Brisbine, Owen,

8   Alvarado and Cotterman -- Mrs. Cotterman, please come forward.

9          THE CLERK:  Raise your right hand, please.

10      (Oath administered.)

11         THE COURT:  All right.  The rule's been invoked if --

12  so you'll have to remain outside the courtroom.  You're

13  instructed not to -- not to discuss the case with anyone, not

14  instruct -- not to discuss your testimony with anyone, other than

15  you can discuss it with the attorney for one of the parties, but

16  do not discuss the testimony with each other.  And if you'll

17  remain outside, we'll come and get you when your testimony's

18  needed.  Thank you very much.

19         MR. MIHOK:  Your Honor, I ask that Agent Riley, she's

20  the case agent, she be allowed to stay.

21         THE COURT:  I understand.  That's fine.  Mr. Mihok,

22  then you can proceed at this time.

23         MR. MIHOK:  Yes, Your Honor, just before I call Agent

24  Riley, the -- I just want to make sure I -- that this -- this is

25  done.  On Monday, I moved those Exhibits 1 and 2, which were the

1   two affidavits.  I don't know if they were accepted.  I've marked

2   them, moved them.  I have a witness list and an exhibit list that

3   I proffered to the Court and defense counsel, so Exhibits 1 and 2

4   if they're not already part of the record and have not already

5   been admitted, I'd move to admit those at this time.

6            THE COURT:  They haven't already been made a part of te

7   record.  Is there any objection to Exhibits 1 and 2 --

8            MR. DONAU:  Exhibit 1 is Ms. Riley's --

9            THE COURT:  Ms. Garman.

10           MR. DONAU:  Garman.

11           THE COURT:  Elizabeth Marie Garman's affidavit, and the

12  Exhibit 2 is Owen.

13           MR. DONAU:  No, I -- I have no objection to Garman.

14  Owen's going to testify, Your Honor, and I -- and Owen -- Owen's

15  affidavit, I believe, contains a lot of information that isn't

16  relevant to the inquiry here.

17           THE COURT:  All right.  I'll admit Exhibit 1.  I'll

18  reserve ruling on Exhibit 2, but I don't believe -- we're going

19  to hear from Mr. Owen, so anything you need from the affidavit

20  you really need to establish through the examination of Agent

21  Owen.  All right.  So you want to call Ms. -- yes, Mr. Mihok?

22                           (Government's Exhibit 1 admitted.)

23           MR. MIHOK:  That's -- yeah, we'll call Agent Riley at

24  this time, Your Honor.

25           THE COURT:  Right.  So Exhibit 1 is admitted, and

1   Exhibit 2 I'll reserve ruling.

2           Agent Riley, if you'd come forward and when you get to

3   the witness stand -- or actually when you get up here, just have

4   a seat where you can speak comfortably into the microphone.  When

5   you're situated, state your full name for the record and spell

6   your last name, please.

7           THE WITNESS:  Mina Riley.  Last name R-i-l-e-y.

8           THE COURT:  Mr. Mihok, you can proceed.

9           MR. MIHOK:  Thank you, Your Honor.

10                      AGENT MINA RILEY

11   called as a witness on behalf of the Government, testified as

12   follows on:

13                      DIRECT EXAMINATION

14   BY MR. MIHOK:

15      Q    Good morning, Agent Riley.

16      A    Good morning.

17      Q    Where do you work?

18      A    United States Immigration and Customs Enforcement.

19      Q    And how long have you worked there?

20      A    For six years.

21      Q    And where are you currently assigned?

22      A    Currently to the special agent in charge SAC Atlanta

23   office in Atlanta, Georgia.

24           MR. DONAU:  Judge --

25   BY MR. MIHOK:

1     Q    And what's the nature of your current --

2          MR. DONAU:  Excuse -- excuse me.  Judson, could --

3     could you move the podium one way or the other, because you're

4     totally blocking the witness.  I can't see her at all from her.

5     I don't know --

6          THE COURT:  Is the podium -- do you know if it locks or

7     something, Sherry?  Go see if you can help him --

8          MR. DONAU:  Here, I can -- I -- if the Court will

9     allow, I'll -- I'll move so that I can -- if the --

10         THE COURT:  Sure, if that's fine with you, Mr. Donau,

11    that's fine with me.

12         MR. DONAU:  That's fine.

13    BY MR. MIHOK:

14    Q    And what is the nature of your current assignment?

15    A    My current assignment is a criminal investigator with

16    Department of Homeland Security.

17    Q    Where were you previously assigned?

18    A    Previously to the resident agent in charge Sells,

19    Arizona office.

20    Q    How long were you assigned to Sells?

21    A    I was assigned to Sells for six years.

22    Q    And what was the nature of dirty -- duties during that

23    time frame?

24    A    While I was in Sells, I was responsible for

25    investigations particular pertaining to the area of Sells,

1 Arizona, Lukeville port of entry, and Sasabe port of entry.  At

2 that time I investigated narcotics and alien smuggling and

3 various incidents that went on at ports of entry.

4     Q    And in -- in relation to that, were you -- did you have

5 occasion during the course of those duties to respond to the

6 Lukeville port of entry?

7     A    Yes, I did.

8     Q    And approximately how many times in those six years?

9     A    Probably more than -- about 40 or more during that

10 time.

11     Q    And when you say called to the Lukeville port of entry,

12 what was the nature of those calls?

13     A    The nature of those calls were I was usually the duty

14 agent or assisting another agent with a port call pertaining to

15 smuggling or various investigations.

16     Q    While assigned to the Sells office, what was your area

17 of responsibility?

18     A    Sells, Arizona, which included Tohono O'odham Indian

19 Nation, Lukeville port of entry, as well as the Sasabe port of

20 entry.

21     Q    Were you working on --

22         MR. DONAU:  As well as -- I'm -- I'm sorry, as well as

23 what?

24         THE WITNESS:  Sasabe.

25         MR. DONAU:  Sasabe.

1  BY MR. MIHOK:

2      Q    Were you working on April 6, 2007?

3      A    Yes, I was.

4      Q    What were your hours for that day?

5      A    8:30 to 5 p.m.

6      Q    What -- what was the nature of your assignment?

7      A    On that -- that day I was the duty agent for RAC Sells.

8      Q    So where were you physically located?

9      A    I was currently in the office that day.

10     Q    Shortly after 10 a.m. on that date, where were you?

11     A    I was in -- in the office that day.

12     Q    What, if anything, attracted your attention at that

13 general date, time, and place?

14     A    At about 12, 12:30, I received a call from the

15 Lukeville port of entry -- actually, my supervisor, Craig

16 Brisbine, at the time received the call from the Lukeville port

17 of entry pertaining to Howard Cotterman and the fact that he had

18 information in our database stating that he had -- he was a

19 potential sexual offender -- actually a sexual offender and that

20 he was potentially involved in child sex tourism and it called

21 for us to respond to the port to go out and investigate further

22 the situation.

23     Q    And so what'd you do?

24     A    After speaking with my supervisor, I contacted the port

25 and spoke with Officer Alvarado who gave me the details of the

1   situation stating that Howard Cotterman and his wife, Maureen

2   Cotterman, entered the port that day about 10 a.m. and after

3   doing routine inspection, asking routine questions, they --

4   Howard Cotterman and Maureen Cotterman was ran through the system

5   and Howard Cotterman returned as a lookout stating that he had

6   possible relations to child sex tourism and that he was a

7   convicted sex offender under Operation Angel Watch Angel Wings.

8        Q    And what was your understanding at that point of what

9   Operation Angel Watch Angel Wings was?

10       A    At -- at that point I wasn't clear on the operation.  I

11  contacted the Pacific field intelligence unit, which was listed

12  on the record, to get more information about it and they told me

13  that -- that operation targets --

14            MR. DONAU:  Your Honor, I understand that hearsay is

15  admissible.  I just like a little more definition of -- she --

16  she testified they told me.  I'd like to know --

17            THE COURT:  All right.

18            MR. DONAU:  -- some foundation on who told her what.

19            THE COURT:  All right.  Sustained.  Go ahead.  Why

20  don't you establish that; who she's talking to, Mr. Mihok, and

21  we'll proceed.

22  BY MR. MIHOK:

23       Q    You called the Pacific field intelligence unit?

24       A    Yes, I did.  Called the --

25       Q    And where are they physically located?

1    A    They're located in Long Beach, California.

2    Q    And do you know who you spoke with?

3    A    I can't recall the name at the time, but it was one of

4    the analysts who -- whom I spoke with at the time.

5    Q    And what information did you get?

6    A    After speaking with her, she informed me that that

7    particular operation was targeted for registered sex offenders in

8    California, specifically those who travel frequently out of the

9    country, and that they were possibly involved in child sex

10   tourism.

11   Q    After having that phone conversation, what'd you do

12   next?

13   A    After that conversation, I spoke again with Officer

14   Alvarado and I asked him was there anything that they found in

15   the car that pertained to any electronic or media equipment, and

16   at that time he said they found a couple laptops and digital

17   cameras.  And after that I told him that myself and my group

18   supervisor, Agent Brisbine, would be on our way out there.

19   Q    What, if any, other information did Officer Alvarado

20   give you about the -- the laptop or the digital media, the

21   cameras?

22   A    Officer Alvarado said that he tried to access the -- he

23   actually accessed the computer.  He turned it on.  And he was

24   able to look at some of the pictures on the computer, some of the

25   files, which were personal pictures of Cotterman's vacations.

1  However, he did encounter some files that were password

2  protected.

3      Q    Was he able to -- or did he represent to you that he

4  was able to break that password protection and view those -- view

5  that file?

6      A    No, he wasn't.

7      Q    Who -- did there come a time that you left Sells to

8  respond to the Lukeville port of entry?

9      A    Yes, I did.  About a hour or so after that, about 1:30,

10  Agent Brisbine and myself left Sells to head out to the port of

11  entry and that trip usually takes about hour and a half to two

12  hours.

13      Q    And approximately what time did you arrive at the

14  Lukeville port of entry?

15      A    Between 3 and 3:30 we arrived there.

16      Q    What observations did you make upon arrival at the port

17  of entry?

18      A    Upon arriving at a port of entry, I noticed that the

19  inspectors had thoroughly went through the Cottermans' vehicle

20  and that there a lot of documents outside of the vehicle.  And

21  after we arrived, I walked in and I spoke with the inspectors to

22  get a update on the situation on what was going on.  And -- and

23  they basically provided me with what they had told me over the

24  phone.  And at that time myself and my Group Super -- Group Sup

25  Brisbine went to the back to just start setting up our

1   information to prepare to talk to the Cottermans.

2      Q    At that point did you make any contact, visually

3   observe the two individuals that were known to you as the

4   Cottermans?

5      A    Yes.  I observed Mr. Cotterman and Mrs. Cotterman

6   sitting out front in the lobby of the port of entry.

7      Q    Were they handcuffed?

8      A    No, they weren't.

9      Q    Is that a secure area?  Were they locked in there?

10     A    They weren't locked.  It's the entrance that the

11  passengers use to come back and forth throughout the port.

12     Q    Do you recognize anyone in the courtroom from that

13  waiting or lobby area?

14     A    Yes, I do.

15     Q    And do you see a person that you recognize from that

16  area in the courtroom today?

17     A    Yes, Mr. Cotterman.

18     Q    And could you point out where that individual is

19  located and describe an article of clothing he's wearing?

20     A    He's sitting on the right next to the gentleman in the

21  black suit.  He has a orange jumpsuit on with a white shirt, and

22  he has on glasses and gray hair.

23          MR. MIHOK:  May the record reflect that the witness has

24  identified the Defendant, Your Honor?

25          THE COURT:  Yes.

1   BY MR. MIHOK:

2       Q     After you set up your equipment, what'd you do next?

3       A     After I set up my equipment, myself and Agent Brisbine

4   went out to speak with Mr. and Mrs. Cotterman and introduced our

5   self, informed them of who we -- who we were, and basically what

6   -- what we were going to be doing that day, and we also told them

7   that we're here to just speak with them regarding some

8   information that receive -- that we received pertaining to Howard

9   Cotterman.

10      Q     And that conversation, that contact, is that happening

11  with both the Defendant --

12      A     Yes.

13      Q     -- and his wife?

14      A     Yes, it was.

15      Q     What, if any, conversation ensued after you made that

16  statement to them?

17      A     After that statement, myself and Agent Brisbine

18  escorted Mrs. Cotterman back to -- back to the interview room to

19  actually speak with her in a more private setting, as opposed in

20  the front of the lobby.

21      Q     And after you got done speaking with Mrs. Cotterman,

22  did you speak with the Defendant?

23      A     Yes, I did.

24      Q     After you got done speaking with the Defendant, what'd

25  you do next?

1      A      After we finishes speaking with -- with the Defendant,

2  we informed Mr. Cotterman, Mrs. Cotterman that we would be

3  detaining their two laptops and one of the cameras to be taken

4  back to Tucson for further forensic exam.

5      Q      Was there other property that was part of that, digital

6  cameras, storage media, that was returned to them at that time?

7      A      Yes.  We returned a Sony video camera and we also

8  returned another digital camera that belonged to Mrs. Cotterman.

9      Q      Prior to returning it, what happened?

10     A      Prior -- prior to returning it, myself and Agent

11 Brisbine examined the video camera to see if there were any

12 indications of any contraband or of child pornography on the

13 video camera, which we didn't find anything, and on the video

14 camera that belonged to Mrs. Cotterman were just pictures of

15 vacations and whale hunting and various excursions that they

16 partook in, in Mexico.

17     Q      Whale hunting or whale watching?

18     A      I'm sorry.  Whale watching.

19     Q      Okay.  And with regard to the remaining items, what was

20 explained -- or was there any conversation regarding those

21 remaining items?

22     A      Yes, the -- we instruct -- we informed the Cottermans

23 basically that -- that the remaining items will be taken to

24 Tucson for exam and that we'll be starting those exam immediately

25 so we would be able to return those items -- some or all of the

1   items prior to their departure from Tucson to -- back to Truckee

2   because they informed us that they were going to stay in Tucson

3   for a couple of days before heading back to California.

4       Q    Was there also a case with CDs?

5       A    Yes, there was.

6       Q    And where was that?

7       A    That case was located a couple months after the

8   incident by one of the inspectors at the port of entry in the

9   bathroom.

10      Q    And were those items -- was -- was that case with CDs

11  also forwarded for -- forwarded to you eventually?

12      A    Yes, it was.  The items were forwarded to me from the

13  inspectors at the port of entry, and at that time I immediately

14  turned them over to John Owen for forensic review.

15      Q    The camera that you referenced and the two laptops,

16  what happened with those?

17      A    Those cameras and -- the two laptops and camera was

18  taken by Agent Brisbine back to the Tucson office that night,

19  which he arrived about 11 o'clock, and he turned that over to

20  Agent Owen for forensic exam which started that evening.

21      Q    Friday night?

22      A    Yes, I'm sorry, Friday night.

23      Q    That's still -- what day is that?

24      A    That was still April 6 and about 11 p.m. when all that

25  happened.

1     Q    What -- approximately what time was it when you left

2  Lukeville port of entry?

3     A    Approximately 6 p.m.

4     Q    And did you make observations of the Cottermans at that

5  time?

6     A    Yes.  Upon us leaving, I -- that the Cottermans were --

7  were still there at the port of entry at that time.

8     Q    And what did you see them -- what were -- what were

9  they doing at that time?

10     A    They were preparing to leave as well as that time, and

11  I -- I remember Maureen just stating that she wanted to see the

12  wild flowers and that it was her birthday that day, so --

13     Q    Did Agent Owen begin a forensic examination of those

14  items?

15     A    Yes, he did.

16     Q    And was that forensic examination ongoing Saturday,

17  which would have been April 7th, 2007?

18     A    Yes, it was.

19     Q    And what were the results of that examination on that

20  day?

21     A    The results of the examination for the laptop that

22  belonged to Maureen Cotterman was negative for any contraband.

23  And on Sunday the forensics were still running for Mr.

24  Cotterman's laptop and at that time that's when 75 images of

25  child pornography were discovered on his computer.

1      Q     And the -- on that Saturday, April 7th, 2007, was any

2 of the property, the two laptops or the digital camera, any of

3 those items returned to the Cottermans?

4      A     Yes.  The laptop -- I'm sorry, the digital camera that

5 belonged to Mr. Cotterman was returned by Agent Owen and Agent

6 Brisbine on Saturday.

7      Q     And who did they return that item to?

8      A     They returned the items to Mr. and Mrs. Cotterman.

9      Q     And what were the circumstances?

10      A     The circumstances were that there were no contraband of

11 child pornography found on the digital camera, so therefore it

12 was turned back over to the Cottermans.

13      Q     And where did that take place?

14      A     That took place at the Tucson Immigration and Customs

15 Enforcement Office.

16      Q     And was there any conversation at that time?

17      A     At -- at that time they were just informed that

18 forensics was still ongoing and that as soon as the laptops were

19 finished that they'll be contacted.

20      Q     To your knowledge, was there any contact after that on

21 Saturday and during the course of the day on Sunday?

22      A     On Sunday, Agent Owen did speak to Mr. Cotterman and

23 just informed him that he would need assistance with -- with

24 opening some of the password-protected files and they were asked

25 to come in on Monday to not only assist with the password-

1   protected files, but also to pick up Mrs. Cotterman's computer.

2       Q    And what did -- what representations did the Defendant

3   make?

4       A    That he'll be available on Monday, April 9th, to come

5   and pick up the property.

6       Q    And what happened Monday morning?

7       A    Monday morning at approximately 9 a.m. Mrs. Cotterman

8   arrived without Mr. Cotterman and at that time she was asked

9   where Mr. Cotterman was and she stated that he had some business

10  -- business to take care of in Tucson and that he wouldn't be

11  able to come that morning.

12      Q    And this is Monday morning, this is April 9th --

13      A    Yes.

14      Q    -- 2007?

15      A    Yes.

16      Q    What happened next?

17      A    After that, Agent Brisbine attempted to -- well, he did

18  contact Mr. Cotterman, he spoke with him, and again informed him

19  that his assistance was needed for the password-protected files

20  to actually complete the forensics on the laptop.  And Mr.

21  Cotterman informed him that the computer had multiple users is

22  that -- and that he would have to contact some of his partners to

23  actually get the passwords for the computer.

24      Q    And how did that conversation end?

25      A    At that time Mr. Cotterman said that he'll call us

1   back, so we awaited his phone call.

2        Q    And did he call back?

3        A    No, he didn't.  After some time passed, Mrs. Cotterman

4   actually called Mr. Cotterman again in my presence, using the

5   Tucson office phone, and I did hear her speak to Mr. Cotterman

6   and say that she -- that we still needed assistance with the

7   passwords.  And after that she said that he didn't have a vehicle

8   and that she would have to go and pick him up to assist.

9        Q    And what happened next?

10       A    And after that Ms. Cotterman received her laptop back

11  and she waited in the lobby in hopes that either Mr. Cotterman

12  would -- would call back to actually give us the passwords so his

13  computer would be turned over as well.

14       Q    Did there come a time she left the Tucson ICE office?

15       A    Yes, she did.  She left the office approximately 11:30

16  a.m.

17       Q    Did Mr. Cotterman ever contact you, Agent Owen, or

18  Agent Brisbine directly --

19       A    No --

20       Q    -- after that?

21       A    No, he didn't.

22       Q    And subsequently what did you discover?

23       A    After that on April 10th, I received additional

24  information from the Pacific field intelligence unit stating that

25  Mr. Cotterman had boarded a plane to Mexico via the Tucson

1 International Airport at approximately 12:15 p.m. on April 9th.

2     Q   12:15; was that the time the flight was leaving or is

3 that the time that he was at the airport?

4     A   I'm sorry.  12:15 p.m. was the time that the flight was

5 leaving.

6     Q   And what time -- what day was that flight?

7     A   That flight was on April 9th, 2007.

8     Q   And so by the time you got this information on April

9 10th, did you know from the itinerary where Mr. Cotterman was or

10 was headed?

11     A   Yes, I did.  The --

12     MR. DONAU:  Your Honor, this is -- this is not relevant

13 now for the Court --

14     THE COURT:  Sustained.

15     MR. MIHOK:  Okay.  Thank you.

16     THE COURT:  All right.  Mr. Donau.

17                   CROSS-EXAMINATION

18 BY MR. DONAU:

19     Q   Agent Riley, where are you headquartered, ma'am?

20     A   Excuse me?

21     Q   Where do you -- where were you headquartered during

22 this period of time?  Did you live in Sells?  Did you live in

23 Tucson?  Did you live --

24     A   I was --

25     MR. MIHOK:  Objection; relevance of where she was

1    living.

2              THE COURT:  Sustained.

3    BY MR. DONAU:

4        Q    Well, where -- where was your office?

5        A    My office was located in Sells, Arizona.

6        Q    Sells?

7        A    Yes.

8        Q    And -- and so when you testified about Owen's

9    examination over a period of days, were you there with him when

10   he was doing this?

11       A    No, I wasn't.

12       Q    So what you testified to about his examination and what

13   he found is from what somebody told you; isn't that correct,

14   ma'am?

15       A    Yes, sir.

16       Q    Not from your personal observation, correct?

17       A    Yes, sir.

18       Q    And what occurred when the Cottermans presented at the

19   border until you arrived at approximately 3 p.m. is what somebody

20   has told you, not based on your personal observation; isn't that

21   correct?

22       A    Yes, sir.

23       Q    And so what you were told was that the Cottermans

24   presented for inspection at approximately 9:56, 57 on Friday; is

25   that correct?

1     A     Yes, sir.

2     Q     That would be April 6th, 2007, correct, ma'am?

3     A     Yes, sir.

4     Q     And at -- at the time you weren't there, correct?

5     A     No, I wasn't.

6     Q     And the people that first came in contact with Mr. and

7  Mrs. Cotterman, do you know who they were?

8     A     Yes, sir.

9     Q     And who were they?

10    A     Inspector Garman, Inspector Thomas Kelly, and Inspector

11 Alvarado.

12    Q     All right.  The first person that came in contact with

13 -- with the Cottermans was Inspector Elizabeth Garman.  Is that

14 your understanding?

15    A     Yes, it is.

16    Q     She was standing at the port of entry inspecting people

17 who applied for admission in the United States prior to 10

18 o'clock in the morning on April 6, correct?

19    A     Yes, sir.

20    Q     And Howard and Maureen Cotterman presented themselves

21 in a -- in -- in a single vehicle, a Ford Explorer; is that

22 right?

23    A     Yes, sir.

24    Q     And they showed passports?

25    A     Yes, sir.

1    Q    And those passports checked out as being legitimate

2 passports issued to those people, correct?

3    A    Yes, sir.

4    Q    And then the -- the passports were run by Ms. Garman --

5 is it Ms. or Mrs. Garman?  I don't know.

6    A    Mrs.

7    Q    Mrs. Garman.  And there was a "TEC" -- T-E-C-S hit.  Is

8 that your understanding?

9    A    Yes, sir.

10    Q    And can you tell the Court what a T-E-C-S hit is?

11    A    TECS is a Treasury Enforcement Communication System and

12 it's used as an investigative tool for Department of Homeland

13 Security to basically keep track of individuals entering and

14 exiting the country, as well as individuals that were involved in

15 crimes or suspected to be involved in -- in crimes.

16    Q    Now you've had an opportunity to see the bases and

17 understand the bases in the intervening months of the TEC hit,

18 correct, as it relates to Mr. Cotterman?

19    A    Yes, sir.

20    Q    And what that TEC hit relates to was a conviction

21 approximately 18 years ago for child molestation; is that

22 correct?

23    A    Yes, sir.

24    Q    And -- and that 18-year-old conviction was the sum and

25 substance of the TEC hit?

1    A    Yes, sir.

2    Q    There was nothing that occurred in the intervening 18

3 years that was listed as a reason to stop Mr. Cotterman, was

4 there?

5    A    No, sir.

6    Q    And so based upon this 18-year-old conviction, he was

7 referred with his wife to secondary inspection; is that correct,

8 as to best of your knowledge --

9         MR. MIHOK:  Objection.

10        THE COURT:  Yes?

11        MR. MIHOK:  I -- well first of all, it's misstating the

12 facts, and second of all, it's not relevant.

13        THE COURT:  All right, overruled.  Go ahead.

14 BY MR. DONAU:

15   Q    Do you -- you recall the question?

16   A    Based upon his status as a registered sex offender, he

17 was listed as a target under that operation.

18   Q    And he was referred to secondary inspection along with

19 his wife and the contents of his vehicle; is that correct?

20   A    Yes.

21   Q    And I see Kelly was one of the original officers on

22 scene, was he not?

23   A    Yes, he was.

24   Q    And you've read Ms. -- Mrs. Garman's report; is that

25 correct?

1       A     Yes.

2       Q     And so tell me what you think she meant when she wrote

3  in her report that Kelly advised me we were instructed by the

4  owner of the TECS record to search the vehicle and all the

5  contents of the vehicle for pornography or any obscene material.

6  Who -- who would be the owner of the -- this T-E-C-S record?

7       A     I don't have the individual's name at the time.  If you

8  look at the report, it states that the officer spoke with the

9  partner of the owner and they list the partner's name.  I don't

10  have her name at the time.

11       Q     Well, I'm -- I'm unfamiliar with the term owner as it

12  relates to government records.  Could you explain that to me?

13       A     Well, the owner of a record is anyone that physically

14  inputs that information in the system.  So if I was to input any

15  information about Mr. Cotterman, my name would be listed as the

16  owner of the record.

17       Q     All right.  Did you subsequently speak to the owner of

18  this record?

19       A     No, I did not.

20       Q     All right.  Did Agent Brisbine?  To the best of your

21  knowledge.

22       A     To the best of my knowledge, no.

23       Q     Now, in the intervening time between when you arrived,

24  which was I think you testified around 3 p.m., and when the

25  Cottermans presented, which was before 10, the -- the vehicle and

1    its contents were searched.

2         A    Yes, sir.

3         Q    And when you arrived, did you observe the vehicle?

4         A    Yes, I did.

5         Q    Did you observe that the doors were open?

6         A    I don't recall.

7         Q    Do you -- did you observe that items of personalty were

8    spread out on the ground around the vehicle?

9         A    Yes, I did.

10        Q    And this -- did you observe that the items of

11   personalty included kayaks and rafts and things like that?

12        A    I don't recall the kayaks and rafts, but I do recall

13   books and papers and such personal effects.

14        Q    And those were spread out around the vehicle; is that

15   correct?

16        A    Yes, sir.

17        Q    And then when you went into the office, you encountered

18   a box of personal records; did you not?

19        A    I don't --

20        Q    Written records.

21        A    -- recall.  I don't recall.

22        Q    Okay.  Do you have any information as you sit here

23   today that at some time during the Cottermans' stay with you, for

24   lack of a better term, some of their personal records were copied

25   by a copier that was located in the building?

1      A      The only items that I received copies of were like

2  handwritten notes and a receipt for their stay in one of the

3  timeshares.  But I do remember the inspectors mentioning that

4  they did encounter some property papers or something like that.

5      Q      And that they copied them?

6      A      I'm not for sure.

7      Q      All right.  But you did receive copies of some of their

8  documentation --

9      A      Yes, I did.

10     Q      -- their personal documentation.  And did any of that

11 personal documentation that the Government copied and provided to

12 you contain anything that could reasonably be determined to be

13 child pornography?

14     A      No, it did not.

15     Q      By the way, what happened to those copies that were

16 made of their records?

17     A      The copies that I have of the records I have inside the

18 case file.  My copies as far as the --

19     Q      To -- to this day?

20     A      Yes.

21     Q      And after Garman and Kelly were -- apparently together

22 with Alvarado were searching these -- the contents of the

23 vehicle, they received information to stop searching and await

24 your arrival; is that correct?

25     A      Yes, sir.

1      Q      Who -- who provided them the information to stop

2  searching?

3      A      I spoke with Officer Alvarado after he informed me that

4  they did encounter the electronic media to actually halt the

5  search and that I was on my way.

6      Q      Well, you know that Officer Alvarado actually viewed

7  the cameras, correct?

8      A      Yes, sir.

9      Q      Before you arrived.

10     A      Yes, sir.

11     Q      And he found nothing that was of illegal or illicit

12  material on the cameras, correct?

13     A      Correct.

14     Q      And you know that he accessed Maureen Cotterman's

15  computer?

16     A      Actually, he accessed Howard Cotterman's computer.

17     Q      So you don't know that he accessed her computer at all?

18     A      No, I don't.

19     Q      You know that he accessed Howard Cotterman's computer.

20     A      Yes.

21     Q      And for what he could see there was nothing illegal or

22  illicit.

23     A      Yes.

24     Q      And but you instructed him to cease accessing the

25  computer and await your arrival.

1     A    Yes.

2     Q    And there are -- are from Agent Owens (sic) times that

3 Howard Cotterman's computer were accessed after they presented at

4 the border and those times were 10:30 approximately --

5     A    Uh-huh.

6     Q    -- and a couple of times during 11 o'clock.  And so

7 those accesses had to be your personnel, correct?

8     A    My personnel?

9     Q    I mean, Alvarado or somebody, you know, or Garman, or

10 Kelly.

11    A    I assume so, yes.

12    Q    Because it was made very clear to the Cottermans that

13 they were not to touch any of their property, including the stuff

14 that was around their vehicle; isn't that true?

15    A    Yes, sir.

16    Q    And that's standard procedure.

17    A    Yes, sir.

18    Q    And so they were instructed, were they not, to remain

19 in the waiting room and not approach their vehicle?

20    A    Yes, sir, they were asked to remain in the lobby.

21    Q    Okay.  Now, when you arrived, you arrived with Agent

22 Brisbane (sic throughout), correct?

23    A    Yes, I did.

24    Q    And at that time did you know what Angel Watch was?

25    A    At that time, yes, I did.

1      Q    Okay.  And tell me what the basis was that whoever you

2  spoke to believed that there was a possibility of child sex

3  tourism.

4      A    As the record stated that he was a registered sex

5  offender and that he traveled frequently and that was the basis

6  for their operation.

7      Q    Okay, so he was a registered sex offender from an 18-

8  year-old conviction and he traveled frequently; is that correct?

9      A    Yes.

10          MR. MIHOK:  Objection.  Again, that's misstating --

11          THE COURT:  Overruled.

12          MR. MIHOK:  That's misstating what the evidence is.

13          THE COURT:  Well, first of all, I guess it's up to me

14  to determine inferences.  Secondly, he's allowed to lead.  She's

15  allowed to disagree with him.  I think.  I mean, that's the way

16  I've done it for 20 years before I got here.  So he's allowed to

17  lead.  She should pay attention, disagree.

18          If I -- well, I guess I'm making a mistake, Mr. Mihok,

19  you -- why don't you explain to me then how I should operate.

20          MR. MIHOK:  With regard to the objection?

21          THE COURT:  Right.

22          MR. MIHOK:  Yeah --

23          THE COURT:  The objection is that it misstates

24  testimony, right?  If you misstate testimony when you lead, then

25  you should expect to get an answer that tells you you're

1  misstating testimony; particular with an experienced agent, I

2  would think.  Right?

3            MR. MIHOK:  I'll -- I'll --

4            THE COURT:  Anything else you want to add to the

5  objection?

6            MR. MIHOK:  I'll -- I'll take care of it on redirect.

7  I'll --

8            THE COURT:  Very good.

9            MR. MIHOK:  Thank you.

10           THE COURT:  Go ahead, Mr. Mihok -- Mr. Donau.

11           MR. DONAU:  Thank you, Your Honor.

12 BY MR. DONAU:

13    Q    Now, Agent Riley, Mr. Mihok asked you on direct if --

14 if the Cottermans were handcuffed or under arrest, and you say

15 they were not, correct?

16    A    Yes.

17    Q    But they weren't free to go.

18    A    They were asked to just wait until the investigation

19 was finished.

20    Q    So -- so they weren't free to go.  I mean, they

21 couldn't get in their car and leave.

22    A    No, at -- not at that time.

23    Q    And you -- you -- you've been an agent how long; how

24 many years?

25    A    Six years.

34

1       Q     Pardon me?

2       A     Six years.

3       Q     Six years as of that date?

4       A     No.  It was like four and a half, closer to five at

5    that date.

6       Q     Okay.  And you had had fairly extensive training, I

7    expect, correct?

8       A     Yes, sir.

9       Q     And some of the training including -- included what the

10   difference between investigative and accusatory questioning is,

11   correct?

12      A     Yes.

13      Q     And you had no information, am I correct, that Maureen

14   Cotterman had any kind of sexual conviction or was on any kind of

15   watch; is that right?

16      A     Not at that time, no.

17      Q     And you had been informed by your -- by Alvarado,

18   Kelly, and Garman that they had found nothing to indicate that

19   there was any child pornography at the time you arrived in the

20   car, correct?

21      A     Yes.

22      Q     And at approximately four o'clock you called Mrs.

23   Cotterman in to the room.

24      A     Yes.

25      Q     And you said you had set up your information and

1  equipment.  What information and equipment did you set up in the
2  room?

3      A    As -- as far as just getting my papers together and
4  just getting situated in the area.

5      Q    What papers?

6      A    My notepad, any forms that I may need, and any
7  information that I had pertaining to the Cottermans.

8      Q    Well, tell me what information you had when you first
9  came in contact with Maureen Cotterman about her.

10     A    At that time the only information I had about Maureen
11 Cotterman was a passport and I think we had a copy of her
12 driver's license.

13     Q    Were you -- you weren't told by anybody that she was --
14 she was demanding that you guys get on with it, she was tired of
15 waiting, that it was now -- at four o'clock, it was now six hours
16 that they had been there?

17     A    Myself and Mr. Brisbine did speak with Ms. Maureen at
18 that time and she was upset pertaining to the time that it took
19 us to get there.

20     Q    Okay, and when you -- you -- when she walked into the
21 room, before you had any conversation with her, you read her
22 Miranda rights, correct?

23     A    Yes, I did.

24     Q    And tell me why -- Miranda rights are written when
25 accusatory and adversarial, correct?

1          MR. MIHOK:  Objection; calls for legal conclusion --
2    BY MR. DONAU:
3      Q    Is that your understanding?
4          THE COURT:  Overruled.
5          THE WITNESS:  In regard to the <u>Miranda</u> warnings it's my
6    practice to read them in a situation where there's any potential
7    evidence of a crime just to cover myself as well as the person
8    that I'm interviewing.
9    BY MR. DONAU:
10     Q    Okay, well what was the potential evidence of a crime
11   that you were aware of at that point?
12     A    At that point I didn't know of anything until I spoke
13   with Mrs. Cotterman and Mr. Cotterman or I reviewed the
14   equipment, the electronic equipment.
15     Q    So you read her, her <u>Miranda</u> rights and told her she at
16   that point wasn't under arrest; is that --
17     A    Yes, I -- I -- I informed her that she wasn't under
18   arrest and she wasn't being accused of any crime at the time,
19   that this was just an interview to get information pertaining to
20   Mr. Cotterman and their travels in Mexico.
21     Q    All right.  And she spoke to you for over an hour,
22   correct?
23     A    The interview pertaining to Mr. Cotterman didn't start
24   until probably about 4:30, 5.  Prior to that time, myself and
25   Agent Brisbine were explaining to Mrs. Cotterman our procedure,

1    as well as the Miranda form.  And she was also complaining about

2    again the time.

3        Q    She was -- she was -- she wanted to leave, didn't she

4    -- did she not?

5        A    She was just asking how long would it take and why they

6    had to wait so long, and I was explaining our travels.

7        Q    You were explaining -- I'm sorry.

8        A    Our travels from Sells and the time in which we were

9    notified.

10       Q    So she wanted to leave?

11       A    Yes.

12       Q    All right.  And at -- at that time it became -- or

13   withdrawn.  After you spoke with Mrs. Cotterman, it's now

14   approximately five o'clock; is that correct?

15       A    After I spoke with her, it was about 4, 4:45 or so.

16       Q    Okay.  And then you spoke to Mr. Cotterman.

17       A    Yes, I did.

18       Q    And you read him his rights.

19       A    Yes, I did.

20       Q    And you told him that he -- he needed to explain to you

21   his travel for the last three months, correct?

22       A    Yes, we asked him about his travels in Mexico.

23       Q    All right.  And both of them gave you fairly consistent

24   renditions of what they had been doing for the last three months.

25       A    Except for Mr. Cotterman.  He said that he didn't

1  remember much of their travels and I would need to talk to his

2  wife.

3      Q    He didn't give you anything inconsistent, did he?

4      A    No, he said that they did read books and went whale

5  watching.  That was it.

6      Q    And you had already verified that because you had seen

7  whale watching pictures, correct?

8      A    Yes, sir.

9      Q    And so what time did you finish with the Cottermans?

10     A    The investigation as far as the media and the entire

11  interview, myself and Agent Brisbine left the port about 6 p.m.

12     Q    And were the Cottermans still there?

13     A    Yes they were.

14     Q    And were they there because their doors having been

15  open all day killed the battery to their car?

16     A    I don't know.

17     Q    Well, did you ever find that out?

18     A    No, I did not.

19     Q    Did you ever find out that -- that -- that they -- that

20  they had to recharge the battery on their own?

21     A    No, I did not.

22     Q    When you were talking to Mr. Cotterman or Mr. Brisbine

23  in his presence, Mr. Cotterman offered, did he not, to help you

24  gain access to his computer?

25     A    Yes, he did.

1    Q    And he did that in your presence.

2    A    Yes, he did.

3    Q    But you didn't take him up on his offer, did you?

4    A    No, I did not.

5    Q    Why not?

6    A    Because I'm not trained in computer forensics and is

7  knowledge to myself and other law enforcement officers that by

8  someone offering or even myself accessing the computer it could

9  into deleting files or the computer could be booby trapped or --

10   Q    How about Brisbine?

11   A    -- something of that nature.

12   Q    Do you know what --

13        MR. MIHOK:  Excuse me, Your Honor, could -- I think she

14 was still finishing her answer.

15        THE COURT:  Were you -- did you have more to your

16 answer, ma'am?

17        THE WITNESS:  Yes, I -- I was just saying that I didn't

18 have any knowledge of computer forensics and that some of the

19 files I would not have any way to see with my naked eye, so

20 therefore I declined to review the computer.

21   Q    Well, Mr. Alvarado had already been in the computer

22 three times, right?

23   A    According to the logs, yes.

24   Q    So why didn't you have him come in and -- and take Mr.

25 Cotterman up on his offer to open the computer any way you

1  wanted?

2      A    Because Mr. Alvarado accessed the computer prior to my

3  knowledge and once I did speak with him, I told him to cease any

4  further forensic exam.  And at that time, which is when I stated

5  before that I was on my way to the port.

6      Q    Okay.  So at the time you were on your way to the port

7  you had determined that Alvarado apparently was not competent to

8  access the computer in a forensic manner, you weren't competent,

9  and Agent Brisbine wasn't competent.  Is that your testimony?

10     A    To my knowledge, yes.

11     Q    And so you had determined before you ever got there

12 that these computers were going to be seized.

13     A    That they were going to be detained.  They would

14 possibly be detained.

15     Q    And they were going to be taken from the port of entry

16 regardless of what you found and examined somewhere other than

17 the port of entry.

18     A    Yes.

19     Q    That determination had been made before you talked to

20 the Cottermans.

21     A    Yes.

22     Q    Now, you've been on the border at least 40 times,

23 right?

24     A    Yes.

25     Q    And how many times have you been present when cars are

1    searched?

2        A    I would say probably less than about five or ten,

3    because usually once I get the call is after everything has

4    already been searched.

5        Q    All right.  How many times to your knowledge has a car

6    been detained and taken away from the border to be searched in

7    Tucson or Phoenix or somewhere else?

8            MR. MIHOK:  Objection; relevance.

9            THE COURT:  Overruled.

10            THE WITNESS:  As far as a vehicle, there's equipment at

11    the port actually there to search the vehicles or x-ray the

12    vehicles or go through the vehicles.

13    BY MR. DONAU:

14        Q    So the answer is none.  You're aware of no time,

15    correct?

16        A    I -- I'm not aware of, no.

17        Q    And you -- you certainly recognized that the computers

18    contained personal and private information of the Cottermans,

19    correct?

20        A    I didn't know that at the time.

21        Q    Did you -- you -- you had seen some of the receipts and

22    some of the -- apparently some timeshare information.

23        A    Uh-huh.

24        Q    And you -- that's personal and confidential, wouldn't

25    you agree?

1      A     Yes.

2      Q     Now, you said that two months later somebody discovered

3  some discs in a bathroom.

4      A     Yes, sir.

5      Q     And who was that somebody?

6      A     I'm not for sure who discovered it, but I spoke with

7  Alvarado who informed me that one of the inspectors discovered

8  the discs --

9      Q     Where were they?

10     A     -- in the bathroom.  Excuse me?

11     Q     Where were they?

12     A     Where were the discs?

13     Q     Yeah.

14     A     In the bathroom --

15     Q     Where?

16     A     -- at the port of entry.

17     Q     But -- but where in the bathroom?

18     A     I don't know.

19     Q     So you -- how -- how is it that they were there for two

20  months before anyone discovered them?

21     A     I don't know, sir.

22           MR. DONAU:  Okay.  I'm going to have a exhibit marked

23  that I just received.  I'm sorry I didn't have it --

24           THE COURT:  That's all right.  So what's that going to

25  be, Sherry?

1            THE CLERK:  Exhibit K.

2            THE COURT:  Exhibit K?

3            THE CLERK:  Yes.

4            THE COURT:  Okay.

5                (Defendant's Exhibit K marked for identification.)

6            MR. DONAU:  May I approach the witness, Your Honor?

7            THE COURT:  Sure.

8    BY MR. DONAU:

9        Q    I'm showing you what's been marked as Exhibit K and ask

10   if you recognize that document.

11       A    Yes, I do.

12       Q    Now that document refers to discs being found in a

13   drawer.

14       A    Yes, sir.

15       Q    Are those different discs or the same discs?

16       A    No, these are the same discs.

17       Q    So that information seems to indicate that the discs

18   were found in a drawer rather than a bathroom, correct?

19       A    When I spoke to Officer Alvarado on that day, he

20   indicated it was found in a bathroom.  This email is dated July

21   25th.  Officer Alvarado advised me to speak with Officer Kelly to

22   get additional information regarding the discs and Officer Kelly

23   stated that it was found in a drawer.

24       Q    So we really don't know where they were found?

25       A    They were in the bathroom or in the drawing according

44

to the inspectors.

Q    And -- and we have no idea how they got there?

A    No.

Q    All right.

THE COURT:  Do you want to leave that with the clerk, please.  Thanks.  Or, I guess is that your only copy of it?  Do you need it back or -- we'll release -- we'll release it at the end of the hearing.  You'll get it back at the end of the hearing.

MR. DONAU:  Yeah, I'll get it back at the end of the hearing, Your Honor.

THE COURT:  All right.  Very good.

MR. DONAU:  May I have just a moment?

THE COURT:  Take your time.

(Pause/Court and clerk confer.)

BY MR. DONAU:

Q    Now, you are familiar, I take it, with the report of Agent Kelly; is that correct?

A    Yes, sir.

Q    And Agent Kelly is now located out of the country?

A    Yes, sir.

Q    All right.  And Agent Kelly was one of the original officers who conducted the inspection --

A    Yes, sir.

Q    And Agent Kelly reported to you that the record owner

45

1   was a Y-u-e-n, first name, last name L-e of ICE Pacific Field

2   Intel Office; is that correct?

3       A    Yes.

4       Q    Does that refresh your recollection of who the owner of

5   the record was?

6       A    Yes.

7       Q    And there -- you don't have any information to dispute

8   that ownership, do you?

9       A    No.

10      Q    And Agent Kelly informed you that they proceeded to go

11  through each and every item which could contain child pornography

12  and this took about an hour and a half to two hours after the

13  vehicle arrived at the port of entry, did he not?

14      A    That's correct.

15      Q    And he -- Agent Kelly advised you that Officer Alvarado

16  went through the cameras and the laptop while they went -- while

17  Kelly and Garman continued their search of the vehicle, correct?

18      A    Yes.

19      Q    And that he and Garman found no evidence of child

20  pornography?

21      A    In the vehicle, yes.

22      Q    Anywhere?

23      A    Inside -- yes.

24      Q    Pardon me?

25      A    Inside the vehicle there were no -- there was no

46

1  evidence of child pornography.

2      Q    Well, they didn't find any evidence anywhere on the

3  cameras, computers, or anywhere; isn't that correct?

4      A    Not at that time.

5      Q    Okay.  And so somewhere around the two hour mark of

6  their inspection they were informed by being put in contact with

7  you; is that correct?

8      A    Yes.

9      Q    And you told them that you were two hours away and you

10 would be there and for them to suspend all further action.

11     A    Yes.

12     Q    And at that time you knew that there were computers and

13 digital cameras.

14     A    Yes.

15     Q    And at that time Owen was available to you, was he not?

16     A    I'm not for sure on that day.  I don't recall.

17     Q    You don't recall.  But in any event, knowing what was

18 there, you determined not to take anybody who was in your mind a

19 forensic examiner of the laptops and the cameras, correct?

20     A    Not at that time, correct.

21          MR. DONAU:  Your Honor, I'm going to --

22          THE COURT:  Go ahead and --

23          MR. DONAU:  -- submit for admission Exhibits A and B,

24 which are the reports of Garman and Kelly.

25          THE COURT:  All right.  Any objection, Mr. Mihok?

1           MR. MIHOK:  No, Your Honor.

2           THE COURT:  All right.  A and B will be admitted.

3  And --

4                 (Defendant's Exhibits A and B admitted.)

5           MR. DONAU:  May I have just a moment, Your Honor?

6           THE COURT:  Sure.

7           MR. DONAU:  I have no further questions at this time,

8  Your Honor.

9           THE COURT:  All right.  Mr. Mihok, redirect.

10                REDIRECT EXAMINATION

11  BY MR. MIHOK:

12     Q   When -- on Monday, April 9th, 2007, after about 9 a.m.,

13  where were you?

14     A   I was at the Tucson ICE office.

15     Q   And were you present then when Maureen Cotterman came

16  to the ICE Tucson office?

17     A   Yes, I was.

18     Q   Were you present when there was conversation?

19     A   Yes, I was when she was speaking with Mr. Cotterman.

20     Q   Were you present when her laptop was returned to her?

21     A   Yes, I was.

22     Q   And did she identify it as her laptop?

23     A   Yes, she did.

24     Q   How did she do that?

25     A   She actually turn -- turned the laptop on and Agent

1  Owen compared the serial numbers on the laptop and she said that

2  it was hers.

3      Q    And what time did you get to the Tucson office on

4  Monday, April 9th?

5      A    I arrived about 8:30 a.m. or so.

6      Q    So prior to meeting and speaking with Ms. Cotterman,

7  did you have any conversation or review any of the results that

8  Agent Owen had found?

9      A    Yes, I did.

10     Q    And what did you observe?

11     A    I -- I did observe pictures of an minor female being

12 sexually molested and there were also other pictures that

13 appeared to be downloaded from the internet of additional minor

14 females.

15     Q    The first information that you got about the TECS hit

16 concerning Howard Cotterman, how detailed was that information?

17     A    The TECS hit basically stated that if there was any

18 media equipment, computers --

19         MR. DONAU:  I -- I'm sorry, I can't hear.

20         THE WITNESS:  The TECS hit indicated that if there were

21 any media equipment, such as computers, cameras, anything

22 electronic that it was to be reviewed for any potential evidence

23 of child pornography.

24 BY MR. MIHOK:

25     Q    And was there detailed information about Howard

1   Cotterman's criminal history, criminal background?

2       A    Yes, I also ran a criminal history check on Howard

3   Cotterman and that -- at that time it was revealed that he had a

4   prior conviction pertaining to child pornography.

5       Q    And did you confirm whether or not he was currently

6   registered as sex offender?

7       A    Yes I did, and yes he was.

8       Q    And when was that conviction?

9       A    That conviction was back in 1992, I believe.

10      Q    And this was in 1997?

11      A    The conviction?

12      Q    No, the -- I'm sorry, the conviction was in -- I'm

13  sorry, when?

14      A    I believe it was in 1992.

15      Q    So 15 years prior?

16      A    Yes.

17      Q    And he was still a registered sex offender?

18      A    Yes, he was.

19      Q    And when Mr. Donau was asking you questions about

20  either providing the Defendant direct access to the computer or

21  indirect access, his offer, I believe, to, you know, boot up the

22  computer and direct you to certain areas on the computer, you --

23  he was -- you did not take him up on that offer.

24      A    No, I did not.

25      Q    And what was the reason for that?

1          MR. DONAU:  Asked and answered, Your Honor.

2          THE COURT:  Overruled.

3          THE WITNESS:  The reason I didn't allow him to access

4    the computer is because I didn't want any of the files tampered

5    with or deleted or anything happening to any of the potential

6    evidence on the computer.

7    BY MR. MIHOK:

8     Q     And I -- on cross-examination, you also commented or

9    made a comment to the effect of there were files on there that

10   you wouldn't be able to see; something to that effect?

11    A     Yes, sir.

12    Q     What did you mean by that?

13    A     There were some files, as indicated by Officer

14   Alvarado, that were password protected and there were probably

15   other files as well that were later discovered to be actually

16   deleted that I wouldn't probably have seen at that moment.

17    Q     Deleted -- okay.  Before speaking with the Defendant --

18   withdrawn.  When did you receive the information regarding a

19   password-protected file on the Defendant's computer in relation

20   to speaking with the Defendant?

21    A     That was when I initially spoke with Officer Alvardo.

22    Q     So was -- did you have that information before you

23   left --

24    A     Yes, I did.

25    Q     -- the Sells office?

1      A    Yes, I did.

2      Q    And before you spoke with the Defendant?

3      A    Yes, I did.

4      Q    And Inspector or Officer Kelly, do you know, did she

5  examine the computers?

6      A    Not that I know of.

7      Q    Did she examine the camera?

8      A    Not that I know of.  Not to my --

9      Q    Or cameras, I'm sorry.

10     A    Not to my knowledge.

11     Q    And Inspector or Officer Garman, did he -- did she --

12 think I have those backwards, but did Officer Garman, did she

13 examine the -- the laptop computer?

14     A    Not to my knowledge.

15     Q    Or the cameras?

16     A    Not to my knowledge, no.

17     Q    So their search, what were -- what were they tasked

18 with at the port?

19     A    They were primarily tasked with the vehicle; going

20 through the vehicle, searching the vehicle, and that's how they

21 came upon the laptops and the camera.

22          MR. MIHOK:  Thank you.  Nothing further.

23          MR. DONAU:  Your Honor, I have a few questions --

24          THE COURT:  What --

25          MR. DONAU:  -- based on --

1          THE COURT:  On what -- in what area?

2          MR. DONAU:  Based -- based on the area that Mr. Mihok

3    just brought up which was beyond the scope of the --

4          THE COURT:  And what area -- so this is about the --

5          MR. DONAU:  The -- the password protection --

6          THE COURT:  Okay.

7          MR. DONAU:  -- and the timing.

8          THE COURT:  Okay.

9                    RECROSS-EXAMINATION

10   BY MR. DONAU:

11       Q    Ma'am, Mr. Cotterman offered to give you the passwords

12   to get into the computer, correct?

13         MR. MIHOK:  Objection; that's beyond the scope of

14   redirect.

15         MR. DONAU:  No, no, no.

16         THE COURT:  Overruled.  Go ahead, please.

17   BY MR. DONAU:

18       Q    Correct?

19       A    He didn't offer to give me the passwords, he offered to

20   access the computer which could have meant turning on the

21   computer.

22       Q    Well, but you didn't ask him if he -- if meant turning

23   on the computer, you turning it on and he giving you the way to

24   get into the computer, did you?

25       A    No I didn't ask him.

1    Q    All right.  Now, Mr. Mihok just asked you about your

2  presence at the Tucson office.  Just for the record, did you take

3  the computers from the port of entry to Tucson?

4    A    No, I didn't.  Agent Brisbine did.

5    Q    And how far is that?

6    A    It's about a three-hour drive to -- from Lukeville to

7  Tucson.

8    Q    So over a hundred miles.

9    A    Yes.

10    Q    And those computers, which arrived at the port of entry

11  at 10 o'clock on the 6th, then were over a hundred miles from

12  where they entered and they were there until at least the 9th at

13  which time you returned Mrs. Cotterman's; is that correct?

14    A    They were in Tucson then till the 9th, yes.

15    Q    Okay.  And -- and when was the first time that there

16  was any images to your best recollection that was discovered that

17  was of a pornography nature?

18    A    To my knowledge, that was Sunday, April 8th.

19    Q    So they had been in your custody -- when I say yours, I

20  mean the Government's custody for two days.

21    A    Yes.

22    Q    Over a hundred miles away from the border.

23    A    Yes.

24    Q    And the conviction that Mr. Mihok asked you about,

25  which occurred in 1992, that was the only conviction on record

54

1  relating to Mr. Cotterman.

2        A    Yes.

3        Q    And you were aware from your examination of his

4  passport that he had traveled in and out of the country

5  frequently since 1992.

6        A    Yes.

7             MR. DONAU:  No further questions.

8             THE COURT:  All right.  Ms. Riley, you can be -- step

9  down.  Thank you for testimony today.  As the case agent, you can

10  remain in the courtroom.

11             THE WITNESS:  Okay.

12             THE COURT:  Mr. Mihok?

13             MR. MIHOK:  Yes, Your Honor, before we -- we rest what

14  is our presentation, I'd remove -- move to admit Exhibit 2 again,

15  and that's the affidavit of Agent Owen.  I think at this point

16  obviously as the Court is aware, you know, I have an ongoing

17  objection to the -- to the remaining testimony.  I think the fact

18  that Mr. Owen's going to be -- Agent Owen's going to be allowed

19  to be called by a witness for the defense doesn't mean that that

20  Exhibit 2 is not properly admitted.  And I'd also note that among

21  the exhibits offered by the defense were two affidavits, one from

22  his client and one from Maureen Cotterman, and Maureen Cotterman

23  is going to be a witness, according to what Mr. Donau informed

24  this morning as well.

25             So I'd just like to make that -- that affidavit a part

1  of the record --

2          THE COURT:  I'm sorry, I must have -- I must have -- I

3  didn't get the last thing you were saying about the -- what'd you

4  say about Maureen Cotterman?

5          MR. MIHOK:  That Mr. -- Mr. Donau has indicated today

6  he's going to call Maureen Cotterman --

7          THE COURT:  Right.

8          MR. MIHOK:  -- and part of what -- part of his

9  presentation as far as triggering our need to respond, which the

10  Court relied on and ruled, was the affidavit of Maureen Cotterman

11  and an affidavit of Howard Cotterman.  So, you know, I don't

12  think the fact that they're going to be called as a witness

13  necessarily translates into the fact that somehow that

14  affidavit's not admissible.

15          THE COURT:  All right.  Mr. Donau.

16          MR. DONAU:  Your Honor, a couple things.  First of all,

17  the only reason the Cottermans filed an affidavit was that Mr.

18  Mihok insisted that -- that they invoke an expectation of privacy

19  in their computer, and so the -- that the -- the purpose of that

20  affidavit was far different from the affidavit that they seek to

21  introduce regarding the findings of Robert Owen and I -- is that

22  F?

23          MR. MIHOK:  It's -- I have it as Exhibit 2.

24          THE COURT:  Right.  Okay.

25          MR. DONAU:  And -- and the affidavit that they seek to

1  introduce goes far afield from the questions that are before the

2  Court and speak of things that go as far as October of '07 and

3  give details of what was found, none of which is relevant to the

4  inquiry today.

5          THE COURT:  All right.  The -- I'm going to admit

6  Exhibit 2, you know, obviously the -- subject to determinations

7  of relevance and of course probative value.  I suspect that I'm

8  going to be -- find more probative what the witness actually

9  testifies to, as opposed to what was typed up for him to sign.

10 So -- but I'll admit it.  All right.  Anything else, Mr. Mihok?

11                        (Government's Exhibit 2 admitted.)

12         MR. MIHOK:  No, Your Honor.  We rest.

13         THE COURT:  All right.  Mr. Donau.

14         MR. DONAU:  We'll -- we will call -- well, let's call

15 Agent Owen.

16         THE COURT:  All right.  Very good.

17     (Pause/Court and clerk confer.)

18         THE COURT:  I'm sorry, sir.  Why don't you step up,

19 have a seat.  Remember you're previously sworn.  When you're

20 situated where you can speak comfortably into the microphone,

21 state your full name for the record, spell your last name,

22 please.

23         THE WITNESS:  John Owen, O-w-e-n.

24         THE COURT:  Mr. Donau, you can proceed.

25

1                          AGENT JOHN OWEN

2     called as a witness on behalf of the Defendant, testified as

3     follows on:

4                          DIRECT EXAMINATION

5     BY MR. DONAU:

6          Q    Agent Owen -- is it Agent Owen?

7          A    Yes, sir.

8          Q    How are you employed, sir?

9          A    I'm a special agent with Homeland Security Immigration

10    and Customs Enforcement.

11         Q    How long have you been so employed?

12         A    I was formerly with U.S. Customs.  I started in 1992

13    and then we transitioned into ICE.

14         Q    Well, how -- I guess so since 1992 you've been with one

15    form or another of Customs?

16         A    Yes.

17         Q    All right.  And have you served as a border inspector?

18         A    No, I have not.

19         Q    Have you ever been on the border part of a primary or

20    secondary inspection?

21         A    No, I have not.  I was a -- I was a special agent

22    assigned to the San Francisco International Airport.

23         Q    All right.

24         A    Where --

25         Q    And that's a -- but that's a -- that's a port of entry,

1    is it not?

2         A    Yes, for international flights.

3         Q    Right.  So did you do primary or secondary inspections

4    on a port of entry in San Francisco?

5         A    No, no, no, I was never an inspector.

6         Q    Okay.

7         A    I mean, I -- we -- our -- our office was nearby.

8         Q    Okay.  So you never were an inspector?

9         A    Correct, never -- never was an inspector.

10        Q    And -- and so I take it you did no searches of people

11   who were entering the country concurrent with the time they were

12   entering the country?

13        A    Not as a -- not -- right, not as an inspector.  I might

14   have been given stuff -- you know, we -- we might have been

15   called like while someone was in secondary.  I might have been

16   called to help out -- I do computer forensics, so I might have

17   been -- I was called to help with, you know, electronic media and

18   laptops.

19        Q    So you'd be called to secondary in San Francisco and

20   help out at secondary?

21        A    Yes, sometimes.

22        Q    Okay.  And have you ever been called to secondary in

23   Arizona to help out?

24        A    No, I have not.

25        Q    Okay, how long have you been in Arizona?

1    A    Approximately little over four years.

2    Q    As of April of 2007, how long have you been in Arizona?

3    A    I believe approximately a year and a half I think it

4 was.

5    Q    A year --

6    A    Two years.

7    Q    -- and a half?

8    A    Yeah.

9    Q    Okay, and in that time, no one said, hey, come down to

10 secondary and help out; is that correct?

11    A    That's correct.

12    Q    All right.  When were you contacted in this case?  When

13 was your first contact in this case?

14    A    I believe it was that Friday, April 6, 2007.

15    Q    And -- and what time was it?

16    A    I don't remember the exact time.  It was -- I just

17 remember it was, you know, during the -- during the day and, you

18 know, indicated -- indicated that, you know -- or I typically

19 would do the forensic exams in my lab, so at some point during

20 the day I knew that I would be, you know, receiving a couple of

21 laptops and some media to look at.

22    Q    Had you received any training about how to

23 expeditiously handle laptops and -- and multimedia devices?

24    A    I mean, I've received lots of forensics training over

25 the -- you know, since I've been doing forensics since 1993 and

1  I've received, you know, three classes a year.  A lot of classes,

2  but --

3       Q    Well, I understand that -- that you -- you are familiar

4  with how to access a computer, but did you receive any training

5  on how to handle computers or cameras or something like that that

6  had been taken from the port of entry and -- and there was no

7  indication there was anything illegal on them at the time they

8  were taken?

9       A    I didn't receive any training specifically for that

10  scenario that you just spelled out, no.

11      Q    Okay.  Well, how many times have you been confronted

12  with that situation?  Prior -- prior to August -- or, April '07.

13      A    In -- in Arizona or altogether in my career?

14      Q    Let's talk Arizona first.

15      A    This may have been the first border search that I did

16  in Arizona.

17      Q    Okay.  And it's a -- a -- a -- a different scenario

18  when you were in San Francisco.  You were on site, correct?

19      A    Yeah, right, my -- the -- the room that I did the

20  forensic exam was in the same -- it was in one of the -- you

21  know, the big airport buildings.  I didn't have to go very far.

22      Q    Right.  And it wasn't very far from the port of entry?

23      A    Correct.

24      Q    And you were in Tucson and you -- and you understood

25  how far the port of entry was from where these items were seized,

1   correct?

2       A     Yes.

3       Q     And it was over a hundred miles.

4       A     Okay.  I knew it was --

5       Q     Do you -- do you --

6       A     -- I -- I knew it was -- took couple hours to get down

7   there.

8       Q     Okay.  Had you ever been down there?

9       A     Not -- not to that port, no.

10      Q     No.  So who provided you with the Cottermans' computers

11  and cameras?

12      A     Supervisory Special Agent Craig Brisbine.

13      Q     Okay.  And what information did he provide to you about

14  the items that he gave you?

15      A     That they were detained as part of a border search from

16  the Lukeville port of entry and that the person that the laptops

17  are detained from had had a, you know, prior conviction, you

18  know, for child pornography related or, you know, that type of

19  stuff.

20      Q     Did he tell you how long ago that conviction was?

21      A     I don't recall.  I knew that it was a number of years

22  ago, but I -- I don't recall if I got the exact information that

23  same date.

24      Q     Did he provide you any information or reason why you

25  were to examine Maureen Cotterman's computer?

62

1      A     No, just that they both came across the border.  I --

2  you know, I looked at everything that the -- every computer and,

3  you know, the media that they found.

4      Q     Okay, and you looked at a camera too, correct?

5      A     Oh, yes.

6      Q     And that was a Pentax?

7      A     Yes.

8      Q     And according to your report you looked at the Pentax

9  first?

10     A     Yes, because I -- I knew I could get that done quickly.

11     Q     And in -- in your review of the Pentax there was

12 nothing on it to suggest anything illegal or illicit.

13     A     Correct.

14     Q     And nothing in it.  No contraband in the camera.

15     A     Correct.

16     Q     And you did that on what day?

17     A     The camera?

18     Q     Yes.

19     A     That was the following the Saturday the -- April 7th.

20     Q     Okay.  And how long did that take you?

21     A     Probably about an -- I mean, you know, I'd say --

22     Q     Pardon me?

23     A     Probably about an hour; half an hour to an hour.

24     Q     Okay.  All right, and then according to your report the

25 next thing that you examined with any kind of specificity was

1   Maureen Cotterman's computer.

2        A    Correct.

3        Q    And -- and how long did that take you?

4        A    Well I mean, I had to -- I believe that I copied the

5   stuff first for, you know, the two laptops and then, right, then

6   -- then I don't remember the exact order that I looked at them,

7   but it would have taken me several hours.

8        Q    To look at Maureen's?

9        A    Correct.

10       Q    And you copied the hard drive, did you not?

11       A    Yes.

12       Q    And where is that copy of the hard drive?

13       A    It's at our -- the lab here.

14       Q    You didn't find any illegal or illicit in it, did you?

15       A    No, I did not.

16       Q    You found a lot of personal records, correct?

17       A    Yes.

18            MR. DONAU:  And -- may I have just a moment, Your

19   Honor?

20            THE COURT:  Right.

21       (Pause.)

22   BY MR. DONAU:

23       Q    Sir, are -- are you familiar with any kind of policy

24   regarding border search information?

25       A    Yeah, somewhat, sure.

1   Q    And are you familiar with the section of the policy

2   that says that --

3          MR. MIHOK:  Objection, Judge, to relevance.

4          THE COURT:  The Government's basis for the exception to

5   the warrant requirement is that this is a border search, right?

6          MR. MIHOK:  That is an exception to the --

7          THE COURT:  Is --

8          MR. MIHOK:  -- warrant requirement.

9          THE COURT:  I thought that was the exception the

10  Government was asserting in this case.

11         MR. MIHOK:  That is the exception, Your Honor.

12         THE COURT:  Okay.  So overruled.

13  BY MR. DONAU:

14  Q    It -- and I'm -- I'm -- I'm paraphrasing, but it says

15  that if there -- if -- if items are copied and reviewed and

16  there's not probable cause to believe that they are illegal, they

17  must be destroyed immediately.

18  A    And says that they must be destroyed.  I don't -- I

19  don't recall about the immediate part, but --

20  Q    But in any event, we're over a year later and they

21  haven't been as it relates to Mrs. Cotterman, correct?

22  A    Correct, but --

23  Q    All right.

24  A    -- it's part of a criminal case.

25  Q    Her personal records are part of the criminal case?

1    A    No, I'm just saying all -- all of my copies -- so far I

2  haven't destroyed any copies that I made.

3    Q    Of Mrs. Cotterman's computer.  You gave her back the

4  computer, correct?

5    A    Correct.

6    Q    And so it took several hours on Saturday to look at her

7  computer.

8    A    Correct.

9    Q    And what time did you determine to give it back to her?

10   A    I believe it was on actually the next day on Sunday

11  that I determined we could give it back to her.

12   Q    So that would have been the 8th?

13   A    Correct.

14   Q    And that's now two days after the initial seizure.

15   A    Correct.

16   Q    And you gave it back to her on the 9th.

17   A    Right.  The Monday, right.

18   Q    Now, when you were going through -- and so I take it

19  that at some time later Saturday or -- or early Sunday -- I think

20  your report indicates Sunday you started looking at Howard

21  Cotterman's computer.

22   A    I started -- I started looking at -- I looked at both

23  the computers on Saturday and -- but then also on Sunday as well.

24  I mean, because there's -- the way that the forensics works

25  sometimes there's -- there's like scripts and procedures that we

1   have to run that can take many, many hours to run, so I would

2   start both of those on that Saturday and then look at the results

3   for both on Sunday.

4        Q     And -- and so on Sunday is when you determined that

5   there was something that was illicit or illegal on Howard

6   Cotterman's computer?

7        A     Yes, that's correct.

8        Q     And so his was the last that you viewed?

9        A     Yes.

10       Q     And your information was he was the target?

11       A     That's correct.

12       Q     And did you have any personal contact with Mr.

13   Cotterman?

14       A     A small amount.

15       Q     Where?

16       A     At our office.

17       Q     When?

18       A     I believe it was that Saturday that I returned the

19   digital camera back to him.

20       Q     Okay.  Did you have any discussion about what their

21   plans were regarding waiting for you, if they were planning on

22   staying in Tucson while you conducted your exam?

23       A     I recall something about that they had planned to stay

24   in Tucson for a few days anyway, and I think that's why I tried

25   to get the camera back to them so if they wanted to take pictures

1   they could.

2       Q    Did you understand that from them or from your fellow

3   officers?

4       A    No, I believe that was -- and I can't remember if it

5   was from Mr. Cotterman or Mrs. Cotterman, but I believe it was

6   from one of the two of them.

7       Q    You don't recall Mrs. Cotterman telling you, hey, we

8   want to get on the road, get us our stuff back?

9       A    No, I do not.

10      Q    And so on Saturday was the last direct contact you had

11  with Mr. Cotterman; is that correct?

12      A    Yes, it was.

13      Q    Okay.  The -- you -- you've reviewed the affidavit

14  that's in evidence.

15           MR. DONAU:  Could I -- could I have a copy of that,

16  Judge?

17           THE COURT:  Which one is it?  The affidavit of --

18           MR. DONAU:  Judson, I think it's 2?

19           MR. MIHOK:  Yes.

20           THE COURT:  Okay.  Do you have Exhibit 2 there?  Why

21  don't you --

22           MR. DONAU:  Just want to make sure.  Yeah, I'm -- I'm

23  -- I'm referring to the same one.  Thanks.

24           THE COURT:  All right.  Why don't you present Exhibit 2

25  to the witness then.

1          THE WITNESS:  Oops.

2   BY MR. DONAU:

3       Q    Now on -- do you have that affidavit in front of you,

4   sir?

5       A    Yes, I do.

6       Q    And I'm referring you to the bottom of page 3.  Have

7   that?

8       A    (No audible response.)

9       Q    When you did this affidavit, who -- who -- whose words

10  are in this affidavit?

11      A    They're mine.

12      Q    And you reviewed it?

13      A    Yes.

14      Q    You signed it under oath?

15      A    Yes.

16      Q    And you believed it to be accurate and a fair

17  recitation of what you believed were -- was the case?

18      A    Yes.

19      Q    Okay.  Now at the bottom of page 3 it says, "Agent

20  Riley and Brisbane asked me to conduct a forensic examination of

21  two Dell laptop computers and a camera that has been seized from

22  the Cotterman vehicle."

23      A    Correct.

24      Q    That's what you understood to be the case, correct?

25      A    Correct.

1      Q     And the -- the -- the information that you have in

2  there containing what Officer Alvarado and others discovered you

3  got from whom?

4      A     Pardon?

5      Q     Who did you get the information from about what took

6  place at the border that -- that's in your affidavit?

7      A     From Special Agent Riley and -- and Brisbine.

8      Q     And so it was your understanding from Brisbine and

9  Riley that they inspected the video camera -- Sony video camera

10 and one of the digital cameras.

11     A     Correct.

12     Q     And apparently had sufficient expertise to examine

13 those cameras to determine whether or not they should be

14 returned?

15     A     I mean, I don't know about their expertise.  I just

16 know that they examined them and returned them.

17     Q     What was different about the Pentax?

18     A     I don't know.

19     Q     But that -- that -- that was seized and given to you

20 for inspection?

21     A     Yeah --

22     Q     The Pentax.

23     A     Yeah, it -- right, it was detained and given to me.

24     Q     Can you -- the -- the items in your affidavit, number

25 19, 20, and 21, 23, 24, and 25, those all occurred after you had

1    discovered on the 9th -- or the 8th or the 9th the images on

2    Howard Cotterman's computer, correct.

3          A    Correct.

4          Q    And did -- and so when you say something like although

5    Cotterman's face is not visible, he can be identified by his

6    distinctive hands and rings, was that something you determined?

7          A    Yes, I -- I looked through a lot of pictures that like

8    vacation pictures on the laptop and --

9          Q    Okay.

10         A    -- and made comparisons.

11         Q    And so you determined that after -- sometime after the

12    11th?

13         A    I'm -- correct, I -- I --

14         Q    Okay.

15         A    I'm not sure on the date though.

16              MR. DONAU:  All right.  May I have a moment, Your

17    Honor?

18              THE COURT:  Sure.

19         (Pause.)

20    BY MR. DONAU:

21         Q    To summarize your involvement in this case, it was all

22    at the lab in Tucson, you were never at the border, never had

23    contact with any of the officers or inspectors or people at the

24    border.

25         A    Correct.

71

1      Q    And your involvement was after the item had been

2   removed -- the items had been removed from the border and taken

3   to your office in Tucson.

4      A    That's correct.

5           MR. DONAU:  No further questions.

6           THE COURT:  All right.  Mr. Mihok.

7                          CROSS-EXAMINATION

8   BY MR. MIHOK:

9      Q    Your lab's in Tucson?

10     A    Yes.

11     Q    You have specialized equipment at your lab?

12     A    Yes, I do.

13     Q    Including specialized software?

14     A    Yes.

15     Q    Do you have a mobile lab?

16     A    I just have a laptop, but it's not nearly as extensive

17  as what I have in my lab.

18     Q    And the physical equipment that you have in your lab,

19  is it on a series of different machines, different computer

20  equipment?

21     A    Yes.

22     Q    Can you throw that in a box and jump in the car and go

23  do an exam somewhere?

24     A    No, I cannot.

25     Q    Physically not able to do that?

72

1      A     Other than my laptop, right.

2      Q     And you received information that one of the files on a

3  laptop computer that was seized at the port on April 6th, 2007

4  had a password-protected file, did you not?

5      A     Yes, I -- I knew about that, I just don't exactly know

6  when though.

7      Q     Did you know about that prior to starting your exam?

8           MR. DONAU:  Your Honor, this is beyond the scope of the

9  -- the redirect, but if I have a chance to respond --

10          THE COURT:  Overruled.  Go ahead.  Well, as far as the

11  -- you're going to get a chance to respond anyway, so don't worry

12  about it.

13          MR. DONAU:  Okay.

14          THE COURT:  Overruled.  Go ahead, sir.

15          MR. MIHOK:  Okay.

16  BY MR. MIHOK:

17      Q     The -- as far as commencing your exam, did you know

18  that there had been a password-protected file on one of those

19  laptops that somebody had found a password-protected file prior

20  to your starting your exam?

21      A     Yeah, I -- I -- actually, I don't recall.  I don't know

22  that I did.  I can't remember.

23      Q     Okay.  And on April 6th, 2007, were you working at --

24  in your lab in Tucson?

25      A     Yes, I was.

1    Q    And do you recall approximately the time you received

2  the notification about what was going on at the Lukeville port of

3  entry that day?

4    A    No, just sometime in the -- I can't remember if it was

5  before lunch or after lunch, but sometime in the afternoon is

6  what I recall.

7    Q    And you stayed at your lab in Tucson?

8    A    Yes, I did.

9    Q    You stayed there until 10 o'clock at night?

10   A    Yeah, 11 o'clock at night.

11   Q    11 o'clock at night and that's when you received the

12  two laptops and the digital camera from Agent Brisbine?

13   A    Yes.

14   Q    And what did you do with them once you received them?

15   A    I -- my lab is also a secure evidence room, so I

16  secured them in the room overnight.

17   Q    And you started your forensic examination of those

18  items Saturday morning?

19   A    Yes.

20   Q    At approximately what time?

21   A    I can't remember what time I came in.  I think it might

22  have been around 11.  I'm usually a late sleeper.

23   Q    And is that typical that you would work over the course

24  of a weekend doing a forensic examination?

25   A    No, not typically.

74

1      Q     This case was given priority?

2      A     Yes, it was.

3            MR. DONAU:  Objection; leading.

4            MR. MIHOK:  It's cross.

5            THE COURT:  Overruled.  Go ahead.

6   BY MR. MIHOK:

7      Q     This case was given priority over other cases you were

8   working on?

9      A     Yes, it was.

10     Q     And did you have other cases that you were working on

11  during this time frame?

12     A     Yes, I did.

13     Q     And typically, a case normally that comes in to -- in

14  to you for a forensic examination, how long does that take to

15  turn around?

16     A     I'd say like a month to two might be average.

17     Q     This case you turned around this forensic examination

18  in under 48 hours.

19     A     Yeah, several days.

20     Q     Is that typical?

21     A     No, be considered quickly.

22     Q     You started with the camera, you looked at the camera,

23  and didn't find any child pornography on the camera.

24     A     Correct.

25     Q     You made the determination that that camera could be

1  returned.

2      A    Correct.

3      Q    Were you given an explanation as to why that camera was

4  brought for inspection -- brought for you to examine or analyze?

5      A    Just that it came across the border.

6      Q    And you started your forensic examination on a computer

7  that you later determined was Maureen Cotterman's computer?

8      A    Correct.

9      Q    And when you say you started, is -- are we talking

10 about the imaging process?

11     A    Both the imaging and the exam, sure.

12     Q    And so you -- you imaged and started your exam on

13 Maureen Cotterman's laptop first.

14     A    Correct.

15     Q    And what was the reason for starting on her laptop

16 first?

17     A    I believed it was Howard Cotterman's laptop computer.

18 They had the -- what I learned subsequently is I believe that the

19 inspectors at the port had switched the laptop case -- the

20 laptops when they put them back, they put them in the wrong

21 cases.  I started with the laptop that had Howard Cotterman's

22 business cards in the case.

23     Q    And later you determined that that laptop was actually

24 Maureen Cotterman's laptop.

25     A    Correct.

1        Q     In the other laptop bag did you find effects that

2   indicated it was Maureen Cotterman's bag?

3        A     Yeah, the other laptop bag had like a -- I remember

4   like a -- I think it was like a feminine change purse or

5   something.

6        Q     And so when you returned the laptop computer to Maureen

7   Cotterman on Monday, you confirmed that the laptop bag was her

8   bag?

9        A     Yes, I had moved the laptop.  I had changed the bags

10  again so the laptops were in the correct bag and I verified that

11  her laptop was in the right bag.

12       Q     And that the laptop you were returning to her was her

13  laptop.

14       A     Correct.

15       Q     With regard to the copy of the hard drive that was in

16  Maureen Cotterman's laptop, you retained a copy of that -- of

17  that hard drive.

18       A     Yes.  It's all part of the same case.

19       Q     And do you know what the defense is going to be in this

20  case?

21       A     No, I'm -- not really, no.

22       Q     Do you see a scenario where information on that laptop

23  could potentially be relevant or inform on some topic that arises

24  at trial?

25       A     Sure.

1      Q    Can you give me some examples?

2      A    If there was email correspondence, be one.

3      Q    What about metadata?

4      A    I'm sure there could be metadata in the pictures and I

5 might have even used pictures from her laptop to form the

6 comparison of the photos, you know, the vacation photos that I

7 identified Howard Cotterman's hand and ring.

8      Q    And ultimately this case you know involves this

9 Defendant molesting and capturing images of molesting of a very

10 young minor female, correct?

11     A    Correct.

12     Q    And the metadata from the pictures or information on

13 Maureen Cotterman's computer could prove relevant in showing that

14 the same cameras, the same video camera was used to create those

15 images, those movies.

16     A    Correct.

17     Q    Could also be used to identify locations.

18     A    Yes.

19     Q    Times.

20     A    Yeah, that's correct.

21     Q    Sunday evening you were examining Howard Cotterman's

22 laptop, correct?

23     A    Correct.

24     Q    And you located password-protected files on that

25 laptop?

1        A      Yes, I -- yes, I did.

2        Q      And utilizing special software you were able to break

3    that password code and view the contents of those files?

4        A      Yeah, but that wasn't until Wednesday that I was able

5    to do that.

6        Q      Okay.  And -- and again, that's software and equipment

7    that you have at your laboratory in Tucson.

8        A      Yes.

9        Q      And the -- there were also files that were relevant

10   that were found in unallocated space, correct?

11       A      Correct.

12       Q      And you found those Sunday evening.

13       A      Yeah, the -- that process takes several hours to find

14   those, so that process ran overnight.

15       Q      And those were approximately 75 images of child

16   pornography?

17       A      Yes.

18       Q      And those were in unallocated space?

19       A      Yes, they were.

20       Q      And that takes special software and equipment to be

21   able to look in unallocated space and see what's there.

22       A      Yes, it does.

23       Q      And those 75 images, approximately, they -- they

24   detailed the sexual abuse of minor children?

25       A      I -- I don't remember the exact content of the images,

1  but I believe there were some of the -- there was some sexual

2  explicit conduct of abuse of minor children in those images, yes.

3          MR. MIHOK:  If I could have one moment, Your Honor,

4  please.

5          THE COURT:  Take your time.

6          MR. MIHOK:  Thank you, Your Honor.  Nothing further.

7          THE COURT:  Very good.  All right.  Mr. Donau,

8  redirect.

9          MR. DONAU:  I'll be brief, Your Honor.

10                     REDIRECT EXAMINATION

11  BY MR. DONAU:

12     Q    Agent Owen, Mr. Mihok was just discussing with you the

13  relevant of the content of Maureen Cotterman's computer, correct?

14     A    Correct.

15     Q    Did he discuss the relevance of what was in her

16  computer with you before this?

17     A    I don't think we specifically talked about --

18     Q    You haven't -- you --

19     A    -- that issue.

20     Q    -- you haven't talked about the -- what was in her

21  computer at all with Mr. Mihok, have you?

22     A    No, I don't think so.

23     Q    Okay.  And the -- tell me about your laptop.  You --

24  you could access that unallocated space with your laptop in Mr.

25  Cotterman's computer, could you not?

1    A    Yeah, I have forensic software on my laptop.  It's just

2  the process takes a long time and the -- the processor in my

3  laptop is much slower, plus I could only do one computer at a

4  time with the laptop.

5    Q    But you could take your laptop right to the border and

6  do a forensic examination, couldn't you?  Might take a little

7  longer, but you could do it.

8    A    Well, it would take a lot longer and I would have to do

9  one computer at a time.

10    Q    Right.  But you -- but there was only one computer that

11  there was any suspicion about, correct?

12    A    Well I mean, there -- I -- I -- see I don't -- I don't

13  know that they exclusive use, you know, their own computers, so

14  my opinion there could have been something on either computer is

15  why I examined them both.

16    Q    So it would have been more time consuming and certainly

17  wouldn't have been convenient -- as convenient for you to take

18  your laptop down to the -- down to the border, but you could have

19  done it.

20    A    Correct.  The other issue would have been if I'd have

21  ran into a technical difficulty and needed additional equipment,

22  I would, you know, had to have send someone to drive and get it.

23    Q    Yeah.

24    A    That would have been the other issue.

25    Q    But if you -- but that's if you ran into a technical

1   problem --

2        A    Correct.

3        Q    -- not that you did.

4        A    Right.  You have password-protected files on your

5   computer, don't you?

6        Q    Yes.

7        A    Most business people do.

8        Q    Yeah, I would -- yeah, they do.

9        A    Nothing suspicious about password-protected files, is

10  there?

11       Q    No.

12            MR. DONAU:  One moment.  I have nothing else.  Thanks,

13  Judge.

14            THE COURT:  All right.  Mr. Owen, thank you for being

15  here today.  You're -- there's no reason that the witness can't

16  be --

17            MR. DONAU:  No, he can certainly --

18            THE COURT:  -- excused from the subpoena?

19            MR. DONAU:  -- be excused, Your Honor.

20            THE COURT:  You're excused at this time then, Mr. Owen.

21  Thank you again.

22            THE WITNESS:  Thank you.

23       (Witness excused.)

24            THE COURT:  What are the chances we can do a witness in

25  15 minutes?

1          MR. DONAU:  Zero.

2          THE COURT:  All right.  I've got a conference call at

3     lunch, so I think we're going to need to recess.  So why don't we

4     recess till 1:30 and over the noon hour, I'll take a -- a look

5     and see if there's any case law that suggests that the explicit

6     language of 26(a) is not -- doesn't mean what it says.  I don't

7     think it's a big issue having looked at the Grand Jury transcript

8     anyway.  It's -- there's not that much of value in there.  And

9     we'll take this up again at 1:30.

10          MR. DONAU:  Judge, can we leave our -- our materials --

11          THE COURT:  Should be no --

12          MR. DONAU:  -- here?  Are you going to be using the

13     courtroom?

14          THE COURT:  That should be no problem.

15          MR. DONAU:  All right.  Thank you.

16      (Recess 11:44 a.m. to 1:35 p.m.)

17          THE CLERK:  Please rise.

18          THE COURT:  Be seated, please.

19          THE CLERK:  Back on the record in CR 07-1207, Howard

20     Wesley Cotterman, on for motion to suppress and evidentiary

21     hearing.  Counsel have previously stated their appearances.

22          THE COURT:  All right.  Before we get started, Mr.

23     Donau, over the lunch recess -- when we started the day, we --

24     Rule 26(a) appears to require disclosure upon a motion of the --

25     a party who's not calling the witness.  On that basis, I decided

1    not to disclose Grand Jury testimony.

2              Over the lunch hour, I reviewed Rule 12(h), which seems

3    to respond to the question that I kind of had.  It seemed that

4    the logic of your argument, Mr. Donau, made sense to me.  I

5    couldn't find anything in the rule.  However, Rule 12(h) provides

6    concerning producing statements at a suppression hearing, Rule

7    26.2 applies at a suppression hearing under Rule 12(b)(3)(C).  At

8    a suppression hearing, a law enforcement officer is considered a

9    government witness.

10             So that seems to answer the question, if were based on

11   Rule 26(a) and Rule 12(h).  I am going to order the disclosure of

12   that Grand Jury testimony.  The testimony's in connection with

13   the witness, Craig Brisbine, and so perhaps -- I don't know if it

14   makes much difference to you, Mr. Donau, perhaps we can do Agent

15   Alvarado, take a brief recess, and you can review the transcript

16   or --

17             MR. DONAU:  I had -- I intended to call Agent Alvarado

18   and promised him he'd be next so he could make the drive back

19   down.

20             THE COURT:  All right.  Why don't we do Agent Alvarado.

21   We'll take a recess.  I think my staff's already made a copy of

22   the transcript.  You'll be able to review it at that time.

23             MR. DONAU:  They have and I briefly reviewed it, Your

24   Honor --

25             THE COURT:  Okay.

1          MR. DONAU:  -- and it won't take me long to read it --

2          THE COURT:  Good deal.  Let's go that way then.

3          MR. DONAU:  -- with some care.  I'll get Agent

4  Alvarado.

5      (Court and court monitor confer.)

6          THE COURT:  Agent Alvarado, if you'll come up to the

7  witness box.

8          THE WITNESS:  Thank you, sir.

9          THE COURT:  Remember you were sworn in here this

10  morning.

11          THE WITNESS:  Yes.

12          THE COURT:  Just take a seat, make yourself

13  comfortable.  Sit where you can speak comfortably into the

14  microphone, and when you're situated, state your full name for

15  the record and --

16          THE WITNESS:  Full --

17          THE COURT:  -- and spell your last name, please.

18          THE WITNESS:  Yes, sir.  The full name for the record

19  is Antonio E. Alvarado, spelled A-n-t-o-n-i-o, middle initial E.

20  Alvarado is A-l-v as in Victor-a-r-a-d-o.

21          THE COURT:  Sherry, can you get a glass of water for

22  the witness and, Mr. Donau, you can proceed.

23          MR. DONAU:  Thank you, Your Honor.  Already lost my

24  paper in just a short --

25                      AGENT ANTONIO ALVARADO

1   called as a witness on behalf of the Defendant, testified as

2   follows on:

3                         DIRECT EXAMINATION

4   BY MR. DONAU:

5       Q    Agent Alvarado, can you state your employer, please?

6       A    (No audible response.)

7       Q    You're employed by?

8       A    Currently I'm employed within the Department of

9   Homeland Security within the division called United States

10  Citizenship Immigration Service.

11      Q    And how long have you been employed in some capacity by

12  what used to be known as Customs?

13      A    I was employed originally with Department of Justice,

14  INS, started in August of 2003.  During that tenure, we merged

15  with what is now known as Customs Border Protection.  So

16  basically from August of 2003.

17      Q    All right.  And what was your position in April of

18  2007?

19      A    My position was a GS11 CBPO, which is a Customs Border

20  Protection Officer.

21      Q    All right.  And did you man a port of entry in

22  Lukeville?

23      A    That is correct.  I was currently assigned to the port

24  of entry at Lukeville, Arizona.

25      Q    All right.  And prior to August or April of 2007, how

1  long have you been at Lukeville?

2      A    After the academy, I was at Lukeville from December

3  2003 to the time that I left in November of 2007.

4      Q    Okay.  And so I take it that you had the opportunity to

5  inspect thousands of people who were attempting to enter the

6  United States from Mexico.

7      A    That is correct, sir.  There was three categories of

8  people entering the United States would be United States

9  citizens, immigrants, and non-immigrants entering the United

10  States or exiting.

11      Q    Now, Lukeville is one of the primary ports of entry for

12  Puerto Penasco, is it not?

13      A    That is correct, sir.

14      Q    And so you have a lot of tourists coming through I -- I

15  would imagine.

16      A    Yes, that is correct.

17      Q    Okay.  Now on April 6th, 2007 you came into contact

18  with Howard and Maureen Cotterman.

19      A    That is correct.

20      Q    Okay.  And I take it that you weren't the first to come

21  in contact with them; that was Garman and Kelly?

22      A    That is correct.  Officer Garman was the primary

23  vehicle lane officer.  I was assigned to passenger secondary

24  inspections.  And what that is, is where people enter through the

25  pedestrian lanes, they come through me, make the declaration,

1  asked their -- first of all their classification as a citizen of
2  the United States or a citizen of whatever country entering, and
3  then also of course the inspections of the people's property that
4  they had in with them at the time as they entered into the United
5  States.  So we were looking for declaration of what goods or
6  illegal contraband that they may be bringing in or attempting to
7  bring into the United States.

8       Q    Okay, what was your first contact with either one of
9  the Cottermans?

10      A    The first contact that I can recollect was when the
11  secondary vehicle lane inspecting officer, Officer Kelly, had
12  advised me that he needed assistance with some of the media that
13  belonged to the Cottermans, and I'm referencing two computers and
14  three digital cameras, to inspect for some information that we
15  had received through a treasury enforcement lookout and that we
16  needed to get information that there may be something of an
17  illegal nature within that system.

18      Q    All right.  And I take it you -- you had inspected
19  computers before?

20      A    I have -- yes, in the past we would look at computers.
21  Specifically, we would have encounters where the drug trade
22  matter is quite extensive.  So sometimes we were looking at
23  computers to see what type of stuff that they may be utilizing in
24  respect of how they're keeping tabs on who they owed what money
25  to.

1    Q    Drug ledgers.

2    A    Correct.

3    Q    On laptops.

4    A    Correct.

5    Q    And so you had more than just a passing familiarity

6 with laptops.

7    A    I would have probably about just slightly above any

8 normal use that a person would have, but nothing of a technical

9 aspect of it.  No more than opening the programs, looking at it,

10 if I could access it.  If I encountered something that I could

11 not access, then I would reference it to somebody that may have

12 that ability to look at.

13    Q    Okay.  So you looked at both computers?

14    A    Yes.

15    Q    All right.  Now when you looked at Maureen's computer,

16 when you turned it on, it said Maureen's computer, something like

17 that, did it not?

18    A    I -- I do not recall the actual banner that was showing

19 at the time the -- the computer booted up.

20    Q    But you could distinguish between computers?

21    A    Actually, I cannot recall that I was looking at one

22 computer that belongs to Maureen or the next belonging to the

23 Defendant Cotterman.

24    Q    When you looked at either one of the computers, did you

25 encounter a lot of data, such as financial records?

89

1      A     Actually, the items that I specifically looked for

2  according to the lookout were like photos.  I saw a lot of what

3  appeared to be vacation or excursions with family members or

4  perhaps friends, not knowing the Cottermans personally.  But

5  that's what I mostly encountered was photos.

6      Q     That's what you mostly encountered or that's what you

7  mostly remembered?

8      A     That's what I mostly encountered and remembered.

9      Q     Okay, because in -- in one of the reports of -- of

10  Garman and Kelly they indicated that there were documents

11  relating to timeshares, personal banking.  Do you have any

12  recollection of discussing that with Garman and Kelly?

13     A     As you mention it, in passing, I think I remember

14  hearing them saying that, but to be more specific, no sir, I

15  don't recall them stating financial records specifically.  I

16  wasn't continuously with the officers as we were on a rotational

17  basis, so we were -- specifically I was either in assisting them

18  or I was back on the primary lane.  Because at the Port of

19  Lukeville, we're very shorthanded, so we still have to man and

20  deal with the other traveling public.

21     Q     So you -- did you have contact with Maureen Cotterman?

22     A     And I believe in passing that's about it.  I didn't

23  really have any verbal conversation with Ms. Cotterman.

24     Q     So you don't recall her telling -- asking you when they

25  could be on their way that they -- they'd waited a long time?

1       A      I don't recall that question ever coming up to me, sir.

2       Q      Okay, what time do you recall them coming across the

3  border?

4       A      Recalling the time frame, I believe it was around 10

5  o'clock in the morning.

6       Q      Okay.  And what time did your shift end?

7       A      My shift ended at approximately three o'clock that

8  afternoon.

9       Q      And when you left, the Cottermans were still there.

10      A      Actually, sir, I was involved with other items going

11  on.  The last recollection I have of the Cottermans waiting in

12  the lobby was approximately one o'clock that afternoon.

13      Q      Okay.  But you discussed this matter with your

14  colleagues, I take it?

15      A      I don't understand the question, sir.

16      Q      Well, did you learn through other than personal

17  observations that the Cottermans were there long after you left?

18      A      No, I -- I can't -- I -- I can't basically answer that.

19  I don't -- as I stated before, the information is, is that I was

20  still working other posts, so as in passing if I happened to walk

21  in the lobby and see the Cottermans there, then I recall that,

22  but to recall when they actually departed, I have no recollection

23  of that, sir.

24      Q      And no recollection of discussing when they departed

25  with your colleagues.

1      A      No, sir, because the next -- at three o'clock that day

2  of departure I had went north into Phoenix for personal reasons.

3      Q      Okay.  You understand that my question is not that day

4  or the next day, but until today --

5      A      Uh-huh.

6      Q      -- you've had no discussions with colleagues about the

7  length of time that they were detained at the port of entry?

8      A      Just in reference to looking at or speaking with the

9  attorney, no, I --

10     Q      I don't want to know what you spoke with the attorney

11 about.

12     A      No.  Then no, sir, I --

13     Q      You haven't talked to anybody --

14     A      No, I have not, sir.

15     Q      Okay.  And you apparently were conversant enough with

16 computers that you discovered on one of them, and you can't say

17 which one, password-protected files; is that --

18     A      I -- I came across a file that appeared to be -- soon

19 as you tried to click on it, it required a password.  Didn't have

20 the ability to break that password, so I moved on to other files

21 which specifically the photos.

22     Q      Okay.  And -- and everything that you observed in the

23 way of photos or whatever you observed were not of an illegal

24 nature.

25     A      No, most were appeared to be vacational (sic) or some

1   type of family excursion.

2       Q    And you also looked at the cameras; is that correct?

3       A    That's correct, and the same media that was encountered

4   in the laptops was approximately the same type of media that was

5   encountered on the cameras.

6       Q    So the cameras were consistent with what -- with the

7   photos you found on the laptops.

8       A    That is correct, sir.

9       Q    And you -- who made the determination to give some of

10  the cameras back?

11      A    It wasn't I, and I couldn't begin to tell you who did

12  that determination.

13      Q    Okay.  And it wasn't you -- at some point you received

14  a call from Agent Riley, correct?

15      A    That is correct, sir.

16      Q    Telling you to cease your examination of the computers.

17      A    I don't recall her telling me to cease the examination

18  of the computers.  All I recall is when she spoken to me I had

19  told her what we had a couple computers and some of the media

20  that I came across, but I don't recalls Mrs. or Agent Riley

21  stating to cease the inspection.

22      Q    So after you talked to her, did you continue to inspect

23  the computers?

24      A    No, I did not, sir, because I was once again in the

25  rotation, so I had to move on to other things.

1     Q    When Agent Riley arrived, you briefed her about what

2 you had encountered?

3     A    That is correct, sir.

4     Q    Did you tell her that you had encountered anything

5 suspicious?

6     A    The only thing that I encountered -- what I spoke to

7 her about was that one file that appeared to be protected and

8 that also I encountered photos of family excursion or vacation of

9 some sort.

10    Q    Which were not suspicious, were they?

11    A    Not to my recollection.

12    Q    Now, do you have a laptop?

13    A    Do I?  Yes, I have a laptop.

14    Q    Do you have password protected files?

15    A    Yes, I do, sir.

16    Q    Okay.  So --

17    A    And the reason I have password protected files --

18    Q    I don't care about the reason.

19    A    Okay.

20    Q    It's just you don't, I'm sure, have -- you have nothing

21 illegal on your computer.

22    A    No.

23    Q    And -- and password-protected files are -- are -- are

24 -- are normal and reasonable and personal computers that are used

25 for personal affairs.

1      A      In my case, it's more of a government-related issue

2   because of Social Security numbers.

3      Q      Okay.  And you -- so you told Riley you had encountered

4   a password-protected file and that you saw family vacation

5   photographs.  Did you tell her or Officer Brisbine anything else?

6      A      I did not meet with Officer Brisbin (sic), just Officer

7   or Agent Riley at the time.

8      Q      Okay.  Did you tell her anything else?

9      A      No, sir, that was it.

10     Q      And did you make any determinations about the -- what

11  should happen to the computers?

12     A      No, sir.  That was not in my scope of the duty at the

13  time.

14     Q      Okay.  In the overall hierarchy of the officers at the

15  border when the Cottermans came over, were you in charge of Kelly

16  or Garman or were you all equal?

17     A      We were all equal colleagues.

18     Q      Okay.  And so you didn't have any decision making

19  authority that they didn't have.

20     A      That is correct.

21     Q      Did you -- did you -- were -- were you the one that

22  contacted TEC, T-E-C-S owner about the -- the -- the hit, the TEC

23  hit on Mr. Cotterman?

24     A      I believe it was Officer Kelly that made the first

25  initial contact, and they returned our call, and I spoke with, I

1  guess, the partner of the TEC owner, because I believe I was told

2  by the partner that the actual owner of the TECS record was on

3  some type of detail at the time.

4      Q    Okay, and do you recall your conversation with this

5  person?

6      A    We spoke about what the actual hit was about, and what

7  I mean by hit is the actual lookout in the TECS record, and she

8  advised me to take a look at those items that the individual may

9  have that would be in reference to that TECS lookout.

10     Q    And the -- the -- you don't recall who you spoke to, I

11  take it?

12     A    I cannot recall the -- the agent's name.

13     Q    But what did the TEC tell you about why to take a look

14  at the computers?

15     A    To recall it stated that the individual appeared to

16  been involved in some type of child pornography.

17     Q    Did you recall -- did you ask for any further details

18  or when this occurred or what it was about?

19     A    No, I did not.

20     Q    Okay.  And before you left at three o'clock, you

21  yourself received no further information about the source or

22  substance of the TEC hit?

23     A    I did not.

24     Q    When you have searched computers before for things like

25  drug records, have you done that at the port of entry?

1     A    That is correct, and then if I required more details,

2    then we would more than likely inform ICE agents of that detail

3    and then turn that equipment over to them.

4     Q    Tell me how many times, if ever, that's happened.

5     A    I -- I would believe the Cottermans' case would be the

6    first time that we had ever encountered it.

7         MR. DONAU:  That's what -- okay.  I have no further

8    questions.

9         THE COURT:  All right.  Mr. Mihok?

10                        CROSS-EXAMINATION

11   BY MR. MIHOK:

12    Q    With regard to the password-protected file, you don't

13   know what was in that file.

14    A    I do not, sir.

15    Q    You don't know if it was contraband?

16    A    I do not.

17    Q    You don't know if it's not contraband?

18    A    That is correct.

19    Q    In and of itself a password-protected file is not

20   evidence of a crime, is it?

21    A    No, it is not.

22    Q    But it is something that requires further inspection,

23   fair statement?

24    A    That is a fair statement.

25    Q    Because you don't know what it is.

1       A       Correct.

2       Q       And people password protect things to keep them secret;

3   is that fair?

4       A       I would believe so.

5       Q       They don't want to reveal that information?

6       A       Yes.

7       Q       At primary inspection, one of your duties is also doing

8   a cursory inspection of the vehicles and their occupants that are

9   presenting for inspection?

10      A       That is correct.

11      Q       And sometimes you -- when you've been at primary,

12  you've done that cursory inspection and you've waved those

13  vehicles and occupants through?

14      A        If I felt that they met that reasonable -- that there

15  was no reasonable suspicion for me to send them over to secondary

16  for a further inspection.

17      Q       And when you wave those individuals through, you know

18  you're not -- there wasn't any -- withdrawn.  Other times you

19  send vehicles to secondary inspection?

20      A       That is correct.

21      Q       And you send them to secondary inspection for -- for

22  further search?

23      A       For various reasons, that is correct.

24      Q       And -- and sometimes at secondary inspection they don't

25  find anything.

98

1    A    That is correct.

2    Q    And they're allowed on their way.

3    A    That is correct.

4    Q    Are both those searches proper?

5         MR. DONAU:  Objection; calls for legal conclusion.

6         THE COURT:  I'll let him answer.  I am completely

7    confused, but go ahead, sir.

8    BY MR. MIHOK:

9    Q    Well, regardless of the vehicle at primary that you

10   pass on its way or the vehicle at secondary you sent for

11   secondary inspection and they don't find anything, both those

12   searches are still proper.

13   A    That is correct.  Under a border search, that is

14   proper.

15   Q    And obviously sometimes when they're sent to secondary

16   they find drugs, right?

17   A    That is correct.

18   Q    Guns.

19   A    Guns, correct.

20   Q    Money?

21   A    Money.

22   Q    With regard to vehicle inspections, have you

23   encountered vehicle inspections where the vehicles had hidden

24   compartments?

25   A    That is correct, sir.

1    Q    And in those hidden compartments there was contraband.

2    A    We encountered anywhere from variety of illegal

3    contraband like marijuana, cocaine, heroin, weapons, and on one

4    occasion somebody's sexual toys.

5    Q    And when you encounter those hidden compartments, that

6    takes extra time to perform that inspection.

7    A    That is correct, sir.

8    Q    You've got all the equipment you need to do that right

9    at the Lukeville port of entry?

10   A    We sometimes do have that equipment.  Whether it's

11   operational sometimes dependent, so we have to figure out other

12   ways to move on in order to get to what we're looking for.

13   Q    And have those inspections sometimes taken several

14   hours?

15   A    I've seen taken almost a complete 24 hours.

16   Q    With regard to digital storage media, computers,

17   computer equipment, do you have the equipment at the Lukeville

18   port of entry to -- that's necessary to accomplish a search of

19   those items?

20   A    No, we do not, just a cursory look originally, if we

21   can access it.

22   Q    And aside from the equipment and software, do you have

23   the personnel that have the training to conduct those reviews?

24   A    No, we do not.

25   Q    And I'm talking about somebody -- a certified forensic

1    analyst, someone with specified training at the Lukeville port of

2    entry to --

3        A    We have --

4        Q    -- do that type of examination.

5        A    We have no such technician at the port of entry at

6    Lukeville.

7        Q    And with regard to breaking passwords, is that

8    something that requires special skill?

9        A    I would believe so.

10       Q    Do you have that skill?

11       A    I do not.

12       Q    Did you have an ability to do that on April 6, 2007?

13       A    I did not.

14       Q    Did you make the decision to detain the two computers,

15   the two laptops, and the -- and the digital camera at the port of

16   entry?

17       A    I was instructed from the -- I believe it was the -- or

18   Pacific intel unit to look at any media that was available and

19   then whatever we found was to be turned over to the oncoming

20   agent.

21       Q    And the oncoming agent was ICE Senior Special Agent

22   Mina Riley and Group Supervisor Craig Brisbine?

23       A    That is correct.

24       Q    And so did -- you didn't make any determination that

25   these particular items were going to be detained for further

1  forensic review?

2      A    No, I did not.

3      Q    Did someone direct you to do that, to detain those

4  items for further review?

5      A    That was from the Pacific intel group off the TECS

6  record.

7      Q    And based on the information you received, you were

8  specifically looking for image files, correct?

9      A    Correct.

10     Q    Movie files, graphic files, right?

11     A    That is correct.

12     Q    And you were specifically looking for contraband in the

13 form of minors engaged in sexually explicit conduct?

14     A    That is correct.

15         MR. MIHOK:  I can just have one moment.

16         THE COURT:  Take your time.

17         MR. MIHOK:  Nothing further.

18         THE COURT:  All right.  Mr. Donau, any redirect?

19         MR. DONAU:  Yeah, thanks, Your Honor.

20                        REDIRECT EXAMINATION

21 BY MR. DONAU:

22     Q    Agent Alvardo, when you do these secondary inspections

23 you said you can recall one that went 24 hours?

24     A    It was from a drug load, sir.  Almost 24 hours, not

25 specifically --

1    Q    Was --

2    A    -- 24 --

3    Q    Well, was that because you discovered the drug load and

4  then it took time to get it out?

5    A    That because it was such a big load -- actually it

6  involved three vehicles, trailers to be exact, with a load of

7  almost 3,000 pounds of marijuana.

8    Q    Is it fair to say that it's rare that a single car

9  comes across, nothing is found in the car that is illegal, and

10 that people are detained at the port of entry in excess of eight

11 hours?

12   A    No, I would not say that that would be incorrect.

13   Q    No, I was not ask -- if it's not incorrect, ask you if

14 it's rare that that occurs.

15   A    Trying to reference some of the cases that we had, the

16 inspection either ran five or it could have ran several hours

17 depending on what we encountered at the time.

18   Q    And you found nothing.

19   A    And we found nothing.  That is correct.  I think one

20 case we were waiting for information back with regard to an

21 actual warrant for the individual's arrest so that took a couple

22 -- couple three hours.

23   Q    Well, special circumstances like a warrant and things

24 like that aside, how many instances can you recall where nothing

25 was found at all --

1      A      Uh-huh.

2      Q      -- that was illegal and yet the people at the border

3  were detained in excess of eight hours?

4      A      I never had an encounter like that.

5      Q      All right.  So this is the first.

6      A      Yes, sir.

7      Q      Okay.  Now let me ask you this:  You have x-ray

8  machines for the cars, correct, and the trucks?

9      A      That is correct, sir.

10     Q      Sometimes those x-rays machines don't work, do they?

11     A      I have never had that opportunity to have one that did

12  not work.

13     Q      So you're not aware of them breaking down?

14     A      Oh, they -- they -- I've been told they've broken down,

15  but on -- with regard to me, I have not had an incident where it

16  broke down.

17     Q      Okay, but when they -- when you've been told they broke

18  down, they -- there's other means of searching at the border,

19  correct?

20     A      That is correct, sir.

21     Q      Nobody loads up the car and takes it into Tucson to

22  check it out there?

23     A      No, sir.

24     Q      Never happened?

25     A      Not with reference to a vehicle.

1    Q    How -- how many times have you searched computers for

2  things like drug records?

3    A    I couldn't basically recall an exact number, sir.

4    Q    More than 10?

5    A    I'd say probably no more than five.

6    Q    Okay.  So you've done at least five times?

7    A    At least.

8    Q    Okay.  Maybe more?

9    A    Perhaps.

10        MR. DONAU:  Have just a moment, Your Honor.

11        THE COURT:  Uh-huh.  Yes, sir.

12    (Pause.)

13  BY MR. DONAU:

14    Q    Is it a practice of yours, Agent Alvarado, to -- when

15  you're questioning people who come across and they don't have

16  anything that is discovered to be illegal or illicit, when you're

17  questioning them about where they've been or what they're doing

18  to Mirandize them?

19    A    No, sir.  We don't Mirandize at the primary lane.

20    Q    Okay.  If you don't find anything at secondary, do you

21  Mirandize them?

22    A    No, sir.

23        MR. DONAU:  Okay.  Nothing further.

24        THE COURT:  All right.  Is there any reasons why the --

25  this witness cannot be released from the subpoena?

1          MR. DONAU:  No.

2          THE COURT:  All right.  Then, Agent Alvarado, you're

3    excused.  Thanks for your appearance here today.

4          THE WITNESS:  Thank you, sir.

5          THE COURT:  Remember the admonition not to discuss the

6    case with the other witnesses, all right?

7          THE WITNESS:  Yes, Judge.

8          THE COURT:  Very good.  Thank you.  Do you want to take

9    a break and go over that --

10          MR. DONAU:  Just a short one to read the transcript --

11          THE COURT:  All right, like --

12          MR. DONAU:  Very short.

13          THE COURT:  -- 10 minutes okay or --

14          MR. DONAU:  Yeah --

15          THE COURT:  All right.

16          MR. DONAU:  -- more than enough.

17          THE COURT:  I got a couple things I can do back there.

18    Let's take a 10-minute recess.  We'll get -- come back out and

19    get to work then.  All right.

20          THE CLERK:  All rise.

21       (Recess 2:05 p.m. to 2:17 p.m.)

22          THE CLERK:  All rise.

23          THE COURT:  Be seated, please.

24          THE CLERK:  Back on the record in CR 07-1207, Howard

25    Wesley Cotterman, on for motion to suppress evidence and

1  evidentiary hearing.  Counsel have previously stated their

2  appearances.

3          THE COURT:  All right.  Sir, if you'll just come on up,

4  make yourself comfortable.  Sit where you can --

5          THE WITNESS:  Your Honor.

6          THE COURT:  How are you?

7          THE WITNESS:  Good, sir.

8          THE COURT:  Sit where you can speak comfortably into

9  the microphone and when you're settled, state your full name for

10  the record and spell your last name.

11          THE WITNESS:  Okay, it's Craig Brisbine, B-r-i-s-b-i-n-

12  e.

13          THE COURT:  All right.  Mr. Donau, you can proceed.

14          MR. DONAU:  Thank you, Your Honor.

15                       AGENT CRAIG BRISBINE

16  called as a witness on behalf of the Defendant, testified as

17  follows on:

18                       DIRECT EXAMINATION

19  BY MR. DONAU:

20      Q    Is it Agent Brisbine?  Do you have a special title?

21      A    Supervisory special agent or group supervisor.

22      Q    Okay.  And how long have you been employed by Customs

23  or its --

24      A    Twenty-four years.

25      Q    Okay.  And how long have you been in the Tucson area?

1      A     Since 1998.

2      Q     Okay.  So on April of 2007, were you assigned to the,

3  what, Tucson Sector, is that the correct name?

4      A     It's the office of investigation for the deputy special

5  agent in charge for ICE, or Immigration Customs Enforcement

6  Office of OI.

7      Q     Okay.  And in your 24 years have you done inspections

8  on the border, primary and secondary inspections?

9      A     No.

10     Q     Okay.  In -- in your 24 years then, you haven't been on

11 the border as any kind of inspector?

12     A     No.

13     Q     Okay.  Has it always been an investigative type thing

14 away from the border?

15     A     I spent four years with the border patrol on the U.S.-

16 Mexico border in South Texas, and then I spent 19 years as an

17 1811 special agent.  Ten of those years was in New Orleans off

18 the border and then from 1998 till present has been in the Tucson

19 area.

20     A     Okay.

21     Q     So --

22          And you investigate things like drug crimes and people

23 smuggling?

24     A     Correct.  The -- the groups -- I -- I supervise

25 different program areas now, but it's a variety of different

1    program areas.

2         Q    Okay.  Tell me how you became involved in the Cotterman

3    matter on the 6th of April 2007.

4         A    On that date, I was the acting resident agent in charge

5    of the ICE Office of Investigations Office in Sells.  The

6    incumbent RAC was -- was absent so I was filling in out there for

7    three weeks.  The duty agent, Special Agent Riley, received a

8    call from Lukeville port of entry that there was an individual

9    who had been detained at the port for seeking admission who had

10   turned up as a -- on a watch list, and they were informing us the

11   case was originated, I guess, out of our office of investigations

12   out of Las Angeles and with our field investigations unit out of

13   Long Beach.

14        Q    Okay, so when -- and do you recall approximately what

15   time you first became aware of the situation down in Lukeville?

16        A    I believe the call first came in to Sells around 12:30,

17   somewhere in that -- shortly after lunchtime I remember.

18        Q    And were you in Sells?

19        A    Correct.

20        Q    Okay, and where was Agent Riley?

21        A    She was in the office also eating lunch.

22        Q    Okay.  And how far is it from Sells to Lukeville?

23        A    I believe it's between 90 -- 90 minutes to two hours

24   drive one way.

25        Q    Okay, and how far from Lukeville to Tucson?

109

1      A      Maybe three and a half -- three and a half hours.

2      Q      Do you -- what's that translate to mileage-wise?

3      A      Hundred and eighty miles maybe.

4      Q      Okay.  Now when you arrived at -- in Lukeville,

5  approximately what time was it?

6      A      I believe somewhere around 3:30, 3:45 in the afternoon.

7      Q      Okay.  And were you -- did you and -- and Agent Riley

8  discuss how you would have conversations with the Cottermans?

9      A      Basically she would just go ahead and interview them

10  like she would any other port case.  You know, Mirandize them and

11  ask them if they're willing to -- to answer any questions that we

12  might possibly have.

13      Q      Okay, is it -- is it your experience that anybody who's

14  being interviewed at a port is Mirandized?

15      A      I'm -- I -- it's a lot of times at the discretion of

16  the agent, just depends on the circumstances.  We don't deal with

17  a lot of port cases, so it's not something that I'm as familiar

18  with as some of the agents that work in the offices who do

19  routinely work port cases.

20      Q      Well, tell me what --

21      A      Oh, usually to be on the safe side they will Mirandize

22  them.

23      Q      Well, is -- is it your understanding that when -- when

24  you're talking to somebody after Mirandizing them, you're talking

25  to them -- it's no longer just investigative, but accusatory?

1    A    No -- no, not unless it's a custodial type situation.

2    Q    Well, was it your understanding that the -- that the

3    Cottermans were free to leave the port at any time?

4    A    That was my understanding.  When we arrived at the

5    port, they were sitting in the lobby area out -- out front, which

6    is right there at the public entrance where they could have

7    walked out and left the building at any time.

8    Q    But that -- that's the only way they could have left is

9    walking; is that correct?

10   A    I -- I'm not sure what the policies are for the

11   inspectors down there as far as whether or not they had the keys

12   to the vehicle or whether they -- you know, what -- what

13   transpired between themselves and the CBP officers.

14   Q    So if there's been previous testimony that they were

15   not free to leave and that they could not approach their car,

16   that would be incorrect as far as you know?

17   A    Like I said, I'm not sure what the -- I'm -- I'm not

18   sure what transpired between the CBP officers and the Cottermans

19   before I got there.

20   Q    So you really just don't know?

21   A    I really don't know.

22   Q    All right.  So when you got there, did you -- were you

23   briefed on what was developed thus far on the computers?

24   A    Special Agent Riley got -- she was -- did most the

25   interaction with the CBP officers at the port and I was calling

1  back to our office in Tucson to speak with one of our criminal

2  research specialists who -- who was running a few extra record

3  checks.  We were trying to get as much information as we could

4  prior to the interviews.  So I wasn't privy to a lot of the

5  briefing that went -- that transpired between the CBP officers

6  and Special Agent Riley.

7       Q    Did you -- you're talking about records check of the

8  Cottermans?

9       A    Correct.

10      Q    Did you come back with anything on Maureen Cotterman?

11      A    Not that I'm aware of.  I don't believe so.

12      Q    Did you come back with anything on Howard Cotterman

13 other than a 15 to 16-year-old conviction?

14      A    In the brief amount of time that we had, that was all

15 we were able to come up with at the time.

16      Q    Did -- did someone brief you on what was ultimately

17 found on Maureen Cotterman's computer?

18      A    Are you talking about after --

19      Q    From --

20      A    -- after they left the port or --

21      Q    From -- from the 6th to today.

22      A    Yeah, I was briefed by Special Agent Owen that after he

23 had conducted his search -- his computer forensics examination,

24 that there had been nothing found -- no contraband or nothing

25 illegal found on her laptop computer.

1    Q    Did he tell you there were lots of personal financial

2  records on her computer?

3    A    He mentioned there was -- there was personal --

4  personal type stuff on there, but no contraband.

5    Q    Right.

6    A    I don't know if he specified if they were financial

7  records or not.

8    Q    Like bill paying by computer?

9    A    He didn't mention it, not -- not that I recall.

10   Q    Okay.  He didn't give you the impression that Maureen

11 Cotterman's computer was simply to hold pictures and play games,

12 did he?

13   A    He never gave me that impression.  Like I said, the

14 only thing that we focus on is whether or not there's contraband

15 on the computer.  If -- if there is, then that's one issue.  If

16 there's not, then the equipment is returned.

17   Q    Okay.  And did he tell you there was a great deal of

18 information on both computers that it took hours and hours to

19 download the discs?  The hard drives, rather.

20   A    Download -- that he had to download the discs?

21   Q    The hard drives.  He copied the hard drives.

22   A    Correct.

23   Q    Did he tell you it took a long time to do that?

24   A    I know one of them I believe he said had two hard

25 drives in it, so that took him a little bit longer than the

1  others.

2      Q    Okay.  So there was a lot of information on the

3  computers?

4      A    With that much capacity, there's the probability there

5  was.

6      Q    Okay.

7      A    I'm -- I'm not certain exactly how much there was.

8      Q    All right.  I take it was Agent Riley's decision to

9  take the computers from the port of entry into Tucson?

10      A    Well that was -- I advised her that that was the proper

11  course for that particular type of call, correct.

12      Q    So it was your decision?

13      A    Well, I was the supervisor on scene, so that was --

14      Q    So --

15      A    -- ultimately my decision.

16      Q    So was your decision to -- to take the computers from

17  Lukeville to Tucson?

18      A    Correct.

19      Q    And at the time you decided to take the computers from

20  Lukeville to Tucson, you hadn't encountered anything to give you

21  a belief that there was illicit or illegal content on the

22  computers, correct?

23      A    We had no way of knowing one way or the other what was

24  on the computers.

25      Q    Well, I guess the answer then is no -- there wasn't

1  anything that you were aware of that specifically said that -- or

2  indicated to you that there was illegal or illicit material on

3  the computers?

4      A    As I stated, one way or the other, I had no way -- we

5  had no indication one way or the other.

6      Q    So you were -- you -- it's fair to say you were seizing

7  the computers, period, whether you believed there was stuff on

8  them or not?

9      A    No, we were -- according to our own agency policy, we

10  were detaining them in order to conduct a proper border search,

11  which when you're dealing with sophisticated equipment like

12  computers, the only way that you can do a thorough border search

13  of a computer is with computer forensics technology by somebody

14  who is specifically trained to do those types of searches.

15     Q    And I -- I -- I thought you testified you hadn't done

16  many border searches yourself?

17     A    As far as responding to cases and -- and actually

18  interacting with the inspectors, no.

19     Q    And so I -- I take it that you were unaware that some

20  of these inspectors have done computer searches on the border and

21  have found drug ledgers?

22     A    That -- say that's something that CBP that's another

23  entity that -- that they do that's above and beyond what our

24  particular entity does.

25     Q    So you wouldn't be aware of that fact?

1    A    There is some -- I know there's some technology

2    available now where they can do that.  I'm not sure if that

3    technology was even available at the time of our encounter with

4    Mr. Cotterman.

5    Q    So I guess one way or the other those computers were

6    going to Tucson?

7    A    Correct, as part of our -- as part of ICE policy.

8    Q    Okay.  And you took them to Tucson; is that correct?

9    A    I transported them, correct.

10    Q    And the ICE policy that you refer to, was it in writing

11    at the time?

12    A    Correct.

13    Q    Do you have a copy of it?

14    A    I have copy of the superceding one and then also a

15    current one that has just gone into effect as of July of this

16    year which mirrors the old one.  It's just --

17    Q    Well, I -- I -- I understand there's one in July of

18    2008.  What's the -- what -- what's the date of the old policy?

19    A    Well there was one from March of 2004 and then there's

20    also one from March of 2007 that relates to border searches also.

21    Q    Okay.  Can -- can I see the March of 2007 policy?

22    THE COURT:  Why don't you -- is -- there's no problem

23    with him looking at that policy, right?

24    THE WITNESS:  I mean, it's -- it's an internal policy,

25    but I don't --

1          THE COURT:  Yeah.  Why don't you go up and recover --

2    take a -- take a look at it, Mr. -- show it to Mr. Mihok, make

3    sure he understands what you're looking at.

4          MR. DONAU:  Have you seen this?

5          MR. MIHOK:  (No audible response.)

6          MR. DONAU:  May I have just a moment, Your Honor?

7          THE COURT:  Yeah, take your time.

8          MR. MIHOK:  Is that different than this thing that you

9    have?

10          MR. DONAU:  Oh yeah.

11          MR. MIHOK:  I guess it is.

12          MR. DONAU:  Oh yeah.

13      (Pause/Mr. Mihok conferring.)

14          THE COURT:  There's water there, sir, if you want --

15    need any, okay?

16          THE WITNESS:  Thank you.

17      (Pause/Mr. Mihok conferring.)

18          THE COURT:  Do you -- are do -- are you going to want

19    to use that as an exhibit or --

20          MR. DONAU:  Yeah.

21          THE COURT:  Why don't we -- Sherry, can you make a few

22    copies of that --

23          THE CLERK:  Sure.

24          THE COURT:  -- and we'll get it marked as -- what are

25    we up to, L or something?  Do you -- do you already have a copy

1   of this or do you need a copy?

2           (Defense Exhibit L marked for identification.)

3         MR. MIHOK:  Do you have a copy --

4         THE COURT:  Why don't you make an extra copy for the

5   prosecution, Sherry.

6      (Pause/counsel confer.)

7         THE COURT:  Here she comes.  Any luck?  Okay, great.

8   Go ahead and -- and can you get one to the witness, too?

9         MR. DONAU:  The --

10        THE COURT:  Sherry?

11        MR. DONAU:  The original.

12        THE COURT:  Great.  Thank you.

13        THE CLERK:  Do you want the original --

14        THE COURT:  No, it's all right.  The witness has a copy

15  of Exhibit L now, Mr. Donau.  You can proceed.

16        MR. DONAU:  Thank you.

17  BY MR. DONAU:

18     Q    Agent Brisbane, is this -- or, is it Brisbine or

19  Brisbane?

20     A    Brisbine.

21     Q    Brisbine.  Is this the policy that was in effect on

22  April 6, 2007?

23     A    Correct, it was one of them.

24     Q    Well, were there multiple policies regarding the same

25  subject matter?

1       A      Well, the -- the -- the one from March -- is it March

2  of 2000?  That was one.  This was a supplemental one that

3  basically covered the same material from the -- from the 2000

4  memo and also included cases that related specifically to

5  national interest.  So basically reiterated the initial policy

6  from 2000 and added on other provisions dealing specifically with

7  national security issues.

8       Q      Okay, and the -- when you say cases, is there -- I -- I

9  missed it.  Is there case law in -- in these policies?

10      A      No, just basically dealing with arriving aliens and

11 potential national security issues.

12      Q      And these relate to terrorism; is that correct?

13      A      Correct.

14      Q      Okay.

15      A      Any -- any possible harm to national -- to the U.S.

16 national security.

17      Q      Okay.  And -- and so when it speaks about a detention

18 or seizure of electronic media from a person of national security

19 interest, they're talking about a potential terrorist?

20      A      Well, they -- they -- they discuss that, but they also

21 add -- added in here statements like regardless of citizenship,

22 all persons seeking admission to the United States and their

23 merchandise are subject to border search.

24      Q      Right.

25      A      So it does cover all scenarios at the border and then

1   it also elaborates specifically on national security issues.

2        Q    Now this -- the -- the -- is this a two-page document?

3        A    Correct.

4        Q    The -- the -- the type on the second page seems to be

5   entirely different than the type on the first page.  Is this --

6   is this a -- a document that was -- this is how you received it?

7        A    Correct, it was a PDF document that was just printed

8   from the document itself.

9        Q    Okay.  And so NSIC is -- is what?

10       A    Where's --

11       Q    NS --

12       A    Oh, the National Security Integration Center?

13       Q    Right.  Okay.  What's that?

14       A    It's some sort of center they have up at our

15   headquarters.  It's a multi-agency like an information sharing

16   center --

17       Q    Was this --

18       A    -- that they --

19       Q    Was this center contacted in the Cotterman case?

20       A    No, because it had no relation to national security.

21       Q    Okay.  Tell me that if -- if I'm correct here.  ICE may

22   review, copy, image, detain, or seize and disseminate electronic

23   media if a violation of the law is immediately evident.  Prior to

24   the detention seizure or -- of this electronic media, were you

25   aware of any violations of the law that were immediately evident?

1      A    None that were immediately evident.  But it also says

2 that further review by ICE is needed to make such a

3 determination, which is what we needed was the further review by

4 a computer forensics agent, a qualified expert, in order to make

5 a determination one way or the other if there was any evidence of

6 violation of law.

7      Q    So at the time you referred this to Owens (sic

8 throughout), you had no evidence that the violation of law was

9 immediately evident?

10     A    Not -- not at the border, no.

11     Q    Okay.  There was no question about the admissibility of

12 the Cottermans, correct?

13     A    No, they're both U.S. citizens, so they were not

14 subject to exclusion.

15     Q    You -- you transported the computers up to Agent Owens?

16     A    Correct.

17     Q    What time did you arrive in Tucson on Friday?

18     A    It was somewhere between 10:30 and 11 p.m.

19     Q    What time did you leave the border, Lukeville?

20     A    Maybe 6:30.

21     Q    Where were the Cottermans when you left?

22     A    They were -- I believe they were loading up their

23 vehicle out in the secondary inspection area.

24     Q    Okay.  So at 6:30 they were at the secondary inspection

25 area when you left?

1    A    I believe so.

2    Q    All right.  And you weren't physically present when

3  Agent Owens was doing his forensic examination, I take it?

4    A    No.

5    Q    Okay.  When did you next have any contact with -- well

6  let me -- withdrawn.  Let me ask you this:  Who made the decision

7  to turn back the Pentax camera?

8    A    I did.

9    Q    And that was based upon?

10    A    The fact that Agent Owen had completed the forensics

11  exam and that no contraband had been found on it.  That's when we

12  gave them -- the -- the Cottermans the opportunity if they wanted

13  to come pick it up to have use while they're -- use of it that

14  Saturday while they were in Tucson or they could wait until the

15  other -- till the computers were completed and they could pick

16  all the equipment up at once.

17    Q    So they came on Saturday and picked up the camera?

18    A    Correct.

19    Q    And then on Monday you turned back Maureen's computer?

20    A    Correct.

21    Q    And that's because?

22    A    There was no contraband on it.

23    Q    Okay.  And then when did you become aware that there

24  was allege contraband on Howard's computer ?

25    A    Sometime on Sunday afternoon, the -- Agent Owen advised

1    that they had discovered I believe was 75 images that we believed

2    to be child pornography that were in the unallocated clusters or

3    the free space on the laptop of Howard Cotterman's -- on -- on

4    the hard drive his laptop.

5        Q    On the hard drive of his laptop?

6        A    It was in the unallocated space of the -- it wasn't

7    saved into like a file or directory, but it was found on the --

8    on the hard drive itself.

9            MR. DONAU:  Excuse me, Your Honor.

10   BY MR. DONAU:

11       Q    You -- do you have before you the copy of your Grand

12   Jury testimony?

13       A    No, I don't.  I was reviewing one earlier, but I don't

14   have my own.

15       Q    Yeah, I have you a copy to review.

16           THE COURT:  You could -- do you need him to see a copy

17   of that?

18           MR. DONAU:  Yes.

19           THE WITNESS:  I think I know the passage he's going to

20   be referring to.

21           MR. DONAU:  Okay, well --

22           THE COURT:  That's all right.

23           MR. DONAU:  -- tell me --

24           THE COURT:  We should be able to show you a copy.  What

25   -- do I have it or --

1          THE CLERK:  You do.

2          THE COURT:  Is this it?  Okay.

3  BY MR. DONAU:

4      Q    The images -- did you see the images that were related

5  to as the ones that were deleted?

6      A    I recall I briefly reviewed them.  Agent Owen had me

7  come in and I briefly reviewed them.

8      Q    Okay, and those were ones that were not actually stored

9  on the hard drive?

10     A    Yeah, they were -- what -- basically what happens on a

11 hard drive like that is when somebody deletes the material, it

12 actually stays on the hard drive, even though it's not visible

13 short of a computer forensics examination until it's over -- till

14 there's enough data that's been added to the hard drive after

15 that to overwrite it.  So it's actually on the hard drive, but as

16 I say, it's not saved as a file or directory or what most people

17 consider, you know, a -- a saving to the hard drive type thing.

18     Q    It -- I -- I don't understand then.  You testified

19 basically those were images that have been viewed or somehow

20 accessed from the computer but were not actually stored on the

21 hard drive.

22     A    It -- it could have been a situation where they were

23 viewed from a website onto the -- onto the computer and they

24 passed through the hard drive, but were never actually saved on

25 there, or they could have been saved and deleted.

1        Q    How --

2        A    It's a little -- it's -- it's a technical thing that's

3   I'm not real -- it's something more a computer forensics person

4   could explain better than I can.

5        Q    All right.  But those were, to the best of your

6   recollection, discovered in Tucson, Arizona sometime Sunday

7   afternoon or evening?

8        A    I believe was -- I was notified sometime Sunday

9   afternoon.

10       Q    Okay.

11       A    I'm not sure when he discovered them, but he did call

12  me Sunday afternoon.

13       Q    Okay.  And since that date, you've been involved in the

14  case extensively, correct?

15       A    In a supervisory role just to make sure that certain

16  things were getting done that needed to be done.

17            MR. DONAU:  Okay.  I have no further questions, Your

18  Honor.

19            THE COURT:  All right.  Mr. Mihok, cross-examination.

20                        CROSS-EXAMINATION

21  BY MR. MIHOK:

22       Q    There's a distinction between items that are detained

23  for further review and then items that are seized.  Is that a

24  fair statement?

25       A    Correct.

1      Q    These two laptops computers and the digital camera,

2    they were detained for further review?

3           MR. DONAU:  Object, Your Honor; calls for a legal

4    conclusion.

5           THE COURT:  Sustained.

6    BY MR. MIHOK:

7      Q    Which form did you use or was used in connection with

8    those two laptops, as well as the digital camera, the -- the

9    items that were detained at the port of entry?

10     A    The initial form that's completed prior to any actual

11   seizure is a -- it's called a 6051D.  It's a form that's used for

12   the detention of property, rather than the seizure of property.

13   So in the event of say a border search where we don't have

14   evidence at the border to -- to justify seizure, it'll be

15   detained or in the case like we do -- go out and do a knock and

16   talk at a residence and somebody grants us consent to do a

17   forensic examination a computer, that computers considered

18   detained until it has been examined and then evidence of

19   contraband has been found.  At that time it is then seized and

20   another form is completed.  And a -- and a formal seizure's done

21   in our Seacat system.

22     Q    And if no contraband is found, then it's returned?

23     A    It's returned.

24     Q    You're aware that the Lukeville port of entry personnel

25   that were involved with the Cottermans in this -- in this

1  situation at the port of entry had made calls to other ICE

2  offices prior to the call to the Sells office, correct?

3       A     That was my understanding.

4       Q     And do you know where they called?

5       A     To the best of my recollection, I believe they called

6  the Pacific or California field intelligence unit, which is the

7  one that actually posted the -- that were -- was the creator of

8  the lookout, and I'm not sure what other entities they may have

9  spoken with.

10      Q     Did they also call the Tucson office?

11      A     They first called the -- as I understand it, the call

12 was routed first from Lukeville to the Phoenix duty agent with

13 the office of investigations in Phoenix.  Then that call went to

14 the office of investigations in Tucson, and it was the Tucson

15 duty agent who called out to Sells and says I just got this call

16 from Lukeville and that's when I told him that well Lukeville is

17 -- is part of the Sells AOR, we'll take the duty call from here.

18      Q     And -- and then when that contact was made between

19 Sells and Lukeville, now it was 12 or 12:30?

20      A     Correct.

21      Q     And when you -- you left at about -- you left the

22 Lukeville port of entry at about 6 p.m.?

23      A     I believe somewhere around six.  I remember it was

24 after dark.

25      Q     And you went from Lukeville to Sells, correct?

| | | |
|---|---|---|
| 1 | A | Went to Sells to drop Agent Riley off. |
| 2 | Q | And then from Sells you went to Tucson? |
| 3 | A | Correct. |
| 4 | Q | To the ICE office in Tucson? |

5   A    Correct.  It -- it took longer than expected, but that
6   -- that's -- I went from Sells to our office, correct.

7   Q    And why did it take longer than expected?

8   A    We were traveling east on State Route 86.  There was a
9   fatal accident out near Kit Peak and they had stopped --
10  basically closed the highway so I had to go back -- double back
11  all the way to Federal Route 15, go up the north side of the
12  reservation, and come out by Arizona City the back way.  That's
13  why it took me -- that's why I was so late in getting to the --
14  the DSAC office, the ICE office in Tucson.

15  Q    When you got there, it was 10:30, 11 o'clock at
16  night --

17  A    10:30, 11.

18  Q    And Agent Owen was waiting for you?

19  A    Correct.

20  Q    He had been called ahead of time, notified that this --
21  that there was some digital storage media that was going to
22  require review?

23  A    That I -- yes, that I needed him to meet me there so
24  that he could sign for the material and lock it up in his office.

25  Q    And are you a supervisor over Agent Owen?

1     A     Correct.  I was -- I -- I was his supervisor at the

2  time and I was also the acting resident agent in charge in

3  Tucson.  I mean, in Sells

4     Q     And did you direct Agent Owen to start that forensic

5  examination as soon as possible move it --

6     A     Correct.

7     Q     -- move it to the top of the list?

8     A     Correct, it was the first thing -- first item of his

9  agenda.  Fact he even came in Saturday morning to start it.

10     Q     Is that unusual?

11     A     In some offices it is, because we do have a

12  reasonableness factor as far as where we start these things.  My

13  personal policy is that in -- if -- unless there's just

14  absolutely no way we can do it, we will initiate the imaging

15  process and start the search as quickly as possible.

16     Q     And as Agent Owen's supervisor, did you know that he

17  had other computer exams that were in his queue?

18     A     Our forensics agents always have exams lined up.

19     Q     This one was put to the very top of the list?

20     A     Correct.

21     Q     And he started working on it on Saturday?

22     A     Yeah, Saturday morning.  As -- as I best remember,

23  Saturday morning.

24     Q     And by Sunday afternoon, he found images of child

25  pornography, correct?

1     A     Correct.  And by that time he had also finished his

2  exam of the -- of the camera.

3     Q     And he also had finished his exam of the laptop -- one

4  laptop that was identified as Maureen Cotterman's laptop?

5     A     I'm not sure if that was completed on Saturday or

6  Sunday.  But it -- it was completed by Monday morning.  That's

7  why we were able to notify them that they could come pick it up.

8     Q     So in less than 48 hours he had done the exam complete

9  -- the exam of the -- of Maureen Cotterman's laptop completely,

10  had done the exam of the digital camera, and was also able to

11  find images of child pornography in unallocated space?

12     A     And also the encrypted files all within 48 hours.

13     Q     And he actually broke the encryption code within a few

14  days after that and discovered more images of child pornography?

15     A     Correct.

16     Q     And on Saturday afternoon, there was -- or on Saturday,

17  during the course of the day Saturday, there was contact with the

18  Cottermans telling them they could come to the Tucson ICE office

19  to pick up their camera?

20     A     Correct.

21     Q     No --

22     A     I spoke with -- well --

23     Q     Go ahead.

24     A     I spoke with Howard, I believe, twice.  The first time

25  was just kind of an update to let him know that -- that we're --

1  the -- the exam was in -- in process, and then the second time to

2  let him know that the camera was -- we -- the exam was complete

3  and if they so desired, they could come and pick it up.

4      Q    And was that you reaching out to the Defendant, Howard

5  Cotterman, updating him about what was going on?

6      A    I believe so, correct.

7      Q    You actually met with Howard Cotterman then on Saturday

8  and returned the camera?

9      A    Correct, he and -- and his wife, Maureen, both came to

10  the office.

11      Q    And you had met him, you'd spoken with him on Friday

12  afternoon at the Lukeville port of entry, correct?

13      A    Correct.

14      Q    Do you see him in the courtroom today?

15      A    Yes, I do.

16      Q    Point him out and describe an article of clothing that

17  he's wearing?

18      A    He's the gentleman in the orange jump -- jumpsuit with

19  the gray hair and classes.

20          MR. MIHOK:  May the record reflect the witness has

21  identified the Defendant, Your Honor.

22          THE COURT:  Yes.

23  BY MR. MIHOK:

24      Q    And in the conversations that you had with the

25  Defendant and his wife, you knew that they were going to stay in

1  Tucson through Monday?

2      A    Correct.  They were going to -- they -- I believe they

3  said they were going to stay through Monday because they had

4  reservation at a bed and breakfast and also some other activities

5  they were going to do in Tucson.

6      Q    The activities were in Tucson, they were not in

7  Lukeville, correct?

8      A    No, they were in -- they were -- they told us when they

9  were going from the port of entry, they were going directly to

10  Tucson.

11      Q    And so you returned that camera as a courtesy to them

12  because they told you that they were there on vacation doing

13  sightseeing?

14      A    Correct.  And since we no longer needed it, we -- we're

15  going to give them the option to come and collect if they so

16  desired.

17      Q    When you arrived at the port of entry no Friday, April

18  6th, 2007, it was approximately 3:30?

19      A    It was --

20      Q    Four o'clock?

21      A    Believe was right around 3:30.

22      Q    And at that point you were the highest ranking

23  supervisor over this situation and what was going on?

24      A    From the ICE side, the Immigration Customs Enforcement

25  side of the house, I was the ranking agent.

132

1     Q    And you're understanding was that Howard and Maureen

2 Cotterman were free to leave?

3     A    Correct.

4     Q    They were not handcuffed?

5     A    No.

6     Q    They were not in a holding cell or a locked confined

7 secured area?

8     A    No, they weren't.

9     Q    That was reception area is open to the public?

10    A    Correct, there's one door that leads that you can walk

11 right out and walk into the inspection area and just keep right

12 on going if you wanted to.

13    Q    And did you observe Howard, the Defendant, or his wife,

14 Maureen Cotterman, going in and out of that area?  Were there

15 times when you came through where only one of them was sitting

16 there?

17    A    I don't recall if they were -- they were separated.

18    Q    During the course of the day Saturday when you had

19 these conversations with Howard Cotterman, the Defendant, you

20 were updating him about the forensic examination of the two

21 laptop computers?

22    A    Just the -- the overall progress of where we were with

23 all of the -- the property that we had and -- and just to let him

24 know that we were progressing and that it was just going to be a

25 matter of time before the process was complete, but we weren't

1  sure -- I didn't think we were going to be able to finish it all

2  on Saturday.  But there was possibility we would at least be able

3  to complete some of it on Saturday.

4      Q    On Sunday, did you have contact in direct contact or

5  telephonic contact with the Defendant or his wife?

6      A    I don't believe so.

7      Q    Do you know if Agent Owen had contact with the

8  Defendant or his wife on Sunday?

9      A    I don't recall.  He may have, he may not have.

10     Q    On Monday morning, which is April 9th now 2007, at

11  about 9 a.m. were you at the ICE office in Tucson?

12     A    Correct.

13     Q    And you were there anticipating that both Howard and

14  Maureen Cotterman would come to the ICE office?

15     A    Correct.

16     Q    And that was because Howard Cotterman had made a

17  representation that he would be there at nine o'clock in the

18  morning to provide the passwords to those password-protected

19  files?

20     A    Well he would be there to pick up his property.

21     Q    Do you know if anybody communicated him prior to that

22  time that there were files that were password protected and they

23  needed those pass -- you needed those passwords to -- to check

24  the contents of those files before those computers could be

25  reviewed?

1    A    As far as I know, that message was not conveyed until

2  Monday morning.

3    Q    You had a conversation with the Defendant on Monday

4  morning regarding that?

5    A    Yes.

6    Q    And that was over the telephone?

7    A    I believe it was over Maureen's cell phone.

8    Q    And you told the Defendant that they needed -- you

9  needed his assistance providing some passwords to password-

10  protected files?

11    A    Yes, I informed him that, you know, we had completed

12  the -- the imaging of the -- of the laptop, but we had

13  encountered some password protected or encrypted files and that

14  before we could return his property to him, we had to review the

15  contents of those protected files to make sure there was no

16  contraband on it.

17    Q    And he represented to you that he needed to check with

18  some other people to get the passwords and he would be providing

19  them to you?

20    A    He said he would try to contact the company that he had

21  retired from to see if they might possibly still have them.

22    Q    And just so it's clear, some of those password

23  protected files contained child pornography, right?

24    A    I believe all of them did.  That -- I believe that's

25  all they contained.

1    Q    And after you had that conversation with Howard

2  Cotterman, the Defendant, did you have another contact with him?

3    A    No.  I don't believe so.

4    Q    Do you know that Maureen Cotterman purported to call

5  Howard Cotterman on her -- on his cell phone using the ICE office

6  phone?  Were you made aware of that?

7    A    She may have been allowed to use our lobby phone to

8  make a call out.

9    Q    And that she called -- indicated that she was calling

10  Howard Cotterman, her husband, about those same password-

11  protected files?  Are you aware of that contact?

12    A    I don't -- I don't recall.  I mean, it may have

13  happened.

14    Q    Maureen Cotterman's laptop was returned to her Monday

15  morning April 9th, 2007?

16    A    Correct.  And we also explained to her that once we

17  were able to view the contents of those encrypted files and there

18  was no contraband on there that the laptop could conceivably be

19  returned to Mr. Cotterman.

20    Q    After your conversations with Howard Cotterman on

21  Saturday, going back to April 7th, 2007, did he ever indicate

22  that he wanted that laptop returned to him again?

23    A    Not after that last contact I had with him on the

24  phone.  We -- like I said, I never had anymore contact with him

25  whatsoever.

1     Q    Was that Saturday or was that on Monday morning?

2     A    That was Monday morning.

3     Q    So Monday morning did he tell you that he wanted his

4  laptop returned to him?

5     A    I don't know if he specifically said that or whether he

6  just inquired about the possibility of getting it back and that's

7  when I advised him again about the encrypted files.

8     Q    And Monday around noon you found out that he was on an

9  AeroMexico flight out of the country, right?

10    A    I don't believe we were informed of that till the

11 following morning.

12    Q    Well, you didn't find out until Tuesday, the 10th, but

13 on Tuesday, the 10th, you found out that on Monday, April 9th, at

14 about noon he was on an AeroMexico flight out of the country,

15 right?

16    A    Yeah, we were provided with the travel itinerary on the

17 10th, the day after he actually departed.

18    Q    And with an ultimate destination of Sydney, Australia?

19    A    Correct.

20         MR. MIHOK:  Nothing further.

21         THE COURT:  All right.  Mr. Donau.

22                          REDIRECT EXAMINATION

23 BY MR. DONAU:

24    Q    Agent Brisbine, when you told Howard Cotterman that all

25 he needed to do was provide you with the passwords and assuming

1  there was nothing on the computer he would get his computer back,

2  you told him that on Monday, correct?

3      A    That there was possibility get it back, correct.

4      Q    And you -- that was not true at all.  You were going to

5  arrest him.

6      A    At that point we probably didn't have enough to arrest

7  him.

8      Q    Oh, I thought you had -- oh, so on -- on Monday morning

9  you didn't have enough to arrest him?

10     A    No.  Not -- not until we actually had access to those

11 files.

12     Q    So -- so when did you have enough to arrest him?

13     A    It was after Agent Owen was able to access those

14 encrypted files.  He was able to crack the password and actually

15 access them.

16     Q    That was days later.

17     A    I believe it was the following day.  One or two days

18 afterwards.

19         MR. DONAU:  May I have just a moment, Your Honor?

20         THE COURT:  Right.

21 BY MR. DONAU:

22     Q    And so those 75 deleted were not enough?  That you --

23 that --

24     A    With -- with current court rulings here in the Ninth

25 Circuit, it -- we -- we would have referred the case to the U.S.

1   Attorney's Office, but there's a -- most likely that would not

2   have been enough to charge him.

3       Q    Okay.  And -- and -- and so on Monday you returned

4   Maureen's --

5       A    Correct.

6       Q    -- computer, correct?  And on -- on Saturday you

7   returned the camera?

8       A    Correct.

9       Q    Now, you testified that you -- you were the agent in

10  charge at the time that the Cottermans were at the port, but you

11  weren't there when the primary and secondary -- the agents who

12  were charged with primary inspection, secondary inspection first

13  came in contact with the Cottermans, correct?

14      A    No, they're with CBP or Customs and Border Protection.

15  They're a whole separate entity from us.

16      Q    Right.  So if they -- if any of those agents told the

17  Cottermans, one, you're not free to leave and, two, don't

18  approach your vehicle while -- while we're inspecting it, you

19  wouldn't know?

20      A    Not unless they told us.

21      Q    Okay.  And when you arrived, did you observe all their

22  property from the vehicle spread out on the ground around the

23  vehicle?

24      A    As best I can recall, I believe most of it was stacked

25  on some sort of bench or table that's -- was next to the vehicle

1    that most of it was on.  There may have been some on the ground,

2    but it was on the opposite side of where we were driving in from,

3    so I didn't get a real good look at it.

4        Q    Okay.  But I mean, do you recall things like boats or

5    kayaks or --

6        A    Not that I remember.

7        Q    Okay.  You recall doors of the vehicle being open?

8        A    They may have been.

9        Q    But whatever was told the Cottermans prior to your

10   arrival is something you have no information concerning?

11       A    Correct, that's -- that's entire a CBP function or

12   however they choose to operate or whatever their operating

13   procedures are at the port.

14       Q    Okay.  You were -- you've been to Lukeville before?

15       A    On two or three different occasions.

16       Q    It's a very small little -- it's not even a community.

17   It's like a bump in the road.

18       A    Correct.

19       Q    And there isn't any rent-a-car centers or airports or

20   any bus stations?

21       A    Not bus station.  They probably have a shuttle service

22   that runs between Lukeville and Tucson and Lukeville and Phoenix,

23   but as far as rental car companies and like Greyhound Bus or

24   something, no, I don't believe there's anything like that there.

25       Q    And so if someone's afoot, it would be difficult to

1   leave that area?

2        A     You could say that.

3             MR. DONAU:  Okay.  No further questions.

4             THE COURT:  All right.  And, Mr. Donau, this witness

5   can be released from the subpoena?

6             MR. DONAU:  Yes, Your Honor.

7             THE COURT:  All right.  Thank you, Agent Brisbine.

8   You're -- you're excused today.  Thanks for being here for your

9   testimony.

10            THE WITNESS:  Thank you, sir.

11            THE COURT:  Mr. --

12            MR. DONAU:  Your Honor, we would rely on the affidavit

13  of Maureen Cotterman indicating a privacy interest in her

14  computer.  If you have any questions about that, we'll put her on

15  for that limited purpose, but I think it's fairly well

16  established that both the Cottermans had a privacy interest in

17  their personal computers.

18            THE COURT:  All right.  Think I've already made that

19  determination.  That was the basis for the way you're proceeding

20  today.

21            MR. DONAU:  I have no further -- I -- I have no further

22  witnesses.

23            THE COURT:  All right.  Mr. Mihok, do you have any

24  rebuttal?

25            MR. MIHOK:  No, Your Honor.

1          THE COURT:  All right.  The -- so far -- Sherry, what
2     do we got, Exhibits 1 and 2 have been admitted.
3          THE CLERK:  We've got 1 and 2, and the defense just A
4     and B.
5          THE COURT:  Okay.  So, so far as -- as far as I know,
6     the only exhibits admitted to date are Exhibits 1 and 2 for the
7     Government and Exhibits A and B for the defense.  Are there any
8     other exhibits that anybody's going to seek to move at this time?
9          MR. DONAU:  Let me just review this L.
10         THE COURT:  That's all right.
11         MR. DONAU:  I just was --
12         THE COURT:  Take your time.
13     (Pause.)
14         MR. DONAU:  I'm going to move to admit L, Your Honor.
15         THE COURT:  Any objection, Mr. Mihok?
16         MR. MIHOK:  If I can just have a moment, Your Honor?
17         THE COURT:  Yeah.  That's fine.  Take your time.
18     (Pause.)
19         MR. MIHOK:  Your Honor, I was just checking with
20     Special Agent Riley and this -- since this is an internal policy
21     that is dealing with different security issues, I had no problem
22     with it being used for whatever limited purpose it was being
23     used, but it being formally made part of the record, I -- I
24     wouldn't want to say I don't have an objection before we give ICE
25     counsel or people further up the food chain than myself --

1          THE COURT:  I'm just -- I'm going to maintain a copy of

2    the exhibit.  The original exhibit's going to be returned to the

3    parties who offered them.  So there's going to be nothing in the

4    record for the exhibits.  Okay?  Is that the interest you were

5    concerned with that nothing be in the public record?

6                               (Defendant's Exhibit L admitted.)

7          MR. MIHOK:  Yes, Your Honor, exactly.

8          THE COURT:  All right.  They'll -- isn't that -- am I

9    right, Sherry?

10          THE CLERK:  Yes.

11          THE COURT:  The exhibits aren't going to be in the

12    public record, right?

13          THE CLERK:  That's correct.

14          THE COURT:  Okay.  So as soon as the hearing's done

15    today, you can come and get your original exhibits.  Sherry's

16    already made copies, so I have copies of the exhibits that have

17    been admitted.

18          MR. MIHOK:  Just I know that the defense has a copy of

19    that, just --

20          THE COURT:  As to the Exhibit L, Mr. Donau, and also

21    the Grand Jury transcript, obviously those are confidential

22    documents, only can be used in connection with the case, can't be

23    disseminated to others.  You would understand that, right?

24          MR. DONAU:  Yes, I understand that, Your Honor.

25          THE COURT:  Okay.  Got you.

1          MR. DONAU:  We will not disseminate it.

2          THE COURT:  Very good.  Why don't you -- the two of you

3   take a couple minutes to collect your thoughts.  I was going to

4   let each of you argue the case for a few minutes.  I have a few

5   questions.  Because I wasn't going to go on a -- a, you know,

6   argument, rebuttal, reply, I just want to hear from each of you

7   once.  Since Mr. Mihok has the burden of proof, I was going to

8   let him go last and have you go first, Mr. Donau.  Is that all

9   right?

10         MR. DONAU:  Fine.

11         THE COURT:  And why don't you each take three minutes,

12  collect your thoughts, and we'll get started here at -- heck time

13  is it?  Quarter after I guess we'll get started.

14         So what I need is I need A and B.

15         THE CLERK:  A and B and --

16         THE COURT:  And I need 1 and 2.  So looks like I got

17  everything I need.  Oh, and L.

18         THE CLERK:  And L.

19         THE COURT:  Right?  Okay, I got everything I need, so

20  you can have the rest --

21         THE CLERK:  Okay.  Thank you.

22         THE COURT:  And then -- okay.  Don't be nice to Rose.

23  It doesn't do you any good.

24      (Pause.)

25         THE COURT:  All right.  Mr. Donau, you ready proceed?

144

1          MR. DONAU:  Yes, Your Honor.

2          THE COURT:  And, Mr. Mihok, you also ready?

3          MR. MIHOK:  Yes, Your Honor.

4          THE COURT:  Very good.  Mr. Donau, you can go first and

5     let me know what you think's important as I make my decision in

6     this case.

7          MR. DONAU:  Your Honor, what I think is important here

8     is the facts and circumstances surrounding this case and two

9     areas of law which are somewhat developed and one area which is

10    not very well developed.

11         What's important here is, Your Honor, that the

12    Government relies on the border search exception to justify what

13    essentially is clearly a search -- a seizure and a search of

14    personal privacy protected property.

15         In the -- in this case, Your Honor, clearly the

16    Government in -- in my opinion, and I think the evidence

17    demonstrates, did not conduct a valid border search and I concede

18    that if it is a border search, they don't need anything.  They

19    can search at the border and they -- and as the Court stated some

20    time ago, they can tear a car down bolt by bolt, as long as they

21    reassemble it and let it go on its way without any kind of

22    suspicion.

23         In this case, however, the Cottermans come to the

24    border.  They're clearly admissible.  They clearly have

25    appropriate documents.  And because of a hit involving a 15 to

1   16-year-old conviction, the agent -- Mina Riley testified that

2   she made the decision before ever arriving on scene that those

3   computers were going to be taken, held, and examined.  And -- and

4   I -- I don't believe that -- that kind of decision making is --

5   supports a border search at all.  I think it's just the opposite.

6           I think clearly if Agent Riley on her way to the border

7   decided that a vehicle was not going to be search at the border

8   but taken to Tucson to be searched or a person's private luggage

9   was not going to be searched at the border but taken to Tucson a

10  hundred and eighty miles away to be searched, that that would do

11  away with the border search exception to the warrant requirement

12  for a -- a search.

13          And -- and I think it's the way that this -- this case

14  unfolded that makes it clear that the Government cannot rely on

15  the border exception search.  These people were detained for

16  hours.  It's -- it's inarguable that they were detained for over

17  eight hours.  They were not -- by the testimony of the people on

18  the ground who were there, they were not free to leave and they

19  did not have access to their vehicle.  And they were -- and the

20  -- the type of -- of atmosphere as demonstrated by Maureen

21  Cotterman who have -- they have absolutely no reason to believe

22  did anything or did anything wrong is read her <u>Miranda</u> rights and

23  told that she's not currently under arrest.

24          They justify it by saying, well, we didn't have the --

25  the equipment on the border, but their own expert testified he

1  had a laptop which could have been taken to the border and this

2  could have been accomplished at the border which would have given

3  them much stronger argument.  Their own agent testified he's done

4  -- Alvarado's done search of computers at least five times and

5  found evidence of drug activity on a computer.

6          So they've had practice, they've had -- it is something

7  that they've done before, and it's something that they were

8  capable of doing.  It's sort of like saying, well, this young

9  woman comes to the border with a -- a diary and the diary's

10 written in Sanskrit.  Well, we can't -- we cannot decipher

11 Sanskrit at the border.  We have no idea what's on it.  May or

12 may not be illegal, but we'll going to take it and send it to New

13 York for investigation from somebody who reads Sanskrit.  That

14 would -- that -- that is the logical conclusion if you uphold

15 this type of warrantless search of the Cottermans' computer, Your

16 Honor.

17         THE COURT:  So are you suggesting that they should have

18 -- is -- what should they have done differently once they

19 encounter the password-protected files?

20         MR. DONAU:  Well, the interesting part about it is,

21 Your Honor, what they should have done differently is -- what --

22 what -- what you need to understand is before Mina Riley ever

23 encountered that password, she had decided to seize the computer,

24 but once they got there and Howard Cotterman said, I'll help you

25 open that -- those password-protected files, their response was,

1  no thanks, we're going to forget that, your offer is refused,

2  we're taking the computer.

3          So what they should have done, Your Honor, if they

4  really wanted to make it a border search is say, okay, what's the

5  -- what's the password and attempted to open it at the border.

6  They didn't have to give possession over to Howard Cotterman.  He

7  wasn't going to be able to give them some secret code that would

8  make the computer explode.  But they didn't even avail themselves

9  of his offer to have the password-protected files opened at the

10  border.  They -- they -- they -- they -- they decided not to,

11  they seized the computer anyway, and transported it away from the

12  border.

13          So what they should have done is first of all had --

14  they -- they -- once they checked everything and found that

15  everything that they could view was not pornography and was

16  consistent with what both Howard and Maureen had told them as to

17  the reason for their trip, they -- they should have then inquired

18  further about the password-protected files if they -- if they

19  wanted to and -- and -- and once they got the offer from Howard

20  to open them, they should have taken that offer up, rather than

21  having a predetermined desire to remove the computers from the

22  border, take them hundreds -- a hundred and eight miles away, and

23  take days to examine them.

24          And -- and I think the testimony of Brisbine's

25  interesting that even as of the 11th of -- the 10th of April they

1  didn't have reason enough to arrest Howard Cotterman.  So these

2  people who lived in California were basically held hostage by the

3  seizure of these computers for four days, and I don't think that

4  -- that was the intent of a border search, and I don't think that

5  commerce -- normal commerce would tolerate that kind of delay.

6           But if the Court agrees that this was a border search,

7  then anybody is subject to having their property removed or

8  themselves removed and examined over a period of days at a place

9  far from the border without the requirement of a warrant, which

10  means if you -- if you come across the line, according to their

11  logic, we can take it and hold it and do whatever we want with it

12  for as long as we want with it wherever we want.  And that's

13  simply not the law.

14           THE COURT:  The -- I mean, the -- the struggle with the

15  case is not determining the facts.  It's kind of determining what

16  the resolution is.  It's pretty clear that it was a -- you know,

17  the property was brought in from Mexico through the -- through

18  the international port there.  The -- so that's beyond question

19  that the property was originally taken.  Whether it was a

20  detention or a seizure, it was taken at the border.

21           Then it's -- then it's also seems clear that it was

22  then transported far away from the border and that -- and that

23  the -- you know, that it wasn't done within the time frame of a

24  normal border search or even an abnormal border search; albeit  -

25  - albeit it within time frames that are much, much, much quicker

1    than a normal forensic exam of a computer.

2         MR. DONAU:  But, Your Honor, I think what's instructed

3    here in this case is that the testimony from the people on the

4    ground -- they've never seen a detention this -- of this length

5    of time without finding something illegal and that -- that they

6    have never referred a computer to Tucson before.  This -- this

7    was clearly exceptional handling of -- of the items of personalty

8    and -- and -- and items that intrinsically have very private

9    matters on them.

10        And I think you need to look at routine versus non-

11   routine border searches as an additional guide for Your Honor and

12   -- and routine searches are that which take place at the border

13   looking at a car, looking in your luggage.  Non-routine border

14   searches are very intrusive, like anal -- a body cavity search

15   that the -- the courts have consistently held require more than

16   just crossing the border.

17        And it is my position that the extreme private nature

18   of a personal computer with banking records and -- and -- and

19   credit card records and tax records when you get and  -- and you

20   get to searching those things in the manner that they did, it

21   becomes non-routine and there has to be something more than just

22   crossing the border that permits the Government to engage in

23   those sorts of non-routine searches.  And there's plenty of case

24   law that we've cited in our memorandum that support that concept.

25        THE COURT:  All right.  Anything else, Mr. Donau?

1          MR. DONAU:  To -- to summarize, Your Honor, this was

2     not routine, it was not at the border, it was intrusive, it was

3     long -- long lasting, and the effect it had on the Cottermans'

4     right to travel within the United States as clear U.S. citizens

5     was impinged.

6          THE COURT:  All right.  That you, Mr. Donau.  Mr.

7     Mihok.

8          MR. MIHOK:  Yes, Your Honor.  Thank you.  The same

9     claims with regard to a heightened scrutiny where computer

10    searches are involved at the -- at the border has already been

11    considered and rejected repeatedly; most recently by the Ninth

12    Circuit in Arnold.  There's other cases on point, Romm, Ickes.

13    They've made it clear that they were not going to give any

14    heightened scrutiny, any additional Fourth Amendment concerns or

15    considerations by virtue of the fact that somebody presents for

16    inspection at the port of entry or at the functional equivalent

17    of the border with digital storage media.  They're entitled to no

18    greater protection and that still is effectively a border search.

19         THE COURT:  Right.  What I -- what I take from Arnold

20    and Ickes is -- is that it -- to me it -- I'm not very impressed

21    with the concern for the private nature of the computers is what

22    I take from that.

23         What my concern with Arnolds (sic) and Ickes and Romm

24    and Roberts is, is that in -- in all four of those cases, the

25    determination that there was pornography in the digital media,

1   whether they were CD ROMs or the computer, was done at the

2   airport or at the port of entry.  It was either -- either through

3   viewing it or through a confession right there.  So there was no

4   delay in time and there was no -- and there was no moving it in

5   distance.

6           And in -- the additional thing in Arnold is, is that

7   after they found the initial evidence of what it was some -- some

8   sort of Kodak picture file or something, then they applied for a

9   warrant to search the rest of the computer.  So these cases are

10  clearly instructive, but they don't clearly answer my question as

11  to whether or not this continued to be a border search.

12          So that's my concern.  What clearly has gone for the

13  Government in this case is that once stuff -- when -- you know,

14  when people come to our ports of entry, you know, their --

15  clearly their -- what they bring is subject to examination.

16  There's no question about it.  Luggage can be examined, cars can

17  be taken apart, and they can be x-rayed and all sorts of things.

18          But I'm just not finding cases where things are held

19  for days or where they're moved from the border and still

20  considered within the border search exception.

21          MR. MIHOK:  Well let me back up and start with Arnold

22  then, because initially what they found on Arnold's computer were

23  two pornographic images of women.  Nothing contraband.  Nothing

24  illegal.  They detained the computer and Mr. Arnold for several

25  hours.  And that's undetermined the length, but as they continued

1   to conduct this forensic examination.

2          With regard to Ickes, the -- I mean, with -- and

3   backing up -- the search warrant that they got in Arnold was two

4   weeks later --

5          THE COURT:  Yes, it was.

6          MR. MIHOK:  -- and so in this case, in two weeks, he

7   was in the Land Down Under.  I mean, there was no -- he -- he

8   abandoned the property.  I -- I know that the -- when I started

9   asking those questions prior to lunch break, I was shut down, but

10  I don't think --

11         THE COURT:  I'm sorry.  When you asked what questions?

12         MR. MIHOK:  When I was asking questions related to from

13  the itinerary of -- of Mr. Cotterman.

14         THE COURT:  Right.

15         MR. MIHOK:  And I asked those questions of Supervisor

16  Brisbine and was able to get the answers, but I don't think

17  there's any question that by Monday sometime in the morning this

18  Defendant had abandoned that property.

19         THE COURT:  Oh, okay.

20         MR. MIHOK:  So to getting a search warrant thereafter,

21  I don't see that as being dispositive relevant or really having

22  weighing --

23         THE COURT:  There's --

24         MR. MIHOK:  -- in the consideration.

25         THE COURT:  There's -- at that point in time there's no

1    need for a warrant because the property's been abandoned?

2              MR. MIHOK:  Correct.

3              THE COURT:  Okay.

4              MR. MIHOK:  With in the Romm case, the laptop was taken

5    and held overnight and an examination was done on it overnight

6    after the defendant had been refused entry into Canada and forced

7    back to Seattle and that was held to be okay.

8              THE COURT:  But he was reviewed -- refused entry into

9    Canada because they determined right then that there was

10   pornography on the computer both by looking at it and by his

11   confession.  And then he -- and then he's held overnight by

12   Canadian authorities and turned over to U.S. authorities,

13   Seattle, with information that he was denied admission because of

14   child -- so again, once he comes to the port in Seattle, they

15   basically have the information.  I think the way I read the --

16   the case.

17             MR. MIHOK:  Well, I -- I was just focusing more on any

18   time lapses, because I think imposing any sort of geographic or

19   time limitation on border search authority will be breaking new

20   ground.  I have not seen in 220 years of jurisprudence dating

21   back to 1789 when the initial act was passed by Congress -- I've

22   only seen sweeping grants of authority, especially post 9/11 when

23   it comes to border searches.

24             The only border searches that have been questioned are

25   some of the intrusive ones that Mr. Donau referred to.  Even in

1  those cases --

2          THE COURT:  Body cavity searches.

3          MR. MIHOK:  -- that there was -- there -- they didn't

4  automatically find that the evidence was suppressed, they said,

5  you know, looking at somebody for 18, 24 hours more to keeping

6  them in custody to monitor their bile movements --

7          THE COURT:  Right.

8          MR. MIHOK:  -- doing a body cavity search, searches

9  that are unnecessarily destructive of property, and the standard

10 that's been clearly defined by the Supreme Court and the Ninth

11 Circuit doesn't talk about time and geography, they talk about

12 the particularly offensive manner in which the way the search is

13 conducted.

14          And if the Court finds that it is particularly

15 offensive, some factor that makes this search particularly

16 offensive, it doesn't lead to a conclusion that the material is

17 suppressed.  What is required then is something more than go to

18 secondary.  What is required then is reasonable suspicion or

19 depending on the length of the detention, it's become a defacto

20 arrest perhaps, maybe probable cause those cases where somebody's

21 been detained and they're monitoring bile movements for a day or

22 more than a day.  That's not this case.  That's not even close to

23 being this case.

24          THE COURT:  Right.

25          MR. MIHOK:  This case is wildly uncomplicated.  This

1   case is somebody at the --

2           THE COURT:  This case is wildly uncomplicated.

3           MR. MIHOK:  Absolutely.

4           THE COURT:  Right, I --

5           MR. MIHOK:  This is 100 percent clear tried and true a

6   border search.  This Court would be announcing new law if it

7   imposed some sort of geographic or time limitation it.

8           THE COURT:  Well I think that's my challenge, my

9   problem is I can't find the law that deals with this situation.

10  Do you -- do you know of any case -- any reported case that

11  involves the -- the Government relying on the border search

12  exception to the warrant requirement where the search itself took

13  place more than 50 miles away from the border?

14          MR. MIHOK:  I think more instructive is the time frame

15  that the material's held and examined.

16          THE COURT:  Okay, well let's -- that may be more

17  instructive, so let's get to that.  Going back to my question,

18  are you aware -- I'm not aware of a single case -- I'm not aware

19  of a single case and the witnesses don't seem to be aware of a

20  single example of this occurring.  Now this may start to be

21  occurring a lot.  This may happen a lot.  I don't know.  But --

22  but in their law enforcement experience, I didn't hear any

23  evidence other than this Cotterman case of this ever occurring.

24  And I don't know of any reported opinion that -- that deals with

25  that.

1          So let me ask you this question:  Are you aware of any

2     reported case involving the border search exception that took

3     place away from either the international border or a designated

4     port of entry, such as an international airport?

5          MR. MIHOK:  No, I'm not.

6          THE COURT:  I -- I'm not either.  Okay, so we're on the

7     same base there.  Now, and -- and so if that is significant,

8     whichever I decide it would be new law.  If I decide -- in other

9     words, I think, if I decide taking it a hundred miles away from

10    the border is still a border search, that's still new law, right?

11         MR. MIHOK:  Well, Your Honor, I think that what you're

12    assuming in -- in your analysis is that it is significant and to

13    any of the courts -- and to the Circuit Court of Appeals or the

14    Supreme Court that has examined border search authority that this

15    would have been significant and if it was moved from the

16    functional equivalent of the border or the border, the -- the --

17    a port of entry, that they would have made pains -- taken pains

18    to note it.  And I just -- I don't think you can necessarily say

19    just because there's no --

20         THE COURT:  Why would any court take pains to note it,

21    Mr. Mihok, when there's no case that involves that fact?

22         MR. MIHOK:  I don't know from looking at the cases that

23    even I'm citing to that -- they're talking about the time that it

24    took to conduct the exam to do what they were doing.  They're not

25    saying it was taken from, you know, the port of entry to a

1    forensic office or a -- and to do -- that they did the forensic

2    exam 75 miles away.  They're not taking pains to note that or to

3    not note that.  So --

4            THE COURT:  Well, I --

5            MR. MIHOK:  -- I don't think it's to say that that

6    is --

7            THE COURT:  Okay.  I disagree.  I -- I think -- I mean,

8    I read the facts carefully because that was important to me.  I

9    think it's clear in -- in most of the cases they're getting

10   confessions at the same time they're examining the equipment.  I

11   don't see anything in any of the cases talking about having to

12   break through passwords or having any problems getting equipment.

13           In one case, as I recall, they have the -- the man who

14   ultimately becomes the defendant in the case open the computer up

15   and actually run through the files.  So I -- I have a difficult

16   time in any of these cases seeing any indication that any of

17   these searches ever took place physically away from the border or

18   an -- an international airport.

19           Now, but if you're --

20           MR. MIHOK:  If I could --

21           THE COURT:  Yeah, sure.  You can.

22           MR. MIHOK:  Well, I think if the Court was to hold that

23   today what -- what the Court would essentially be announcing --

24   and again, this is just in a report and recommendation, but as

25   far as the law that we'd be establishing, it would be imposing a

1   requirement on every ICE CBP office to -- at every port of entry,

2   at every airport that's the functional equivalent of the border

3   that where anybody could possibly present for inspection in the

4   United States of America that there would be a requirement that

5   there would be the equipment -- physical equipment, the software,

6   and someone trained with the know-how to be able to conduct a

7   forensic examination.

8          And I think the ramifications from a ruling like that

9   would be -- I think there would be a lot of issues budget-wise,

10  staffing shortages -- already for the entire area of Southern

11  Arizona, that entire Tucson area, there's two forensic guys in

12  the Tucson office.  That's it, and they're usually backlogged

13  several months.

14         So to announce a rule that, well, it's got to be within

15  X number of miles, some hard and fast rule, which I --

16         THE COURT:  What about -- what about the implications

17  of announcing a rule that it doesn't have to be within X number

18  of miles?

19         MR. MIHOK:  I like that better.

20         THE COURT:  I would think you do.

21         MR. MIHOK:  Yeah.

22         THE COURT:  But I'm supposed to be trying to kind of

23  referee the two sides and the policies in both sides, so if I

24  issue a ruling that says, no, this was fine; going to Tucson's

25  fine.  In fact, they can take it to Kansas City.  They can take

1   -- if -- if they -- there are special optical people in -- in

2   Geneva, Switzerland, they can take it to Geneva, and they can

3   hold it there for seven months and that's a border search because

4   it was taken the border.  That may be the correct answer.  That

5   may be the correct answer, but I think that's the problem this

6   case presents.  That's the problem this case presents.

7           What you have going for you is the strong language in

8   those cases that says, we have a right -- we have a right to

9   protect our borders and make sure that contraband doesn't come in

10  our borders.  And -- and we have more of a right there than

11  anywhere else.  And that's -- that's the key thing the Government

12  has going for him.

13          But in this case there are two factors, and the time

14  factor for you I -- I thought it was going to be much worse,

15  because my experience with the computer searches is more like

16  what Mr. Owen said, you know, is it takes months.  And there's no

17  question that they expedited this to it fairly well.  I've never

18  seen it gone that fast.  I'll have higher expectations for other

19  cases, I guess, but that's -- that's where -- that's where I'm

20  struggling and that's where I'm trying to find some sort of legal

21  authority, some sort of analogy that -- that gives me guidance.

22          On the -- on the car situation, I know they build those

23  x-ray machines at the border.  You know, they don't take the

24  cars, you know, to Phoenix to x-ray them.  Even at a little port

25  of entry like Lukeville or Naco, they have the x-ray -- the --

1   and they're -- they're big machines.  You know, they x-ray trucks

2   with those machines.  You know, they have certain technology

3   there.

4            There's no question that under the circumstances of

5   this case, they didn't have the technology to do the exam that

6   was done in Tucson.  So their question if I rule that that's

7   fine.  Well, then maybe, you know, you don't have to maintain the

8   x-ray machines there.  We can take the -- take the -- all the

9   vehicles to Flagstaff and x-ray them there.

10           You know, so those are the considerations I have.

11  There is no question that there's limited constitution rights

12  there, but -- but it is -- it is within the succession to the

13  warrant requirement and I have to figure out was this a border

14  search under the circumstances that it was conducted.

15           So that's what I'm looking at from you is to explain to

16  me other than the fact that, you know, the -- the property was

17  originally brought over from the border and that the -- the

18  strong government interest in making sure the contraband is kept

19  out of the border, I need to know, you know, why I should

20  determine that it still should be considered a border search

21  under these facts.

22           MR. MIHOK:  Yes, Your Honor, and just backing up a

23  little bit, but the -- the equipment and the software, obviously

24  there would be cost with regard to that, but I think the larger

25  issue when we're talking about digital forensic examinations is

1   the personnel.  And you'll see and -- and heard some of from

2   Agent Owen.  I think he's got 6,000 plus hours of training.

3   They're just in such short supply and to -- you know, to put the

4   within, you know, a short drive or striking distance of the

5   border or on the border or the functional equivalent of the

6   border, I think would be -- there -- it would be a cost-

7   prohibitive issue to -- to be able to do that.

8         One case from the Fifth Circuit I think is instructive

9   as far as detaining equipment and allowing the passenger on their

10  way, that's the Roberts case, Fifth Circuit 2001.  They examined

11  the -- the defendant's travel case, shaving kit, found two CDs in

12  there.

13        THE COURT:  Right.

14        MR. MIHOK:  They detained those for further inspection,

15  further review, allowed him on his way, and 11 months later he

16  was arrested because they completed the forensic examination and

17  found child pornography.

18        So, you know, whether in the -- in the situations where

19  it's readily available, apparent, there's a confession, those

20  aren't tricky issues.  I -- I -- I agree.  I think the situation

21  where somebody has password protected or encrypted files, they

22  don't have the personnel at the border to do those examinations.

23  Here we have -- that's -- that was the -- those were the facts in

24  this case.

25        THE COURT:  Right.

1          MR. MIHOK:  You know, and -- and over the course of,

2    you know, not even one full day to examine the camera, the

3    digital camera, within -- you know, within two days or a little

4    over two days -- Saturday, Sunday -- Monday morning the --

5    Maureen Cotterman's laptop is returned to her.

6          And again, I -- I just want to keep coming back to the

7    instruction we've gotten from the Ninth Circuit, from the Supreme

8    Court on border searches and any limitations on those, again it's

9    -- it's focused on the manner of the searches is particularly

10   offensive or unreasonable.  I think that becomes important here

11   because we're talking about taking the items from the Lukeville

12   port of entry to Tucson and I think Mr. Donau through his

13   examination was making the point that the Cottermans were

14   chomping at the bit to leave.  They weren't vacationing in

15   Lukeville.  You know, it's -- I don't even know if there's a

16   traffic light down there.  Their vacation was in Tucson.

17         So as far as being reasonable and convenient to them,

18   would it be more convenient to have John Owen with this fatal

19   traffic accident spend, you know, four or fives hours in the car

20   getting -- picking his way through, ending up at the Lukeville

21   port of entry with his laptop to conduct a forensic examination

22   on one computer at a time, keeping his fingers crossed that there

23   was no issues with imaging the drives, conducting the

24   examinations, that he had the passwords -- the password

25   encryption breaking programs he needed on the laptop, that there

1   were no issues with -- with that, and they're detained there

2   while that's going on?

3           I mean, maybe it's Monday, Tuesday, Wednesday.  I mean,

4   as -- as John Owen is working over the weekend and into the next

5   week.  I mean, I can only speculate, but, you know, it would have

6   taken longer -- obviously him driving down there and doing the

7   examination there would have taken longer, and that was not where

8   the Cottermans wanted to be.

9           In a way, you know, not only did it accommodate where

10  the forensic exam in the laboratory was, but it accommodated the

11  Cottermans.  They were staying in Tucson till Monday anyway.  So

12  if we want to talk about being particularly offensive,

13  unreasonable, which are the standards that we're supposed to

14  apply when talking about a border search, I think, you know, they

15  didn't take it to Tucson to accommodate the Cottermans, clearly.

16  But in a way they did accommodate the Cottermans by doing so.

17          And when they call them and say you can come pick up

18  your camera, that to me is more evidence of them being -- going

19  out of their way to accommodate the Cottermans.  They knew that

20  they were there on vacation.  It was Maureen Cotterman's

21  birthday.  They were going to see the wild flowers.  Hey, we're

22  done with the camera.  You want to come pick it up.  They're in

23  Tucson anyway.  It's not a four or five hour trip back down to

24  Lukeville.  It's a come over to the ICE office and get the

25  camera.

1          On Sunday, Agent Owen finds those password-protected

2    files.  They're making arrangements to return Maureen's --

3    Maureen Cotterman's laptop to her.  They were going to be in

4    Tucson through Monday anyway.  Monday morning come to the office,

5    get your laptop.  What happens?  Monday morning Maureen Cotterman

6    comes to the ICE office, gets her laptop.

7          So I really think in this case the agents, just looking

8    at it through that narrow lens that focus of -- of being

9    reasonable, they -- they really went out of their way.  Did they

10   prioritize this?  I agree with the Court.  I've never seen a

11   forensic examination get done this quick.  I've been doing these

12   cases almost exclusively for four years.  They went out of our

13   their way to get it done quickly.  As soon as things were return

14   -- or were cleared that there was no contraband, they returned

15   them.  And, you know, again as a courtesy and to -- and -- and to

16   accommodate the Cottermans.  And it was convenient for them

17   because they were in Tucson and the ICE office is in Tucson.

18          I think that's all I have, Your Honor, unless the Court

19   has any questions for me.

20          THE COURT:  No, I think you answered the questions.

21   All right.  I'm going to take the matter under advisement.

22   What's the trial date is October or --

23          MR. MIHOK:  I think we have a September 23rd trial

24   date.

25          THE COURT:  Okay.

1          MR. DONAU:  Your Honor, I understand we only had one

2     side had one chance, but I invite your attention to the law on

3     abandonment.  That was not something that I talked about in my

4     portion and it's clearly in our memorandum and clearly this is

5     not abandonment.

6          THE COURT:  Okay.  I'll take a look at all that for

7     sure.  All right.  Thank you for your argument, counsel.  We'll

8     be in recess.

9          THE CLERK:  All rise.

10        (Proceedings concluded at 3:47 p.m.)

11                         *  *  *  *  *  *

12                         CERTIFICATE

13        I certify that the foregoing is a correct transcript

14    from the electronic sound recording of the proceedings in the

15    above-entitled matter.

16    DATED:  September 4, 2008

17

18                    s/TRACY A. GEGENHEIMER

19                    TRACY A. GEGENHEIMER, CERT*D

20

21

22

23

24

25