IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>             Plaintiff,<br><br>vs.<br><br>HOWARD WESLEY COTTERMAN,<br><br>             Defendant.<br>_____ | No. CR 07-01207-TUC-RCC (CRP)<br><br>REPORT AND<br>RECOMMENDATION |

Defendant has filed a Motion to Suppress Evidence (Doc 17) seeking to suppress all evidence seized from him by Customs Inspections at the Lukeville Port of Entry. The Government opposes the Motion. (Doc 39). This Court recommends that the District Judge, after his independent review and consideration, enter an order GRANTING the Motion for the reasons set forth in this Report.

**STATEMENT OF FACTS**

Howard and Maureen Cotterman entered the Lukeville Port of Entry ("POE") seeking admission to the United States on April 6, 2007 at 9:57 a.m. In primary, a Treasury Enforcement Communication System ("TECS") hit was observed based on Mr. Cotterman's convictions for child sex crimes in 1992.

1   Based on the TECS hit, the Cottermans were referred to secondary. At secondary, the Cottermans were told to exit the car, leave all their belongings in the car and they were not to touch those belongings until they were allowed to leave. (TR 31). The Cottermans were told to wait in the small lobby at the POE. They were not handcuffed, but since they could not access their car, for pragmatic purposes they were not free to leave.

Two border inspectors searched the contents of the Cotterman's car for one and a half to two hours. Among other things, they found three cameras and two laptop computers which they turned over to Agent Alvarado for inspection. The inspectors also found personal papers, possibly financial records or time-share information, which they photocopied. Those photocopies are still maintained in the case agent's file. (TR 29).

Agent Alvarez examined the cameras and laptops, but was unable to discover any contraband. However, on one of the computers, certain files were password protected. Agent Alvarez then went on to attend to other duties.

The TECS hit was referred through the ICE chain of command and finally assigned to Sells duty agent Mina Riley. Agent Riley and her supervisor, Agent Craig Brisbine, traveled to Lukeville, arriving about 3:30 p.m. At Lukeville, Ms. Riley interviewed Mr. and Mrs. Cotterman separately. Mr. Cotterman offered to assist in accessing his computer, but Agent Riley declined due to concerns that Mr. Cotterman might be able to sabotage the computer. (TR 38, 50).

Two computers and one camera were seized. Agent Brisbine drove the laptop computers and camera to Tucson, arriving between 10:30 p.m. and 11:00 p.m. He turned the equipment over to John Owen for forensic evaluation, which Owen began immediately.

The Cottermans were finally allowed to leave Lukeville at approximately 6:00 p.m.

Owen continued the forensic examination on Saturday and Sunday. On Saturday he determined there was no contraband on the camera, and it was returned that day to the Cottermans. On Sunday it was determined that there was no contraband on Mrs. Cotterman's laptop. However, 75 images of child pornography were found on Mr. Cotterman's laptop in unallocated space.

1    Mrs. Cotterman's laptop was returned Monday morning. However, a copy of the
2 laptop was made by Owen and is still in his file, even though nothing illicit was found on her
3 computer. (TR 63). Mr. Cotterman was asked to come to the Tucson ICE office and provide
4 the passwords. Mr. Cotterman indicated he would have to call some business associates to
5 get the password(s), and would be in later. Actually, at noon on Monday, Howard Cotterman
6 boarded a plane for Mexico, ultimately traveling to first Japan, and then Australia. As of
7 Monday morning, Agent Brisbine did not believe he had probably cause to arrest Howard
8 Cotterman. (TR 37).

9    Agent Riley testified that she determined before she arrived in Lukeville that the
10 Cotterman's computers would be taken to Tucson for forensic evaluation. (TR 40). Agent
11 Alvarado believed he was required to turn over the computers to the ICE agents to be taken
12 for forensic evaluation because of the instructions from Pacific Intel in connection with the
13 TECS hit. (TR 100-101). Agent Brisbine determined that "one way or another" those
14 computers were going to Tucson because ICE field guidelines, Exhibit L, required it. (TR
15 115).

16    Forensic specialist Owen was at work in Tucson on April 6, 2007, and was notified
17 at work sometime around lunch that the laptop computers would be brought in. (TR 73). He
18 was not asked to travel to Lukeville.

19 **POSITIONS OF THE PARTIES**

20    Defendant argues that the search of his laptop 170 miles from the port of entry over
21 a period of four days is a non-routine border search requiring reasonable suspicion. (Motion,
22 p 4). Defendant argues that searching a laptop is the equivalent of a body cavity search
23 because a laptop is likely to hold an individual's most private thoughts and information.
24 Defendant also argues First Amendment interests are implicated. (Motion, p 5). Defendant
25 also argues that the statutory authority for customs officers to seize contraband, 19 U.S.C.
26 § 482, requires that the officer find contraband before making the seizure. (Motion, p 7).
27 Additionally, Defendant argues that a search warrant should have been obtained prior to
28 conducting the forensic exam of the laptops. (Motion, p 9).

1    The Government's primary argument is that this was a border search and thus no
2 individualized suspicion was required to conduct the search of the camera and computers.
3 (Response, pp 9-10). The Government argues that the border search authority justified the
4 warrantless forensic exam of the computers without reasonable suspicion. (Response, pp 11-
5 13).

6    The Government offers several other arguments that are circular or not supported by
7 the facts. For instance, the Government argues that once the items were properly seized they
8 can be searched:

> Here by statute and case law, the agents had a duty to seize the items for further examination. Once properly seized, the further forensic exam of these items was proper and the evidence found is admissible.

11 (Response, p 14.) This argument begs the question, were the items properly seized?

12    The Government also argues that exigent circumstances justified the seizure and
13 forensic examination of the computers. The exigent circumstance was the need to identify
14 the victim and ensure her safety. (Response, p 17). Here again, the Government puts the cart
15 before the horse. The Government had no information that there was a potential victim until
16 after several days of computer forensic examination.

17    The Government also argues that after the agents found contraband, they were
18 authorized by statute to secure the items for trial. (Response, p 18). This is correct, but once
19 again avoids the issue raised by Defendant's Motion, did the agents discover the contraband
20 without violating the Defendant's Constitutional rights?

21    Finally, the Government argues that Defendant abandoned the compact discs ("cds")
22 and laptop computer when he fled to Australia. Having abandoned the property, the
23 Government argues he has no standing to bring this motion.

24 **ANALYSIS**

25    Border Search Requirements

26    In *United States v. Arnold*, 523 F.3d 941 (9th Cir.2008), the Ninth Circuit Court of
27 Appeals held that reasonable suspicion was not required to search a laptop computer
28 belonging to an international traveler arriving at Los Angeles International Airport. The

- 4 -

Court noted that "searches of closed containers and their contents can be conducted at the border without particularized suspicion under the Fourth Amendment." *Arnold*, 523 F.3d at 945. The Fourth Circuit came to the same conclusion. *United States v. Ickes*, 393 F.3d 501 (4th Cir.2005). Two other similar cases supported the legal doctrine that under the border search exception, a computer or computer diskettes ("cds") could be searched at an international border, or its functional equivalent without probable cause, reasonable suspicion, or a warrant. *United States v. Romm*, 455 F.3d 990 (9th Cir.2006); *United States v. Roberts*, 274 F.3d 1007 (5th Cir.2001). All four of these cases are distinguished from this case because evidence of child pornography was discovered physically at the border within a few hours of examining the laptop.

In *Arnold*, ICE agents questioned Arnold for several hours and "examined the computer equipment and found numerous images depicting what they believed to be child pornography." *Arnold*, 523 F.3d at 943. They released Arnold, seized the laptop and memory devices, and two weeks later obtained a search warrant, presumably to justify a full computer forensic examination. *Id*.

In *Ickes*, customs officers discovered video footage of a tennis match that focused excessively on a young ball boy, as well as photo albums of nude, or semi-nude, provocatively posed prepubescent boys. While in custody at the port of entry, Ickes admitted he stored child pornography on the computer. *Ickes*, 393 F.3d at 503.

In *Romm*, Canadian border agents discovered child pornography on Romm's laptop and excluded him from entry into Canada. Romm was detained until he could be put on the next flight to Seattle. Canadian border agents informed U.S. Customs of when Romm would be arriving and what contraband he had in his possession. ICE conducted a preliminary analysis of Romm's laptop at Seattle-Tacoma International Airport and discovered 10 images of child pornography. Thereafter, while still at Sea-Tac Airport, Romm confessed to downloading child pornography on the computer in question. *Romm*, 455 F.3d at 994-995.

In *Roberts*, customs agents in Houston were advised by customs agents in Lake Charles, Louisiana and a sheriff's deputy from Natchitoches, Louisiana, that Roberts would

1 be traveling from the international airport in Houston to Paris, and that Roberts would be
2 carrying cds containing child pornography in his shaving kit. At a preliminary inspection at
3 the Houston airport, customs investigators found six cds in Roberts' shaving kit. Roberts
4 soon thereafter admitted there was child pornography on the computer diskettes. *Roberts*,
5 274 F.3d at 1009-1010.

6       In all four of these cases, evidence of child pornography was found at the border
7 inspection station or the international airport and within a matter of hours. In this case, the
8 first evidence of child pornography was discovered 170 miles from the Lukeville port of
9 entry, and at least two days afer the Cottermans entered the United States.

10       This case poses the question, can the government seize property at the border, move
11 it far away from the border and hold the property for days, weeks or months without any
12 heightened scrutiny? Under those circumstances, the law requires the Government to have
13 reasonable suspicion before extending the search in both distance and time away from the
14 border.

15       The Government argues that the search was neither offensive nor unreasonable, so
16 reasonable suspicion is not required. It is true that the conduct of the officers was reasonable
17 and in fact responsive to ICE field guidelines. (Exhibit L. Response, p 16). Moreover, there
18 was no destruction of Defendant's property. This is not a case of a body cavity search where
19 reasonable suspicion would be required because of the personal intrusiveness of the search.
20 *United States v. Montoya deHernandez*, 473 U.S. 531, 105 S.Ct. 3304 (1985).

21       Defendant argues that searching his laptop is the equivalent of a more intrusive search
22 that requires reasonable suspicion, because the First Amendment is implicated by this
23 incursion into his most private matters. (Motion, p 5). However, in *Ickes*, the Court reasoned
24 there was no First Amendment exception to the border search doctrine. *Ickes*, 393 F.3d at
25 506. The Court in *Arnold*, found this reasoning persuasive. *Arnold*, 523 F.3d at 941.

26       The Government's position is that under the facts of this case, the search of
27 Defendant's laptop required no suspicion at all under the border search exception. In oral
28 argument at the end of the evidentiary hearing, AUSA Mihok warned the Court that a time

and distance restriction on border searches would be establishing new law. Given the parties' briefing, the Court assumed that to be correct. It is not.

Extended Border Searches

Under certain circumstances, searches that take place away from the border or remote in time from the initial inspection can still be considered border searches. This involves two related doctrines: the functional equivalent of the border and the extended border search doctrine. *United States v. Alfonso*, 759 F.2d 728, 734 (9th Cir.1985).

The most common example of the functional equivalent of a border search is at airports for flights arriving directly from or traveling directly to a foreign country. *Almeida-Sanchez v. United States*, 413 U.S. 266, 273, 93 S.Ct. 2535, 2539, 37 L.Ed.2d 596 (1973); *United States v. Duncan*, 693 F.2d 971, 977 (9th Cir.1982). A search at the functional equivalent of a border requires no warrant, probable cause or any suspicion. *Id.*

When a search is removed in time and place from the border, the courts have repeatedly held that this represents a greater intrusion on the person requiring that under the totality of the circumstances, customs officers had reasonable suspicion of criminal activity in order to justify the search, the so-called "extended border search." *United States v. Whiting*, 781 F.2d 692, 695 (9th Cir.1986); *United States v. Cardona*, 769 F.2d 625, 628 (9th Cir. 1985); *United States v. Alfonso*, 759 F.2d 728, 734 (9th Cir.1985); *United States v. Bilir*, 592 F.2d 735, 740-741 (9th Cir.1979). As the Court in *Alfonso* stated:

> We recognize, of course, that time and place are relevant, since the level of suspicion for extended border searches is stricter than the standard for ordinary border searches. Extended border searches occur after the actual entry has been effected and intrude more on an individual's normal expectation of privacy. Therefore, extended border searches must be justified by "reasonable suspicion" that the subject of the search was involved in criminal activity, rather than simply mere suspicion or no suspicion.

*Alfonso*, 759 F.2d at 734. In *Alfonso*, the search took place thirty-six hours after the ship docked at Los Angeles harbor.

At some point, the discrepancy in time and distance will become so great that it is no longer an extended border search, thus requiring probable cause and a warrant. Again, there is no bright line test, but an examination of the totality of circumstances, including time,

distance and law enforcement efforts is required. *Alfonso*, 759 F.2d at 736; *United States v. Sahanaja*, 430 F.3d 1049, 1054-1055 (9th Cir.2005). For instance, had the forensic examiner in this case placed the Cottermans electronics equipment at the end of the queue, conducting the examination in a month or two, it could be argued the search was so removed in time as to no longer be an extended border search. We need not reach that question here, where the facts show reasonable diligence and speed in conducting the computer forensic examination. Therefore, the Government need only show reasonable suspicion, not probable cause, to justify the search in this case.

<u>Reasonable Suspicion</u>

Reasonable suspicion is more than mere suspicion, but less than probable cause. Reasonable suspicion exists when an officer is aware of specific, articulable facts, which together with objective and reasonable inferences, form a basis for suspecting that the particular person to be detained has committed or is about to commit a crime. *United States v. Salinas*, 940 F.2d 393, 394 (9th Cir.1991), *See also Terry v. Ohio*, 392 U.S. 1, 21 (1968) (To justify a warrantless search, "the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.") The determination whether reasonable suspicion exists must be based on "the totality of the circumstances - the whole picture." *United States v. Cortez*, 449 U.S. 411, 417 (1981). The facts are to be interpreted in light of a trained officer's experience, and the whole picture must be taken into account. *United States v. Sokolow*, 490 U.S. 1, 8 (1989).

In a motion to suppress the Government bears the burden of proving a warrantless search satisfies the constitutional protections of the Fourth Amendment against unreasonable searches and seizures. *Vale v. Louisiana*, 399 U.S. 30, 34 (1970). To protect against unreasonable searches and seizures the Government must prove probable cause to a judge or magistrate prior to the search or it must prove the warrantless search fell within "a few specifically established and well-delineated exceptions". *Mincey v. Arizona*, 437 U.S. 385, 390 (1978).

1  In *Alfonso*, reasonable suspicion was based on a confidential informant's information, which was confirmed in part by a federal wiretap, thirty-six hours of extensive surveillance of suspicious activity by people connected with the ship, and two separate stops of people leaving the ship with containers holding large amounts of cocaine. *Alfonso*, 759 F.2d at 731-733. In *Sahanaja*, ICE agents suspected a package contained contraband because the described contents were different from what the package appeared to hold, an odor coming from the package, the fact that the mail carriers who handled the package became nauseated, the ostensible recipient's refusal to open the package in the presence of postal employees and the multiple inquiries by different people who were not the addressee concerning the package. *Sahanaja*, 430 F.3d at 1054.

In this case, there are only two circumstances that support any suspicion; the TECS hit reflecting Howard Cotterman's 1992 conviction for child molestation and the existence of password protected files on his laptop computer. After almost two hours of searching the Cotterman's car and electronic equipment, no basis for suspicion was determined, other than the existence of the password protected files.

Using password protection can be for legitimate purposes as well as nefarious purposes. In fact, the witnesses at the hearing conceded that legitimate use of password protection on laptop computers was commonplace.

It is clear that the TECS hit alone does not establish reasonable suspicion. The fact that password protection has innocent explanations does not necessarily negate this from being considered in determining reasonable suspicion. However, in this case, the additional fact of password protected files on Howard Cotterman's computer does not amount to reasonable suspicion for three reasons. First, it is undisputed that Howard Cotterman offered to open the files at the Lukeville port of entry. Second, the facts show that Officer Riley had determined that she was taking both laptops in for a forensic evaluation before she left Sells to travel to Lukeville. (TR 40;p *See also* Exhibit B, Kelly Witness Statement, p 12) ("[Riley] informed us she and another agent were in route to our Port, and would be there in approximately two hours to interview subjects and taken (sic) into custody the laptops.")

1 Third, perhaps most importantly, the customs officers also seized Mrs. Cotterman's laptop, which was <u>not</u> password protected.

That these officers acted so presumptively, without even considering whether they had reasonable suspicion to seize any of the electronic equipment that day, is consistent with ICE field guidelines, reenforced by the boilerplate on the Custom and Border Protection Witness Statements. Exhibit L, admitted without objection, is a March 15, 2007, Memorandum to field special agents from Marcy M. Foreman, Director, Office of Investigations for ICE. The subject of the memo is "Field Guidance on Handling Detained or Seized Electronic Media from Persons of National Security Interest at Ports of Entry." The memo makes clear that electronic media may be seized at the border without any individualized suspicion.

> ICE may review, copy, image, detain or seize, and disseminate electronic media if a violation of law is immediately evident, if further review by ICE is needed to make such a determination, or if technical assistance (e.g. translation services) is deemed necessary ...
> An ICE JTTF duty agent and/or ICE Computer Forensics Agent ("CFA") may conduct a cursory search of the subjects' electronic media and detain or image the electronic media to conduct a more thorough search.

Exhibit L, p 2. The guidelines do not advise that a search remote in time or distance from the border entry requires, at a minimum, reasonable suspicion.[1] Rather the memo emphasizes use of the authority to conduct border searches without particularized suspicion. Here, the agents responded in compliance with the field guidelines. Riley, the JTFF duty agent, seized the laptops to be transported to CFA Owens for computer forensic analysis at a remote location. In addition to the field guidelines relying on border search authority, the CBP Witness Statement form emphasizes Border Search Authority in boilerplate at the end of each statement. *See* Exhibits A and B. Moreover, Agent Alvarado testified the TECS hit alone meant the digital media would be taken to Tucson. (TR 100-101). Certainly, Pacific Intel had no information other than the 15 year old criminal conviction.

The Government's disregard of the Fourth Amendment in connection with border

---

[1] On the first page of Exhibit L is reference to the statutory authority for warrantless search if "there is a reasonable cause to suspect a basis for denying admission to the United States." Exclusion was never an issue as the Cottermans were U.S. citizens with valid passports.

- 10 -

searches of electronic media is emphasized by the Government's continued possession of a copy of Mrs. Cotterman's hard drive. At the hearing, Mr. Owen suggested some vague, speculative ways in which the hard drive could possibly, but apparently not actually, contain probative information. (TR, pp 76-77, 79). If there is probative information on the hard rive, seventeen months is more than enough time to determine that. The Government apparently believes that returning Mrs. Cotterman's laptop eliminates the intrusion on her privacy. Obviously, keeping a copy of the hard drive with no viable basis does violate Mrs. Cotterman's privacy interests as well as the field guidelines directive that the electronic media seized "shall not be retained by ICE longer than is necessary to determine its relevance to furthering the law enforcement mission of ICE." Exhibit L, p 2. At this point in time, any incriminating evidence found now on the copy of Mrs. Cotterman's hard drive would be inadmissible because that hard drive was not subject to seizure for containing contraband. *United States v. Cardona*, 769 F.2d at 629 (cashier's checks, not in bearer form, found in valid extended border search were not seized because they were not contraband, but were photocopied because the checks were not subject to seizure the photocopies were inadmissible).[2]

In this case there is no evidence to support a determination of reasonable suspicion to seize any equipment. Nor did any government agent involved in this case ever consider whether reasonable suspicion existed, since they believed ICE policy and the TECS hits required the computers be sent to Tucson for forensic evaluation. Because the agents did not have reasonable suspicion to seize any of the Cotterman's property, unless the abandonment argument prevails, the motion to suppress should be granted. Additionally, the Government should be ordered to return the copy of Mrs. Cotterman's hard drive and the copies of the Cotterman's personal documents.

Abandonment

---

[2] Photocopies were made of the Cottermans personal records found in their vehicle and are maintained in the agency file to this day despite not being related in any way to child pornography. (TR 29).

The Government argues that Mr. Cotterman abandoned his property on September 9, 2007 when he fled to Australia. While it is not clear, the Government appears to argue, or perhaps more correctly, imply that a case of computer discs was abandoned by the Defendant.

The Government's main argument is that Howard Cotterman abandoned the laptop when he fled the jurisdiction Monday, April 9, 2007 at noon. The case for this proposition is *United States v. Garcia*, 516 F.2d 318 (9th Cir.1975), in which Garcia, after being referred to secondary at a fixed checkpoint, sped up and drove away in an attempt to elude law enforcement. The Court in *Garcia* held that even if the initial stop and referral to secondary was illegal, Garcia's flight from law enforcement was an adequate basis for his arrest and the search of the car. *Id.* at 319-320. The *Garcia* decision has no relevance to this case.

In this case, the laptop computer was seized from Mr. Cotterman at the border on April 6, 2007, and transported to Tucson that same day. Prior to Cotterman fleeing to Australia, the Government found 75 images of child pornography in the unallocated hard drive space of the computer on Sunday afternoon. At that point in time, the computer was contraband, was required to be seized, and could not be returned. The Government's argument that Howard Cotterman's flight from the jurisdiction deprived him of standing to bring this motion fails.

The Government's second argument is that "10 additional CDs that there left at the Lukeville POE by the Cotterman's (sic) were located shortly after their departure on April 6, 2007, and held at the DHS-CBP/ICE office in Lukeville." (Response, p 6). Those CDs were referred to Agent Riley in July of 2007, and subsequently forwarded to Agent Owen. *Id.* During his examination of the CDs, Owen found child pornography on one of the ten CDs. Defendant describes this as an "uncontroverted fact" that establishes Cotterman has no standing to challenge the CDs as evidence. (Response, p 15).

The entire factual presentation by the Government on this point is as follows:

Q (By Assistant United States Attorney): Was there also a case with CDs?
A (By Agent Riley):                         Yes, there was.
Q (By Assistant United States Attorney): And where was that?
A (By Agent Riley):                         That case was located a couple of

> Q (By Assistant United States Attorney): months after the incident by one of the inspectors at the port of entry in the bathroom. And were those items - was - was that case with CDs also forwarded for - forwarded to you eventually?
>
> A (By Agent Riley): Yes, it was. The items were forwarded to me from the inspectors at the port of entry, and at that time I immediately turned them over to John Owen for forensic review.

(TR 17).

On cross-examination, Agent Riley conceded that she did not know who discovered the CDs, how they were discovered or how the CDs got there. (TR 42-44). Moreover, there were two different versions of where the CDs were found, one stating in the bathroom and the other stating in a drawer. *Id.* Far from being an uncontroverted fact, the Government has fallen well short of satisfying its burden of proof that the Cottermans abandoned the CDs. The facts more likely establish that one or more government agents mishandled and misplaced the CDs at the border. After all, there was no testimony that the agents tried to return the CDs.

For these reasons, the Government's arguments that the CDs and laptops were abandoned should be rejected.

**RECOMMENDATION**

In a border search, time and distance do matter. In the *Alfonso* case, thirty-six hours was too long. Certainly, 170 miles is too far. Therefore, based on both extended time and distance, the computer forensic search in this case was an extended border search requiring reasonable suspicion of criminal activity before taking the computers away from the port of entry. The government agents in this case, following ICE policy to the letter, never considered whether reasonable suspicion existed because they had been repeatedly and incorrectly instructed no suspicion was necessary. No suspicion at all existed as to Mrs. Cotterman's computer, but it was seized anyway, and a copy of that computer memory is still maintained by the Government. No reasonable suspicion existed as to Mr. Cotterman's computer. The only suspicion was Mr. Cotterman's 15 year old child sex crime conviction

1 and password protection on certain files, which he offered to access. Moreover, the
2 Government has not factually established that the Cottermans abandoned any of the property
3 in issue.

4     For these reasons, it is the Report and Recommendation of this Court that District
5 Judge Collins, after his independent review and consideration, enter an order as follows:

6     1. The Motion to Suppress Evidence be GRANTED. (Doc 17).

7     2. The Government be ordered to return the copy of Mrs. Cotterman's computer and
8 retain no copy of it.

9     3. The Government be ordered to return the copies of the Cotterman's personal papers
10 that were photocopied at the border and retain no copies.

11     Pursuant to 28 U.S.C. § 636(b), any party may serve and file written objections within
12 ten days of being served with a copy of the Report and Recommendation. If objections are
13 not timely filed, they may be deemed waived. The parties are advised that any objections
14 filed are to be identified with the following case number: **cr-07-1207-RCC**.

15     The Clerk is directed to mail a copy of the Report and Recommendation to Plaintiff
16 and counsel for Defendant.

17     DATED this 12th day of September, 2008.

_____
CHARLES R. PYLE
UNITED STATES MAGISTRATE JUDGE