**DIANE J. HUMETEWA**
**United States Attorney**
**District of Arizona**
**JUDSON T. MIHOK**
**Assistant United States Attorney**
**405 W. Congress, Suite 4800**
**Tucson, Arizona  85701-5040**
**Telephone:  520-620-7300**
**judson.mihok@usdoj.gov**
**Attorneys for Plaintiff**

## UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, ) | |
| ) | **CR-07-01207-TUC-RCC (CRP)** |
| Plaintiff, ) | |
| ) | |
| v. ) | **GOVERNMENT'S OBJECTIONS** |
| ) | **TO MAGISTRATE'S REPORT** |
| HOWARD WESLEY COTTERMAN, ) | **AND RECOMMENDATION** |
| ) | |
| Defendant. ) | |
| ) | |

_____

Excludable delay pursuant to 18 U.S.C. § 3161(h)(1)(F) and (J) will occur as a result of these objections.

Plaintiff, United States of America, by and through its attorneys, Diane J. Humetewa, United States Attorney for the District of Arizona, and Judson T. Mihok, Assistant U.S. Attorney, hereby files the following objections to the magistrate's report and recommendation in the following Facts and Memorandum of Points and Authorities.

RESPECTFULLY SUBMITTED this 26th day of September, 2008.

DIANE J. HUMETWA
United States Attorney
District of Arizona

/s/ *Judson T. Mihok*
JUDSON T. MIHOK
Assistant U.S. Attorney

Copy of the foregoing served electronically
this 26th day of September, 2008, to:

Alfred Donau, Esq.

## MEMORANDUM OF POINTS AND AUTHORITIES

### PROCEDURAL HISTORY

A hearing was held before Magistrate Judge Charles R. Pyle on August 27, 2008, pursuant to 28 U.S.C. § 636(b), Federal Rule of Civil Procedure 72 and Local Rule of Criminal Procedure 57.6(d)(1).  At the hearing, the defense was allowed to meet its burden to establish a legitimate expectation of privacy and that a search or seizure violated that legitimate expectation of privacy in support of its motion to suppress by submitting two affidavits.  After finding that the defense had met its initial burden, the Magistrate Judge required the government to call a witness to establish by a preponderance that the government activity in conducting the border search was proper.

Senior Special Agent (hereinafter, "SSA") Mina Riley from the Department of Homeland Security (hereinafter, "DHS"), U.S. Immigration and Customs Enforcement (hereinafter, "ICE"), testified as a witness for the government and exhibits were introduced, and then the government rested its direct case.  Over the government's objection (after partially overruling the government's motion to quash subpoenas), the Magistrate Judge ordered former Customs and Border Protection (hereinafter, "CBP") Officer Antonio Alvarado, ICE SSA/Certified Forensic Analyst (hereinafter, "CFA") John Owen, and ICE Group Supervisor (hereinafter "GS") Craig Brisbine to make themselves available as witnesses for the defense.  All three were called and did testify as witnesses for the defense.  While the defendant's attorney had initially represented that the defense  would call a fourth witness, Maureen Cotterman, after calling the three government witnesses, the defense rested.

On or about September 12, 2008, the Magistrate Judge issued a "Report and Recommendation" (hereinafter, "R and R").  If the parties have objections to the "Report and Recommendation," they have ten days to file written objections. 28 U.S.C. § 636(b); Fed.R.Civ.P. 72.  Pursuant to Rule 45(a)(1) and (2), that period excludes the day of filing and intermediate Saturdays, Sundays and holidays.  FRCP 45(a)(1) and (2).

Once objections are raised, the District Court is required to make determinations de novo. 28 U.S.C. § 636(b); Fed.R.Civ.P. 72.  The District Court can base its decision on the record before it or order that a hearing be held for the purpose of taking additional evidence. 28 U.S.C. § 636(b); L. R. Crim. 57.6; Fed. R. Civ. P. 72(b). The District Court can either modify the R and R in whole or in part, refuse to modify it altogether or send the matter back to the Magistrate Judge with instructions. 28 U.S.C. § 636(b); L. R. Crim. P. 57.6; Fed. R. Civ. P. 72(b).

FACTS

The R and R contains a "Statement of Facts" section which, for the most part, the government does not dispute.  However, the government takes exception to some statements which are either misstated and/or unsupported by the record.  The government incorporates by reference herein the facts as previously stated in its motion to quash and its response to the defendant's motion to suppress.

1.   In the first paragraph on page two of the R and R, it states that the Cottermans were told they "were not to touch those belongings until they were allowed to leave" with a citation to page 31 of the transcript.  While SSA Riley did confirm that the Cottermans were denied access to their belongings as the inspection proceeded, there is no indication in the transcript that the Cottermans were not allowed access to their belongings "until they were allowed to leave."  (R and R at 2.)

2.   The lobby where the Cottermans remained is characterized as a "small" lobby, with no transcript page cited for support.  (R and R at 2.)  No where in the transcript is the lobby characterized as "small."

3.   The second paragraph of the "Statement of Facts" concludes with the observation that since the Cottermans "could not access their car, for pragmatic purposes they were not free to leave."  (R and R at 2.)  As SSA

3

Riley testified, the Cottermans were in a public non-secured area and they were not handcuffed. (RT 8/27/08 14.) Further, the notion that the Cottermans were not free to leave was contradicted by GS Brisbine. (RT 8/27/08 110, 132, 139.)

4.   The objection noted in 3 applies to the unsupported statement contained at paragraph six of the "Statement of Facts": "The Cottermans were finally allowed to leave Lukeville at approximately 6:00 p.m." (R and R at 2.)

5.   In the fourth paragraph on page 2, the R and R states that Mr. Cotterman "offered to assist in accessing his computer, but Agent Riley declined due to concerns that Mr. Cotterman might be able to sabotage the computer." (R and R at 2.) First, the defendant did not offer to open the files or give SSA Riley the passwords, he offered to "access the computer." (RT 8/27/08 52.) Second, SSA Riley never used the word "sabotage." More accurately, SSA Riley testified that she had concerns about Mr. Cotterman "deleting files," that the computer could be "booby trapped" and that she did not want "any of the files tampered with or deleted or anything happening to any of the potential evidence on the computer." (RT 8/27/08 39, 50.)

6.   While the "Report and Recommendation" goes into some detail about the subjective beliefs of SSA Riley, GS Brisbine and CBP Officer Alvarado concerning the taking of the computers to Tucson for forensic analysis, the emphasis placed on their subjective beliefs ignores the fact prior to leaving Sells for Lukeville, SSA Riley was told that some of the files were password protected. (RT 8/27/08 12-13, 50-51.)

7.   The "Report and Recommendation" is also incomplete in that it omits references to the hardship, inefficiency and potential impossibility of SSA/CFA Owen conducting the forensic examination of the computers in

4

Lukeville.  (RT 8/27/08 71-72, 78, 80, 99-100.); *See United States v. Hill*, 459 F.3d 966, 975 (9th Cir. 2006) (discussing the difficulties of conducting forensic examinations outside of the computer forensics lab, noting taking extra time to conduct examinations in other locations "would not only impose a significant and unjustified burden on police resources, it would also make the search more intrusive.")

8.   The R and R states that SSA/CFA Owen was notified at lunch time.  (R and R at 3.)  However, he testified that he was notified sometime in the afternoon. (RT 8/27/08 73.)

9.   There is also no reference to the Cottermans' vacation plans, which actually made the examination of the laptops, and the return of some of the items after they had been cleared by ICE, much more convenient for the Cottermans in Tucson as compared to Lukeville.  (RT 8/27/08 16-18, 66-67, 121, 129-131.) At the hearing, the agents emphasized their desire to minimize inconvenience to the Cottermans and return their property, particularly their camera, as quickly as possible so that they could use it during their vacation in Tucson and continue with their travels.  (RT 8/27/08 16-18, 66-67, 121, 129-131.)

10.  In the "Analysis" portion, the distance from Lukeville to Tucson is characterized as 170 miles.  (R and R at 6, 13.) ("Certainly, 170 miles is too far.") SSA Riley characterized it as about 100 miles.  (RT 8/27/08 53.)  GS Brisbine set the distance at about 180 miles.  (RT 8/27/08 109.)

11.  The "Report and Recommendation" states that Pacific Intel had no information other than a 15 year old criminal conviction, but omits record checks which disclosed more information.  (R and R at 10.)  The facts elicited at the hearing clearly established that the Pac FIU and further records checks indicated: (1)

the conviction was for a child pornography related offense; (2) the defendant traveled abroad frequently; and (3) he was currently registered as a sex offender.  (RT 8/27/08 12, 32, 49.)

<u>MEMORANDUM OF LAW</u>

The R and R recommends that this Court grant the defendant's motion to suppress the laptop computer.  In reaching that conclusion, the R and R found that border search became an "extended border search" due to the fact that the forensic analysis occurred away from the initial point of entry into the United States.  (R and R at 6, 13.)  Once morphed into an extended border search, the search had to be supported by reasonable suspicion, which the R and R found to be lacking.  (R and R at 11, 13.)  The R and R went further to order the return of a government hard drive and photocopies of paperwork, relief that was not requested by the defendant; in fact, this defendant lacks standing to request the return of the government hard drive.  (R and R at 11, 14.)  For the reasons that follow, the District Court should reject this R and R and issue an Order denying the defendant's motion to suppress in all respects.

The government incorporates by reference herein the government's response to the defendant's motion to suppress, the government's motion to quash the subpoenas, and all arguments proffered by the government at various hearings before the Magistrate Judge.

I.     <u>THIS WAS A BORDER SEARCH</u>.

Recently, the Supreme Court stated that "[t]he Government's interest in preventing the entry of unwanted persons and effects is at its zenith at the international border." *United States v. Flores-Montano*, 541 U.S. 149, 152 (2004).  Border searches by their very nature are reasonable under the Fourth Amendment, and require neither a warrant, probable cause, or even articulable suspicion. *United States v. Ramsey,* 431 U.S. 606 (1977).  These concerns have only increased over time, "heightened by the veritable national crisis in law enforcement caused by [the] smuggling of illicit narcotics." *United States v. Montoya De Hernandez*, 473

6

U.S. 531, 538 (citing *United States v. Mendenhall*, 446 U.S. 544, 561 (1980)) (Powell, J., concurring).  Even more recently the Seventh Circuit noted, "the events of September 11, 2001, only emphasize the heightened need to conduct searches" at our borders.  *United States v. Yang*, 286 F.3d 940, 944 n. 1 (7th Cir. 2002).

The R and R recast this border search as an "extended border search."  Perhaps the starkest example in the R and R of a general misconception of the authority granted to DHS per border search authority, both by statute and case law, as well as an attempt to reach beyond the facts of the case to stake some new legal territory, is in the posing of the following question: "This case poses the question, can the government seize property at the border, move it far away from the border and hold the property for days, weeks or months without any heightened scrutiny?"  (R and R at 6.)  First, this case did not involve the movement of these items "far away" from the border.  Second, the search did not take weeks or months.  Third, the answer to the ultimate question posed is, "Yes."  Courts in the Second, Third, Fourth and Fifth Circuits have found exactly that activity to constitute a permissible border search.

There is a long list of statutes and regulations granting Customs the authority to conduct searches at the border.[1]  Customs has statutory authority to conduct "border searches" in order to search and examine any vehicle or person for merchandise that might be introduced into the United States in any manner contrary to law.  19 U.S.C. § 482.  This authority includes the examination of potentially obscene materials.  19 U.S.C. § 1305.

---

[1]
   19 U.S.C. § 1496 (authorizing customs officials to search the baggage of persons entering the country); CFR § 162.6 (authorizing customs officials to inspect and search all persons, baggage, and merchandise arriving from foreign countries); 19 U.S.C. § 1499(a) (authorizing customs agents to examine and detain imported merchandise); 19 U.S.C. § 1582 (detain and search "all persons coming into the United States from foreign countries."); 19 U.S.C. § 1595a(c)(3) (authorizing customs officials to detain merchandise introduced contrary to law); 50 U.S.C. § 2411(a)(2)(A) (authorizing customs officials to seize and detain goods at ports of entry in the enforcement of war and national defense); 22 U.S.C. § 464 (authorizing customs agents to detain armed vessels and any property found thereon).

"Merchandise" shall not be delivered from the custody of Customs until it has been inspected, appraised, or examined, and found to have complied with the laws of the United States. 19 U.S.C. § 1499(a)(1).[2] In the course of conducting such examination, property remains in the custody of Customs, and may be tested off-site by private testing laboratories or by Custom's laboratories until "cleared" by Customs. 19 U.S.C. §§ 1499(a)(2)(B) and (b)(1-3). In addition to the statutes vesting Customs with broad border search authority concerning specific items, there is a "long-standing practice of seizing goods at the border even when the type of good is not specified in the statute." *United States v. Ickes*, 393 F.3d 501, 504 (4th Cir. 2005).

When merchandise remains in the custody of Customs to be searched and examined at a location other than the first place of entry into the United States, the search is still a border search-it is not transformed into an "extended border search." For example, in *United States v. Gallagher*, a camper was sent from Lisbon, Portugal, to Norfolk, Virginia, and it first arrived in the United States at the port of Baltimore on June 3, 1974. *United States v. Gallagher*, 557 F.2d 1041, 1042 (4th Cir. 1977). The camper was unloaded from the ship and parked in a security area at the pier where it remained until June 7, 1974. *Id.* On June 7, the camper was loaded onto the truck of a bonded shipping company and a customs official inventoried its contents and then sealed it. *Id.* The truck then delivered the camper to Norfolk, Virginia, where it arrived on June 11, 1974, and the next day it was inspected by a customs official to ensure the seal was still intact. *Id.* The camper was then unloaded and again parked in a secure area, this time a warehouse. *Id.* at 1043. On June 12, the defendant

---

[2] After presentation of goods for entry, Customs has five days, excluding weekends and holidays, in which to either release or detain those goods. 19 U.S.C. § 1499(c)(1). If the goods are not released within those five days, they are deemed detained. *Id.* Customs must "make a final determination with respect to the admissibility of detained merchandise" within thirty days after the merchandise is presented for examination. § 1499(c)(5)(A). Failure to make a final determination within thirty days is "treated as a decision ... to exclude the merchandise for purposes of [ 19 U.S.C. § 1514(a)(4) ]." § 1499(c)(5)(A). This is referred to as a "deemed exclusion."

came to Norfolk to pick up the camper, but a customs official decided to conduct a more extensive search before releasing it to him due to its size, newer looking interior and infrequency of vehicles shipped to that Customs office.  *Id.*  After turning the defendant away, the customs official ran a records check through TECS and learned that the defendant had previously been arrested abroad for possession of drugs.  *Id.*  Thereafter, officials conducted an extensive search and located a hashish derivative secreted around the gas tank and arrested the defendant when he returned to claim the item on June 13, 1974.  *Id.*

In upholding the search in Norfolk nine days later and after the initial inventory of the camper in Baltimore, the Fourth Circuit stated that, "Norfolk was the border" for purposes of the statute in question.  *Id.* at 1044.  The Court stated, "Although the camper was physically within the territorial confines of the United States, it never left the official custody of United States Customs . . . . Thus, when the camper arrived at Norfolk, it stood at the border for purposes of section 482."  *Id.*  Notably, the Fourth Circuit did not even mention the possibility that this was tantamount to an "extended border search."

The Fifth Circuit came to the same conclusion in *United States v. Sheikh*, 654 F.2d 1057 (5th Cir. 1981) (reversed on separate grounds).  In *Sheikh*, a package was shipped from Iran to Denton, Texas.  *Id.* at 1060.  The package was sent via commercial airplane on January 22, 1980, arriving first in the United States in Houston, then trucked via bonded carrier to Dallas, arriving on January 25, 1980.  *Id.*  It remained in the "in-bond" room of American Airlines until a Customs inspector examined its contents four days later and determined that it contained heroin.  *Id.*  DEA confirmed the substance was heroin, repackaged the item with special paper and a beeper, allowed the item to be picked up February 5, 1980, and placed it under surveillance for two days before effecting the defendant's arrest.  *Id.*  The defendant challenged the search and alleged that the search was an extended border search lacking reasonable suspicion.  *Id.* at 1068.

//

9

The Fifth Circuit upheld the search three days later and a considerable distance from the initial point of entry (Houston to Dallas) as a border search, finding that Dallas was the functional equivalent of the border. *Id.* at 1069. Therefore, the warrantless search of the package was a border search and proper because the package had not cleared Customs. *Id.* at 1069-70. The Court stated, "The defendant fails to distinguish between the 'functional equivalent of the border' concept and the doctrine of 'extended border searches.' The latter is invoked to uphold the warrantless searches of persons and things once they have entered the country." *Id.* at 1070.

The Third Circuit held similarly in *United States v. Caminos*, 770 F.2d 361 (3d Cir. 1985). A wood carving was shipped from Brazil to Pittsburgh, arriving first via commercial airline in New York on August 2, 1984. *Id.* at 362-63. From there, it was sent via commercial airline (per Customs bond) to Chicago and then to Pittsburgh, arriving a day later. *Id.* at 363. There, the package remained for 10 days until someone came to claim the package and a Customs official inspected it. *Id.* Suspecting the package contained drugs, the Customs official opened it and drove a nail through the carving and discovered cocaine. *Id.* After DEA confirmed the substance was cocaine, the government removed the cocaine, inserted a tracking device, allowed the package to be claimed, tracked the package to the defendant's residence, obtained a search warrant for the residence and arrested the defendant. *Id.*

The defendant moved to suppress the evidence, arguing alternatively that the warrantless search of the package violated the Fourth Amendment or, at a minimum, that the evidence be suppressed as the search amounted to an "extended border search" which required reasonable suspicion that the defendant claimed was lacking. *Id.* at 364-65. The Third Circuit soundly rejected both claims and upheld the search of the package 11 days after, and great distance from its initial entry (New York to Pittsburgh via Chicago), as a border search.

The Third Circuit noted that "border searches are valid without a warrant or a showing of probable cause where the searched person or item is shown to have crossed the border, where there has been no opportunity for the object or person to have materially changed since the crossing, and where the search is conducted at the earliest practicable time and place." *Id.*, citing *United States v. Ramsey*, 431 U.S. 606, 619 (1977); *United States v. Garcia*, 672 F.2d 1349, 1363-64 (11th Cir. 1982).  The Court continued:

> While it may seem that the first practicable place to conduct the search was New York, practicability must be viewed realistically.  Requiring that all imported packages be searched at their first point of entry, even where immediately forwarded under customs bond to their final destination, would place unreasonable burdens upon customs officials.  When there is no evidence that the package has been materially changed, and when the package's transportation to its stated final destination from the initial point of entry has been under a customs bond, there would appear to be no reason not to allow border searches to be conducted at the destination point rather than the point of entry.

*Id.* at 365.

The Third Circuit also rejected the defendant's contention that the search was an extended border search requiring reasonable suspicion.  The Court noted that extended border searches take place "*after* the first point in time when the person or package might practicably have been stopped and searched."  *Id.* at 364 (emphasis added in original), citing *United States v. Niver*, 689 F.2d 520, 526 (5th Cir. 1982).  A showing of reasonable suspicion is required in the case of extended border searches because, "unlike routine border searches, an extended border search may stigmatize the individual searched, is unexpected, and involves greater invasion of privacy . . . . " *Id.*, citing *United States v. Richards*, 638 F.2d 765, 772 n.4 (5th Cir. 1981).  The Third Circuit found that none of the "reasons advanced in the case law for requiring a showing of 'reasonable suspicion' in extended border searches applies here. . . . Where a package is searched while still under a customs bond and prior to its delivery to the addressee, . . . . " *Id.* at 365.

The Second Circuit followed this same logic in *United States v. Gaviria*, 805 F.2d 1108 (2d Cir. 1986).  In that case, 70 cartons of canned fruit were sent from Colombia with

11

**1**
**2**
**3**
**4**
**5**
**6**
**7**
**8**
**9**
**10**
**11**
**12**
**13**
**14**
**15**
**16**
**17**
**18**
**19**
**20**
**21**
**22**
**23**
**24**
**25**
**26**

a final destination of New York, but arriving first in Miami on May 8, 1985. *Id.* at 1110. Once in Miami, a Customs official inspected 7 of the 70 cartons, then resealed them, and all of the cartons were then taken by a bonded truck carrier from Miami to New York. *Id.* The items arrived in New York five days later and were secured. *Id.* On May 16, eight days after the initial inspection in Miami, a Customs official inspected the cartons in New York, discovered cocaine and arrested the defendant who had come to claim the package after his apparent failed attempt to flee the airport upon seeing the inspectors approaching. *Id.* The defendant moved to suppress the cocaine, and asked the Court to apply "extended border search" analysis, which required reasonable suspicion. *Id.* at 1111.

The Second Circuit upheld the search eight days later and a considerable distance away from the initial point of entry into the U.S. (Miami to New York) as a border search and rejected the defendant's contention that the search was an extended border search. *Id.* at 1112. The Court noted that "an extended border search is a search that is usually conducted after a person or some property has cleared an initial customs checkpoint and has entered the United States." *Id.*, citing *United States v. Glaziou*, 402 F.2d 8, 13 (2d Cir. 1986) (dictum), cert. denied 393 U.S. 1121 (1969) (internal quotations omitted). The Second Circuit quickly dispensed with extended border search analysis given the facts of the case, stating, "since the shipment had not yet been cleared by Customs in Miami, and, therefore, had not 'entered the United States,' the search was not an extended border search." *Id.* at 1112. The Second Circuit's finding was not disturbed by the inspection which had taken place in Miami some eight days prior to the inspection in New York, a substantial distance away, because, "A search of one-tenth of the total shipment was not considered to be a final inspection by Customs and, indeed, did not result in a final customs clearance." *Id.* at 1114.

The facts of the case before this Court parallel the cases discussed above out of the Second, Third, Fourth and Fifth Circuits. The item the defendant sought to introduce into the United States and that he seeks to suppress (his laptop) was never cleared by DHS. The item

was at all times in the physical custody of DHS and remained under their original border search authority.  In fact, the laptop was not handled by bonded commercial truckers or airlines, but moved by GS Brisbine, a 24 year veteran of ICE.  (RT 8/27/08 106.)

Once in Tucson, the files recovered from the laptop were determined to be contraband, and the item was properly seized.

Regardless of the distance the laptop traveled (whether it is 100, 170 or 180 miles), or the time the analysis took (2 days), the search in this case was a border search since the item in question was not cleared by Customs.  The time and date are irrelevant in this case, especially when considered in light of the cases cited above: 9 days and a distance of 240 miles (*Gallagher*, Fourth Circuit); 3 days and 239 miles (*Sheikh*, Fifth Circuit); 11 days and a distance of 1253 miles (*Caminos*, Third Circuit); 8 days and a distance of 1290 miles (*Gaviria*, Second Circuit).[3]  As in the cases cited above, the laptop in question was never cleared by DHS-ICE and never out of their custody and control.  This was a border search and the motion to suppress should be denied.

The R and R attempts to factually distinguish *Arnold*, *Romm*, *Ickes* and *Roberts*, cases which involved border searches of computers, by noting that those cases involved forensic examinations done at or near the point of entry into the United States.  (R and R at 4-6.) While that appears to be for the most part true, in that exercise the R and R glosses over the central holdings of the cases which lend clear support to the government's position that the search that took place in this case was a border search.  Moreover, if the holding of this R and R was applied to the facts of those four cases, it might have led to different outcomes.

In *United States v. Arnold*, the Ninth Circuit upheld the search of the defendant's laptop computer at Los Angeles Airport after arriving on a flight from the Phillippines. *United States v. Arnold*, 523 F.3d 941, 943 (9th Cir. 2008).  While ICE agents did find child pornography on the defendant's computer, it was only after he had been initially detained for

---

[3]Distances approximate and calculated using mapquest.com.

13

several hours. *Id.* That initial detention for several hours was based on a cursory inspection of the defendant's computer which revealed only a photo of two nude women. *Id.*

In *Ickes*, the images of child pornography were found only after ever more intrusive and thorough searching of unstated duration, all premised on the discovery of a videotape which appeared focused on a young boy at a public sporting event. *Ickes*, 393 F.3d at 503.

In *United States v. Romm*, Canadian officials denied the defendant entry based upon a review of his computer's internet history which listed websites related to child pornography.[4]    *United States v. Romm*, 455 F.3d 990, 994 (9th Cir. 2006).  When the defendant arrived at the airport in Seattle, he was greeted by ICE agents who arranged to search his laptop that night, and despite the defendant's repeated denials about having child pornography on his computer, they eventually located about 10 images. *Id.*

While the Fifth Circuit found that there was reasonable suspicion to justify the search of a passenger on an outbound international flight in *United States v. Roberts*, based on an informant's tip (that came to fruition seven weeks late), it is worth noting that the six cds found in the defendant's shaving kit were not examined at all on the day they were seized. *United States v. Roberts*, 274 F.3d 1007, 1010 (5th Cir. 2001).  The cds were sent to a forensic agent who examined them, resulting in the defendant's arrest some 11 months later. *Id.* at 1011.

In each of these cases the question becomes, would the initial several hours of detention pending a further forensic examination have been permissible, applying the logic and holding of this case?  If so (and perhaps more importantly), then would CBP and ICE Officers in the field, who would have to interpret and apply this holding, be able to comprehend and understand that they were acting within the scope of a permissible border search?  This is exactly the type of rigid framework that the Supreme Court rejected in the context of border searches. *See e.g., Flores-Montano*, 541 U.S. at 152 ("Complex balancing

---

[4]
It should be noted that the R and R states that Canadian officials found child pornography, but there is a distinction between that and IE history.  (R and R at 5.)

tests to determine what is a 'routine' search of a vehicle, as opposed to a more 'intrusive' search of a person, have no place in border searches of vehicles."); *Ickes*, 393 F.3d at 507 ("The essence of border search doctrine is a reliance on the trained observations and judgments of customs officials, rather than upon constitutional requirements applied to the inapposite context of this sort of search.").

In sum, these cases establish that searches of computers at the border or its functional equivalent are border searches and are not given any heightened protection pursuant to the First or Fourth Amendments. The R and R notes that *Ickes* found no First Amendment exception to border search doctrine, which *Arnold* found persuasive, but stops short of actually agreeing with the government and rejecting the defendant's argument that the search of his laptop is more intrusive and requires reasonable suspicion. (R and R at 6.) As the Fourth Circuit stated in rejecting the defendant's First Amendment exception argument to border searches, "We refuse to put these issues into play and thereby divert customs officials from their charge of policing our borders and protecting our country." *Ickes*, 393 F.3d at 506.

Reasonableness is the key component to be analyzed when considering limitations placed on border searches and the conduct of law enforcement authorities in effecting them. The Ninth Circuit has held that reasonableness in the context of border searches is "incapable of comprehensive definition or mechanical application. The scope of the intrusion, the manner of its conduct, and the justification for its initiation must all be considered in determining whether a search comports with reasonableness." *United States v. Duncan*, 693 F.2d 971, 978 (9th Cir. 1982), citing *United States v. Guadalupe-Garza*, 421 F.2d 876, 878 (9th Cir. 1970) (internal quotations omitted).

Unfortunately, the R and R never applies the "reasonableness" framework which is crucial when dealing with searches at the border or its functional equivalent. The R and R specifically noted that the ICE agents acted reasonably in conducting the search twice: (1) "It is true that the conduct of the officers was reasonable . . . " (R and R at 6); and (2) "We need not reach that question here, where the facts show reasonable diligence and speed in

conducting the forensic examination." (R and R at 8)  However, the issue is not expounded upon and no other clear findings are made in the R and R.

Instead of focusing on reasonableness, the R and R focused on time and distance and, in complete disregard of established precedent, attempted to fashion a hard and fast line as a limit to border search authority.  However, when analyzing border searches, distance is not important because prior to being cleared by Customs, the person or item has "not mingled in the normal stream of commerce so as to lessen the certainty that the contraband had come directly across the border."  *United States v. Smith*, 629 F.2d 1301, 1304 (9th Cir. 1980).

The R and R is also quite critical of ICE guidelines and policy.  (R and R at 10, 11, 13.)  The lack of deference afforded to DHS policy and field guidelines is contrary to established law.  *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 845 (1984); *See also Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944).  Here, the ICE policies referred to and complied with by the agents involved in this case was entitled to deference, not just because of their source and the vast experience of the agency, but also because of what they are based on: clearly defined statutes and regulations that illustrate the propriety of this border search.  The R and R should be rejected and the motion to suppress should be denied in all respects.

II.     THIS WAS NOT AN EXTENDED BORDER SEARCH.

The R and R made a specific finding that the distance from Lukeville to Tucson ("170 miles") was too far to permit a border search.  (R and R at 13.)  The R and R then went on to hold that by virtue of GS Brisbine taking the laptop from Lukeville and delivering it to Tucson, the border search had become an extended border search, thus requiring a showing of reasonable suspicion.  The R and R found reasonable suspicion to be lacking.  However, the R and R misapplies the notion of extended border search to the facts of this case.

The "extended border" doctrine allows border searches to be conducted before or after the border is actually crossed. See, e.g., *United States v. Caicedo-Guarnizo*, 723 F.2d 1420,

1422 (9th Cir.1984).  "Extended border" searches are thought to be more intrusive on an individual's legitimate expectation of privacy than searches at the actual border because, "unlike routine border searches, an extended border search may stigmatize the individual searched, is unexpected, and involves greater invasion of privacy . . . ." *Caminos*, 770 F.2d at 364, citing *United States v. Richards*, 638 F.2d 765, 772 n.4 (5th Cir. 1981).  Accordingly, such searches must be justified by "reasonable suspicion" that the subject of the search was involved in criminal activity.  *Cardona*, 769 F.2d at 628-29; *United States v. Alfonso*, 759 F.2d 728, 734 (9th Cir.1985).

"Extended border search" cases involve searches before or after items have crossed the border and can arise in a variety of ways.  Often the border search is purposely delayed in an effort to identify other persons involved in criminal activity.  *See United States v. Espericueta-Reyes*, 631 F.2d 616, 619-20 (9th Cir. 1980).  Sometimes, the item or person is allowed to enter the United States so they can be placed under surveillance in an effort to bolster suspicions that were marginal at the time of entry or are confirmed later in some other way.  *See United States v. Brom*, 542 F.2d 281 (5th Cir. 1976); *Jones v. United States*, 326 F.2d 124 (9th Cir. 1963).  Extended border searches have also been found where packages were searched that were being sent from a place within the United States to a place outside the United States well before the item is about to leave the country and far away from the border, although there appears to be conflict regarding that finding.  *United States v. Cardona*, 769 F.2d 625 (9th Cir. 1985); *See infra* at 20-21.

In this case, "extended border" search analysis does not apply because the laptop the defendant attempted to introduce into the United States was never cleared by DHS.  It never left their custody or control.  Thus, the cases cited in the R and R are all distinguished from the facts of this case.

In *Alfonso*, a ship was initially inspected by five Customs inspectors, allowed to enter United States waters and thereafter was placed under surveillance for the next thirty-six hours as it anchored off the coast.  *United States v. Alfonso*, 759 F.2d 728, 731-32 (9th Cir. 1985).

During the ensuing thirty-six hours of surveillance, law enforcement observed various individuals coming and going, including the following: one person identified with the boat donning scuba gear and swimming in the direction of the boat; two men leaving the ship carrying a box who were stopped in their vehicle a short while later, resulting in the seizure of forty pounds of cocaine; and two women leaving the ship with duffel bags who were stopped a short while later and seventeen pounds of cocaine was seized. *Id.* at 732. Due to the lapse of thirty-six hours between when the ship was first inspected and allowed to enter the United States, the Ninth Circuit held that the subsequent search had to be analyzed as an "extended border search." *Id.* at 734.

However, based on the observations of law enforcement during the thirty-six hours of near constant surveillance, observations which corroborated the original information from a confidential informant, the Court found there was reasonable suspicion to justify the search. *Id.* at 736. The Ninth Circuit noted that thirty-six hours was not dispositive and that the near constant surveillance made it reasonable to believe that the cocaine later seized was on board when the ship crossed the border. *Id.* Importantly, the Ninth Circuit stated (as cited in the R and R), "[e]xtended border searches occur **after the actual entry has been effected** and intrude more on an individual's normal expectation of privacy." *Id.* at 734; R and R at 7 (emphasis added).

However, this case is factually distinguished from *Alfonso*. In *Alfonso*, after five inspectors left the ship, it had cleared Customs and entered the country. The ship was allowed to remain docked at the Los Angeles Harbor and its occupants were allowed to leave the ship and travel around the mainland, thereby entering the stream of commerce away from the border. The ship was not detained, its occupants were not quarantined inside and its contents were not sealed. In this case, the laptop in question was not cleared by Customs, therefore, it was not allowed to enter the country. It was detained as part of a lawful border search, taken into ICE's custody that same day and so it remains.

The other "extended border search" cases cited in the R and R are also distinguished. *United States v. Whiting*, 781 F.2d 692, 696 (9th Cir. 1986) (search of packages at post office destined for Switzerland analyzed under extended border search despite the fact that post office in question was far removed from border and packages would have gone through two domestic post offices before leaving the country); *United States v. Bilir*, 592 F.2d 735, (**4**th Cir. 1979) (ship which was allowed to enter United States at Savannah, Jacksonville, Galveston, New Orleans, and Baltimore, and vehicle associated with occupants were under surveillance for most of the time both were traveling, extended border search analysis applied); *United States v. Sahanaja*, 430 F.3d 1049, 1054 (9th Cir. 2005) (search of package at post office which had been mailed to California from Canada nine days after its attempted delivery by postal carrier by ICE analyzed as extended border search); *United States v. Cardona*, 769 F.2d 625, 628-29 (9th Cir. 1985) (search of Federal Express package being mailed from California to Colombia 24 hours before the package was to leave the country and 3,000 miles away from the border it was to cross analyzed as an extended border search).

It is worth noting that the Ninth Circuit has distinguished the *Cardona* case recently on somewhat technical grounds, calling the continued vitality of *Cardona* into question.  In *United States v. Abbouchi*, 502 F.3d 850 (9th Cir. 2007), the Ninth Circuit upheld the search of a package mailed from California to Lebanon at a mailing hub in Louisville, Kentucky, as a search occurring at the functional equivalent of the border requiring no reasonable suspicion.  *Id.* at 855.  The Court declined to analyze the case as an "extended border search" (despite  the fact that the package might have been airlifted to another city in the United States before leaving the country) and distinguished the case from *Cardona* by noting that it was searched "at the last practicable opportunity for inspection."  *Id.* at 853, 855.  Finding Louisville to be the functional equivalent of the border, the Ninth Circuit stated, "Even if the airplanes briefly stop at another hub or airport to refuel or redistribute cargo before departing our country, it is **unreasonable** to require customs officials to wait until that last domestic stop to unload the packages from the airplane, reopen the sealed containers, and conduct an

inspection before allowing the airplane to proceed to its international destination. Certainly, the search at the Louisville hub represents no greater intrusion on Abbouchi's privacy interests than a search at the last possible moment before the package's departure from the United States." *Id.* at 856 (emphasis added); See also *United States v. Bareno-Burgos*, 739 F.Supp. 772, 779 (E.D.N.Y. 1990) (distinguishing *Cardona* and noting, "neither the Supreme Court nor the Second Circuit has focused on time and space in determining whether a search was conducted at the functional equivalent of the border or at an extension thereof. Indeed, the court in *Gaviria* suggested that what was more relevant to an extended border search than time and space was the fact that a person or some property has initially cleared Customs and entered the United States." *United States v. Gaviria* 805 F.2d at 1112.). *Cardona* also appears to conflict with out of Circuit precedent which it never distinguished. *United States v. Udofot*, 711 F.2d 831, 840 (8th Cir. 1983).

In this case, the item was properly detained at the border and the computers remained in DHS-ICE custody pending further examination consistent with statutory authority. While the laptop and camera were eventually cleared by ICE and returned to the Cottermans, the laptop in question was not as contraband was discovered and it was properly seized. This was a border search, not an extended border search, thus no reasonable suspicion to search was required.

Additionally, because the intrusion upon the Cottermans took place at the border, this is not a scenario where there is a greater expectation of privacy away from the border. Further, the search of the computer was done discretely, not in public and at a time when the defendant was not even present. Therefore, there was no danger of undue stigmatization or embarrassment. *See United States v. McAuley*, 563 F.Supp.2d 672, 678-79 (W.D. TX 2008).

III.     ALTERNATIVELY, REASONABLE SUSPICIONS SUPPORTED THE SEARCH.

Even assuming for the sake of argument that the Court finds that reasonable suspicion is required to justify the search, then the government submits that there was reasonable suspicion.

20

Determinations regarding reasonable suspicion are mixed questions of law and fact in which the Court must consider the facts available to the officer at the moment of the seizure. *Terry v. Ohio*, 392 U.S. 1, 21-22 (1968). Reasonable suspicion is less than probable cause. *United States v. Brignoni-Ponce*, 422 U.S. 873, 880 (1975). In determining whether reasonable suspicion exists, the totality of the circumstances, the "whole picture" must be considered. *United States v. Cortez*, 449 U.S. 411, 417 (1981). Further, when making the determination regarding reasonable suspicion, the Supreme Court has noted that it is a determination that must be made based upon objective consideration of the available facts and that the subjective beliefs of either the officer or the person who is the focus of the investigation are inconsequential. *Stansbury v. California*, 511 U.S. 318 (1994); *Berkemer v. McCarty*, 468 U.S. 420, 442, 104 S.Ct. 3138, 3151 (1984). Moreover, in making determinations regarding facts and circumstances leading up to reasonable suspicion, courts can also consider an officer's training and experience. *United States v. Arvizu*, 534 U.S. 266, 122 S.Ct. 744, 752 (2002).

Considerations regarding findings of reasonable suspicion are fact specific. Courts have found that when reasonable suspicion exists, it justifies further police action in a myriad of situations. *United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 1585 (1989) (defendants paid for airline tickets in cash, flew from Miami to Hawaii in July, spent less than 48 hours there, and may have been traveling under an alias, finding of reasonable suspicion upheld); *Haynie v. City of Los Angeles*, 339 F.3d 1071, 1075 (9th Cir. 2003) (citizen tip of Asian men getting into blue van with guns or squirt guns, reasonable suspicion found, stop justified to investigate further); *United States v. Summers*, 268 F.3d 683 (9th Cir. 2001) (10 p.m., defendant by trailer that was closed, seen carrying a box to his vehicle, defendant on foot when approached, reasonable suspicion found which justified request for identification and follow up questions); *United States v. Bautista*, 684 F.2d 1286 (9th Cir. 1982) (police report broadcasting robbery in area including general description of suspects and direction traveling in, reasonable suspicion found for police officers who approached

defendants in the area 15 minutes later based upon them generally matching description and questions surrounding their clothing).

In determining that the agents lacked reasonable suspicion, the R and R states that Pacific Intel had no information other than a 15 year old criminal conviction.  (R and R at 10.)  However, that statement omits record checks which disclosed much more information. The facts elicited at the hearing clearly established that the Pac FIU and further records checks indicated: (1) the conviction was for a child pornography related offense; (2) the defendant traveled abroad frequently; and (3) he was currently registered as a sex offender. In addition, the TECS record specifically noted that the defendant was suspected of engaging in sex tourism and instructed that all electronic and media equipment was to be searched. (RT 8/27/08 12.); *See United States v. Irving*, 452 F.3d 110, 114, 124 (2d Cir. 2006) (defendant searched upon return from Mexico based in part on 15 year old conviction for attempted sexual abuse of a minor).  Further, the Republic of Mexico is a country associated with "sex tourism." *See Id.; United States v. Julian*, 427 F.3d 471, 475 (7th Cir. 2005).

The R and R further discounts the existence of at least one password protected file on the laptop computer for three reasons: (1) the defendant offered to open the files at the port of entry in Lukeville; (2) SSA Riley had decided to take the computers away from Lukeville for analysis prior to leaving Sells; and (3) Maureen's laptop was also taken.  (R and R at 9-10.)

First, the defendant's offer to access the password protected files on Friday, April 6, 2007, was disingenuous.  At the outset, it should be noted that the defendant did not offer to open the files or give SSA Riley the passwords, he offered to "access the computer."  (RT 8/27/08 52.)  Second, as established at the hearing, on Monday, April 9, 2007, the defendant represented to GS Brisbine that he did not have the passwords to the files on that same computer, but was making arrangements to get them.  (RT 8/27/08 133-34.)  However, the offer was quite hollow since it is well settled that at that time, the defendant was making arrangements to flee the country. (RT 8/27/08 136.)  Given the defendant's conduct and what

we now know those files contain, graphic images of him sexually molesting a minor female, facts which were clearly known to the defendant at the time he made the offer, this clearly weighs in favor of SSA Riley's concerns that had the defendant been given the opportunity, he would have deleted files or tampered with the evidence.

Second, SSA Riley's subjective belief that the laptops were going to be detained for analysis prior to arriving in Lukeville are immaterial.  First of all, SSA Riley's subjective beliefs are irrelevant.  Second, as established at the hearing, SSA Riley knew before departing Sells for Lukeville that files on laptop were password protected.

It was also established at the hearing that password protected files require further inspection because the contents of such a file are unknown.  (RT 8/27/08 96-97.)  Password protected files are an indication of the presence of information someone wants to keep secret which may contain contraband.  (RT 8/27/08 96-97.)  Together with all of the other facts and circumstances, there was reasonable suspicion.

The R and R also considers the TECS hit and password protection individually, then discounts them.  (R and R at 9, 13-14.)  However, reasonable suspicion determinations are based on the totality of the circumstances.  Further, deference should have been paid to the trained observations of the ICE agents and CBP officers.  Taken collectively, the defendant's prior conviction for sexual offenses involving children and child pornography, his current status as a registered sex offender, his frequent travel abroad, the fact that he was returning from Mexico (a country associated with sex tourism), the TECS hit (along with its suspicion and instruction), the number of items capable of storing images and/or movies (2 laptops, 2 digital cameras, a video camera), and the presence of at least one password protected file established a reasonable suspicion to justify the search.  *McAuley*, 563 F.Supp.2d at 678 n.7 (district court found reasonable suspicion was not required, but noted that had it been, it was likely established by record check, which showed that the defendant was the subject of an investigation for suspected criminal acts involving child pornography in New York); *United States v. Bunty*, 2008 WL 2371211 at *3 (E.D.PA 2008) (no reasonable suspicion required,

but if it had been, it was present premised on: records check which showed a prior conviction for corrupting the morals of a minor, possession of two laptops, a digital camera and a cell phone, letter allowing travel to England from probation officer, and defendant's extensive international travel).   Therefore, the facts of this case clearly establish that there was reasonable suspicion.  The R and R should be rejected and the motion to suppress denied in all respects.

IV.      MRS. COTTERMAN'S LAPTOP AND PHOTOCOPIES OF PAPERWORK.

The R and R reaches beyond the relief requested to recommend the return of property for which this defendant lacks standing.  It noted that SSA/CFA Owen "suggested some vague, speculative ways in which the hard drive could possibly, but apparently not actually, contain probative information."  (R and R at 11.)  Actually, SSA/CFA Owen testified that Maureen Cotterman's laptop computer could contain information relevant at trial in the form of e-mail correspondence and metadata that ties the digital cameras and video used by the defendant to create visual depictions of the sexual abuse of a minor to the defendant on certain dates and in certain locations.  (RT 76-77.)

These are not "vague" and they are only "speculative" in that there is no way to predict with absolute certainty how this case will resolve.  While the defendant's attorney indicated previously that there will be no trial, that is not binding on the defendant should he exercise his Constitutional right to one.   In fact, there is no guarantee that this defense attorney will be the defense attorney through the resolution of this matter.  If the evidence is not suppressed and the matter does proceed to trial, there are a myriad of ways that the information contained in Maureen Cotterman's laptop computer could become relevant. The same holds true for the limited paperwork photocopied at the border.  This is the point missing from the analysis of this issue in the R and R when it states that "seventeen months" is long enough to determine if there is probative information on her laptop.  (R and R at 11.) Time prior to trial is not dispositive; the government may only know whether this information will become probative after the matter is resolved.

24

In addition, the R and R grants relief that was not requested by this defendant. Moreover, this defendant has no standing to request this relief.  The other problem with returning the image of the hard drive from Maureen Cotterman's laptop is that the image itself is on a government hard drive and, more than likely, completely useless to her.  Lastly, the paperwork was generally referred to as "personal documentation," to include business receipts, not private paperwork for which there is a clear and established expectation of privacy.  Rather than returning a government hard drive and identification documents, the government proposes the following: that the image contained on the hard drive and the photocopies of the paperwork be sealed and maintained by the Court or by ICE.  The items will only be unsealed pursuant to Court order upon application and showing by the government that the items have been made relevant.  As a precaution, the government has already instructed ICE to do exactly that and it is the understanding of the attorney undersigned that the task has already been accomplished.

/

//

///

CONCLUSION

Based on the foregoing, given the number of facts found in the R and R which are clearly not supported by the record, the improper analysis which transformed a border search into an extended border search, and the granting of relief not requested concerning items which this defendant lacks standing to contest, the District Court should reject the R and R altogether and issue an Order denying the motion to suppress in all respects.

RESPECTFULLY SUBMITTED this $\underline{26^{th}}$ day of September, 2008.


DIANE J. HUMETEWA
United States Attorney
District of Arizona


/s/ *Judson T. Mihok*

JUDSON T. MIHOK
Assistant U.S. Attorney

Copy of the foregoing served electronically
or by other means this 26th day of September, 2008, to:

Alfred Donau, Esq.