IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States, Plaintiff v. Howard Wesley Cotterman, Defendant | Case No. CR 07-01207-TUC-RCC Motion for Equitable Relief and for Reconsideration of Compassionate Release |

FILED ___ LODGED
RECEIVED ___ COPY
DEC 23 2020
CLERK U.S. DISTRICT COURT
DISTRICT OF ARIZONA
BY ___ DEPUTY

## I. Introduction

I, Howard Wesley Cotterman 30367-208, am currently incarcerated at FCI-Sheridan; P.O. Box 5000; Sheridan, OR 97378. My handwritten Motion for Compassionate Release (Doc. 178) was filed pro se with this Court on June 18, 2020 followed by a transcription (Doc. 179). The public defender office filed a Supplemental Motion for Compassionate Release on September 11, 2020 (Doc 191). Subsequently, several substantive factual disputes, errors, omissions, and newly discovered or previously unavailable evidence have come to light. No longer represented by the public defender, this pro se Motion asks this Court for a professional psychological evaluation, an evidentiary hearing to establish the truth, and based on those outcomes, to reconsider the compassionate release motions in pursuit of 18 U.S.C. Sec. 3582 relief.

The most significant errors and previously unavailable or newly discovered evidence are presented by the declarations below. It's duly noted here that I am 80 years old (Doc 205; 1.25); and that there is no ED CA conviction of which I'm aware (Doc 205 3,24). Particularly noteworthy in support of the release plan, is the visit to our Truckee, CA home on Sept 30, 2020 by ND CA Probation officer Matt Faubert who interviewed my wife and son. Mr. Faubert, upon receiving assurances by my wife, Maureen, and my son, Greg, that they would diligently support all conditions and aspects of supervised release, including professional therapy, approved the residence and situation.

## II. Lingering Uncertainties; the whole truth

There is no uncertainty about what I did that led to much distress. The record is clear: I never denied taking the photos while she slept. I offered no excuses, nor are there any. The reasons for my behavior, remaining unresolved,

continue to be subject to speculation and various personal beliefs. That the underlying basis and discriminations remain unresolved have added to the distresses for which I'm ultimately responsible. I openly apologized to my granddaughter and expressed my ongoing remorse to all those I hurt in other ways, as well. Again, I say I'm terribly sorry to her and to all the family members hurt by my selfish behavior. My wife, daughter-in-law, and sons were — and still are — impacted. As emphasized here and elsewhere, my daughter-in-law took on a heavy burden of guilt being led to believe that she had subjected her daughter to a predator. Of course, none of this would have happened had I behaved properly. Nonetheless, the reasons matter to all the victims. They deserve to know the whole truth and that I would never knowingly hurt anyone, especially family.

III. The "Minimizing" Conundrum

As public defender, Leo Costales, notes in his Reply Brief (Doc 209, 8.17), I faced an unresolvable conundrum as I fully acknowledged my actions but had to stop short of accepting culpability for statutory elements with jury trial and plea reliefs pending. Character assassination complicated the situation. The Catch-22 is that, as errors and misinformation continue to compound and prevail, some of which are substantial, greater punishments result or reliefs are denied. Conversely, if I pursue correction of missing, untrue, or misleading information, I'm accused of minimizing my misbehavior, thereby exacerbating my situation. The following matters related to my history and potential danger exemplify this conundrum.

My daughter-in-law's burden of guilt is noted above. It's true that I'm to blame. It's also true that she and my son, the victim's parents, were fully aware of the details of my 1992 case and the outcomes, that the court found the episode not to be sexually motivated; that I am not a predator. Yet the government persists in recharacterizing the 1991 event and raising the specter of guilt noted above. I acknowledged my role in the distress by providing a substantial sum in an out-of-court settlement despite my granddaughter's psychiatrist's

refusal to testify on her behalf, finding that her problems were due mainly to her dysfunctional family environment well before my involvement and not due to me.

The nature of the 1992 case was resolved by the court after extensive investigation and professional analyses. Nevertheless, the prosecution here has created the appearance of a pattern by connecting two very different isolated events some 15 years apart, and furthermore by depending on an erroneous version of the 1991 event, itself. That revision of settled history grew out of an uncorrected 1992 PSR. (Footnote 1). I'm compelled to reference the far reach of the error here yet fearful that doing so can appear to minimize my actions in both cases.

I have recently learned that my granddaughter expressed her belief to the prosecutor that I was not a danger to her or the community. In that prosecutor's phone call, my granddaughter apparently also expressed that I should serve my time remaining. She did so, however, having been misinformed that I had about 7 years left, and that under compassionate release I would be entirely free (Doc 197, 6.08 and 25.18). She did not know, nor was she informed, for example, that even if released from prison, I would be subjected to stringent restrictions and close government supervision. That my granddaughter doesn't consider me a danger to her or the community, and that the prosecutor suppressed exculpatory details, presents this Court with a different kind of danger.

IV. Medically Diagnosed Conditions; Speculation

Throughout its Response, the government discounts or outright rejects conditions or disorders that have not been medically diagnosed, claiming "pure speculation" (Doc 197; 14.27, 15.08, 15.12, 15.13). The "government submits that only medically diagnosed and established conditions should be considered" (Doc 197; 15.28, n.2). In fact, the government depends entirely on conclusory statements and speculation, presenting no diagnosis to support its claims of my potential danger. Actual expert diagnoses have found no such danger.

And when the prosecutor suggested that notion to my granddaughter, she rejected it. In the absence of confirmation or professional diagnosis, the speculation of sexual motivation is apparently based on personal beliefs. It would appear that there's a pattern of misguided speculation and misinformation. In fact, three separate examinations were consistent: "not motivated by perversity," "no violent tendencies," but rather that I was "monofocused" and "failed to see implications." (Footnote 2.) Referring to testimony and the expert reports, the court concluded that I was not a pedophile and that the acts were not sexually motivated, emphasizing that I was amenable to treatment for lack of self-awareness, for a misguided belief in a "right to know," and difficulty in respecting society's boundaries," manifested as chronic curiosity. I admit to invasive curiosity and related disorders as supported by medical diagnoses, albeit performed in 1992. There, the facts were all made clear by caretaker testimony and the police investigation. My rehabilitation therapy has been guided largely by the medically diagnosed and established conditions as demanded by the government (Doc 197, page 15 and n.2). I have benefitted greatly from prison psychologist, Dr. Hinman's, therapy programs and received her commendation (Doc 200, Exhibit A). I gained valuable insights from the separate prison-wide therapy groups that I joined, especially the challenges of constructive confrontation (Footnote 3).

    Nevertheless, as the government correctly points out, I have not been psychologically evaluated by the Bureau of Prisons (Doc 197, 23, 27). I did, however, starting in May 2008, repeatedly request a further psychological evaluation. I'm making that request again in this Motion.

V. Conclusion; Requested Relief

    I'm asking this Court to address the disputes that, if resolved in my favor, could potentially shift the 28 U.S.C. Sec. 3582

Compassionate Release balance. I'm pleading for this Court to:

- provide for a professional psychological evaluation or to request the BOP to conduct its evaluation;
- conduct an evidentiary hearing to resolve the disputed facts;

and based on the outcomes, and the new discoveries above, to reconsider my compassionate release motions, incorporated by reference here.

To quote from the public defender, Leo Costales's Supplemental Motion Conclusion, "Compassion is an altruistic principle, based on who we are as a society and what role the courts have in reaching that normative goal. It's divorced in many ways, from the ideas of retribution, condemnation, or worthiness. So too, is the focus within 18 U.S.C. Sec 3582(c)."

FOOTNOTES

1. I had photographed a boy, reportedly abused, and a girl, to document apparent abuse. According to subsequent courtroom testimony by the caregiver, the girl had been examined by a doctor for a urinary-tract infection an hour before I interviewed her and photographed her purported "injury." It turns out that the PSR writer took it upon herself to conduct a phone interview of the seven-year-old girl a year after the incident. Inexplicably, the PO conflated the doctor's exam with my interview where I supposedly wore a white coat and a stethoscope. This brought in the "touching," a story that was further embellished and propagated into the current PSR even though I asked for a thorough vetting and correction. My Sept 29, 2016 affidavit notes these critical discrepancies. The stipulation I proffered on May 23, 2019, ignored by both party's attorneys, also states the facts that are supported by court records.

2. The three thorough medical diagnoses were conducted independently in 1992 by mental health experts and authorities, including Dr. Charles Casella, M.D., psychiatrist appointed by the trial court. Dr. Casella found that I was not a pedophile nor sexually motivated. Psychologist Lynne Woodward, after some 16 weeks of intensive analysis and therapy, concluded that I was not a danger as did psychologist, Dr. Paul Berg, Ph.D. The three separate examinations found that my behavior was not sexually motivated.

3. Throughout my years at FCI-Sheridan, I have participated fully in the Mental Health Unit's therapy program and mentored others, as well. I sought out, and joined, a separate prison-wide inmate therapy group where I actively contributed and led some sessions and series such as "Self-control" and "Rational Thinking," "Judgment under Uncertainty" (Daniel Kahneman), and "The Believing Brain" (Michael Shermer).

Respectfully submitted, December 16, 2020

Howard Cotterman

December 16, 2020

TO: Clerk of the U.S. District Court
Evo A. DeConcini U.S. District Courthouse
405 West Congress Street; Suite 1500
Tucson, AZ 85701

FROM: Howard Cotterman 30367-208
PCI-Sheridan
P.O. Box 5000
Sheridan, OR 97378

SUBJECT: Case No. CR 07-01207-TUC-RCC
Motion for Equitable Relief and
Reconsideration of Compassionate Release

Please file as pro se, the enclosed Motion for Equitable Relief and Reconsideration of Compassionate Release.

Respectfully submitted: December 16, 2020
Howard Cotterman

CERTIFICATE OF SERVICE

I, Howard Wesley Cotterman, certify that on or before December 16, 2020, I mailed this letter and Motion for Equitable Relief and Reconsideration of Compassionate Release by placement in the Institution's Legal Mail, in a properly-addressed envelope with first class postage duly paid and affixed to the envelope. I declare under penalty of perjury that this certification is true and correct.

Howard Cotterman
Howard Wesley Cotterman, certifier